ORIGINAL

FILED
AUG 14 2006
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNIONBANCAL CORPORATION & SUBSIDIARIES, Plaintiff, | ) | No. 06-587 T |
| v. | ) | |
| THE UNITED STATES, Defendant. | ) | |

## COMPLAINT

Plaintiff, UnionBanCal Corporation & Subsidiaries, brings this action for a refund of Federal taxes paid in connection with the Internal Revenue Service's proposed adjustments to its Federal tax returns for the taxable years ending December 31, 1998, December 31, 1999, December 31, 2000, December 31, 2001, and December 31, 2002. The adjustments are related to Plaintiff's investments in a hydroelectric facility in Switzerland and a sports and entertainment facility in the United States.

In support of its refund claim, Plaintiff alleges as follows:

### JURISDICTION AND SUMMARY OF ACTION

1. Plaintiff, UnionBanCal Corporation & Subsidiaries ("UBOC") brings this refund action, founded upon the Internal Revenue Code of 1986, for the recovery of Federal income taxes paid by Plaintiff for the taxable years ended December 31, 1998 ("the 1998 taxable year"), December 31, 1999 ("the 1999 taxable year"), December 31, 2000 ("the 2000 taxable year"), December 31, 2001 ("the 2001 taxable year"), and December 31, 2002 ("the 2002 taxable year").

2. Defendant is the United States of America.

3. This Court has jurisdiction by reason of 28 U.S.C. §§ 1346(a)(1) and 1491(a)(1) and 26 U.S.C. § 7422.

4. UBOC filed timely Federal consolidated income tax returns with the Internal Revenue Service ("IRS") for the following years and timely paid income tax in the following amounts:

| Taxable Year | Tax Paid |
|---|---|
| 1998 | $206,412,552 |
| 1999 | $204,979,025 |
| 2000 | $212,611,695 |
| 2001 | $152,941,090 |
| 2002 | $173,239,182 |

5. UBOC's name, address, and identification number appearing on the 1998, 1999, 2000, 2001, and 2002 tax returns are: UnionBanCal Corporation & Subsidiaries; 400 California Street, 13th Floor, San Francisco, CA 94104; and 94-1234979, respectively.

6. During the 1998 taxable year, UBOC, through its subsidiary, Bankers Commercial Corporation ("BCC"), made an investment in a hydroelectric facility in Switzerland owned by Misoxer Kraftwerke AG ("Misoxer"). This transaction is hereinafter referred to as the "Misoxer Investment."

7. During the 1999 taxable year, UBOC, through its subsidiary, BCC, made an investment in a sports and entertainment facility in Anaheim, California. The facility is generally known as the Arrowhead Pond of Anaheim (the "Pond") and is owned by the City of Anaheim, California ("Anaheim"). This transaction is hereinafter referred to as the "Pond Investment."

8. On its 1998 through 2002 tax returns, UBOC reported rental income with respect to the Misoxer Investment and deducted rental expense, amortization of transaction expenses, and interest expense relating to the property and indebtedness incurred in this Investment.

9. On its 1999 through 2002 tax returns, UBOC reported rental income with respect to the Pond Investment and deducted rental expense, amortization of transaction expenses, and interest expense relating to the property and indebtedness incurred in this Investment.

10. The IRS, during a routine audit of UBOC's tax returns for the 1998 through 2002 taxable years, disputed UBOC's tax treatment of the Misoxer and Pond Investments.

11. On or about May 7, 2003, the IRS issued Notices of Proposed Adjustments to UBOC, proposing additional Federal income for the 1998 through 2000 taxable years with respect to the Misoxer and Pond Investments in the following amounts:

| Taxable Year | Proposed Adjustments |
|---|---|
| 1998 | $9,434,080 |
| 1999 | $63,166,481 |
| 2000 | $65,661,544 |

12. On or about July 30, 2004, the IRS issued Notices of Proposed Adjustments to UBOC, proposing additional Federal income for the 2001 and 2002 taxable years with respect to the Misoxer and Pond Investments in the following amounts:

| Taxable Year | Proposed Adjustments |
|---|---|
| 2001 | $65,556,477 |
| 2002 | $55,743,866 |

13. On November 3, 2005, the IRS issued Audit Statements for 1998 through 2002 setting forth proposed deficiencies in Federal income tax for each year. The deficiencies were

attributable to the proposed additional income with respect to the Misoxer and Pond investments as well as to a number of other adjustments to UBOC's tax returns which are not the subject of this action for refund. The proposed deficiencies attributable to the Misoxer and Pond investments and to the other adjustments are as follows:

| | Proposed Deficiency: Misoxer and Pond Investments | Proposed Deficiency (Overpayment): Other Adjustments | Net Proposed Deficiency |
|---|---|---|---|
| 1998 | $3,301,928 | $(334,770) | $2,967,158 |
| 1999 | $22,108,268 | $(2,907,949) | $19,200,319 |
| 2000 | $22,981,540 | $(188,343) | $22,793,179 |
| 2001 | $22,944,767 | $1,484,130 | $24,428,897 |
| 2002 | $19,510,353 | $(8,378,643) | $11,131,710 |

14. In two installments on or about July 2, 2003, and December 5, 2005, UBOC paid the 1998 through 2002 proposed tax deficiencies to the IRS with respect to the Misoxer and Pond Investments in the following amounts:

| Taxable Year | Proposed Deficiency |
|---|---|
| 1998 | $2,967,158 |
| 1999 | $19,200,319 |
| 2000 | $22,793,179 |
| 2001 | $24,428,897 |
| 2002 | $11,131,710 |

15. On or about January 4, 2006, UBOC filed a Form 1120X (Amended U.S. Corporation Income Tax Return) with the IRS requesting a refund of erroneously paid Federal income taxes for the 1998 through 2002 taxable years in the following amounts:

| Taxable Year | Refund Requested |
|---|---|
| 1998 | $3,301,928 |
| 1999 | $22,108,268 |
| 2000 | $22,981,540 |
| 2001 | $22,944,767 |
| 2002 | $19,510,353 |

16. The requested refunds are attributable to UBOC's payment of the proposed tax deficiencies with respect to the Misoxer and Pond investments as described in paragraph 13 above. A true and complete copy of these claims for refunds is attached as Exhibit A.

17. UBOC requests a refund of the overpayments of Federal tax for the 1998 through 2002 taxable years as stated in paragraph 15, plus interest and allowable costs.

18. No action on the claims for refunds attached as Exhibit A has been taken by Congress or any agency of the United States or in any judicial proceeding, including any in the Tax Court of the United States.

19. UBOC has timely filed this Complaint for a refund of Federal taxes paid following the expiration of six months from the date of filing its refund claim, on January 4, 2006, as required under 26 U.S.C. § 7422(a).

20. UBOC is the sole owner of the claims included in Exhibit A and asserted herein, and has made no assignment thereof.

## FACTUAL BACKGROUND

### A. UBOC's Business

21. UBOC is based in San Francisco, Calfornia and is a bank holding company. Its primary subsidiary is Union Bank of California, N.A., currently one of the 25 largest commercial banks in the country. UBOC is 62% owned by the Bank of Tokyo-Mitsubishi UFJ, Ltd. and its stock has been listed on the New York Stock Exchange since July 1999 under the symbol "UB."

22. UBOC offers a wide array of banking and financial services to a broad spectrum of domestic and international customers. It operates a leasing business as part of the array of services it provides to its customers.

23. While national banks are prohibited from engaging in many commercial activities, Federal law specifically authorizes national banks to engage in the leasing business. *See* 12 U.S.C. § 24; 12 C.F.R. § 225.28(b)(3). UBOC is one of many financial institutions actively engaged in the leasing business.

### B. BCC's Leasing Business

24. UBOC carries on its leasing business through BCC, which was organized in 1969. BCC engages in the leasing business in order to earn a profit. BCC's leasing business is complementary to UBOC's banking business because both involve areas of expertise such as credit analysis, industry knowledge, and collateral values. The leasing business also provides portfolio diversification for UBOC's business.

25. BCC entered into the Misoxer and Pond Investments for the principal purpose of earning a profit. While BCC expected that each Investment would produce a significant profit for BCC's leasing business, each Investment also included features which, in BCC's view, presented additional value for its leasing business.

26. Prior to 1997, UBOC had developed an expertise in the financing of utilities and power plants, including hydro-electric facilities. As part of a reorganization of its business in 1997, BCC decided to take advantage of UBOC's expertise and favorable track record in the financing of power generation facilities and related equipment by developing BCC's leasing business in this area. The Misoxer Investment was BCC's first leasing investment in a utility or power plant. BCC's expansion into this area has been profitable and successful.

27. BCC made an investment in the Anaheim Pond because the facility is a state-of-the-art sports and entertainment venue located in UBOC's geographic area In addition, BCC expected that the Pond Investment would assist in developing BCC's relationships with Anaheim and Ogden Corporation ("Ogden") (the parent corporation of the manager of the Pond), a provider of energy, recycling, entertainment, and aviation services. BCC sought to improve its relationship with Ogden because Ogden's recycling and energy businesses represented a close fit with BCC's plans to expand its interests in power generation and distribution.

**C. The Misoxer Investment**

28. As part of its plan to expand into the leasing of power generation facilities and related equipment, one of the leasing opportunities identified by BCC was a leasehold interest in hydroelectric facilities owned by Misoxer and located in the Canton of Grison, Switzerland. Misoxer is controlled by Elektrizitats-Gesellschaft Laufenburg AG ("EGL"). Misoxer was established on June 7, 1957 to exploit the water from the Moesa and Calancatal rivers for the production of hydroelectricity. Specifically, Misoxer owned hydroelectric generating facilities including three power generation stations located in the Canton of Grisons, Switzerland: Kraftwerk Isola-Spina, Kraftwerk Valbella-Spina, and Kraftwerk Spina-Soazza (the "Facilities"). The Facilities were conceived as a single hydraulically integrated system.

29. BCC decided to invest in the Facilities together with BTM Funding Corporation ("BTM") and Manufacturers Life Insurance Company (U.S.A.) ("MLIC"). Each made a capital contribution to a trust which is treated as a partnership for Federal tax purposes.

30. Before making the decision to proceed with the Misoxer Investment, BCC investigated and considered many factors, including (i) Misoxer's business and creditworthiness, (ii) conditions in the energy markets for Switzerland and Europe, (iii) the political, legal, and economic climate of Switzerland; (iv) the economic return and accounting income of the Misoxer Investment; (v) the quality of the Facilities; and (vi) the terms of the transaction. BCC also considered the potential risks and benefits associated with its residual value interest in the Facilities. In the leasing context, residual value refers to the remaining useful life and value of an asset at the end of the lease of that asset.

31. BCC retained a number of consultants to assist in its review of the Misoxer Investment.

32. On behalf of BCC, BTM, and MLIC, Duke Engineering & Services ("Duke Engineering") performed a comprehensive engineering assessment of the Facilities. Duke Engineering made a site visit to the Facilities, interviewed the Facilities' personnel, and reviewed the Facilities' documents. This was followed by Duke Engineering's analysis of the Misoxer data, including an estimation of remaining useful life, maintenance capital costs, replacement costs, and rating these Facilities in comparison to other hydroelectric plants in the United States and Switzerland.

33. Duke Engineering found the Facilities to be in "excellent condition and to be well managed, operated and maintained." Duke Engineering rated the Facilities "Above Average" based on its nine-point evaluation criteria.

34. Duke Engineering also assessed the remaining useful life of the Facilities. Water supply structures and generating equipment are critical components that determine the useful life of a hydroelectric power station. The useful life of a hydroelectric power station can be extended to 100 years with good operation, maintenance, and capital expenditure improvements. Duke Engineering concluded the Facilities had a total useful life of potentially 100 years and with about 40 years of life already expended, the Facilities had approximately 60 years of useful life remaining at the time of Duke Engineering's assessment.

35. On behalf of BCC, BTM, and MLIC, BABU Gmhb, Buro fur Altasten Boden und Umwelt bv ("BABU") conducted an environmental assessment of the Facilities. BABU performed on-site inspections, interviewed the Facilities' personnel, and reviewed applicable environmental laws and regulations in conducting its review.

36. BABU concluded that the Facilities' environmental systems were in good condition and very well maintained, and that there was no evidence of potential contamination in the future.

37. On behalf of BCC, BTM, and MLIC, Deloitte & Touche LLP ("Deloitte & Touche") performed a comprehensive valuation assessment of the Facilities. Deloitte & Touche performed a physical inspection of the Facilities and interviewed plant management personnel regarding documentation provided by the Facilities. Deloitte & Touche also interviewed management face-to-face to obtain and analyze data regarding the Facilities' historical, current, and contemplated business activities.

38. To arrive at a fair market value for the Facilities, Deloitte & Touche analyzed the Facilities' financial statements, construction costs, projected operating costs and other expenses, comparable market transactions, and comparable publicly listed companies. Deloitte & Touche

then studied the Facilities' useful life data to determine their useful life, remaining useful life, and residual value. Deloitte & Touche also reviewed the electricity market in Switzerland. Finally, Deloitte & Touche assessed the different options available to Misoxer and BCC under the proposed Investment.

39. Deloitte & Touche determined that, as of September 11, 1998, the closing date for the Misoxer Investment, the Facilities had a remaining useful life of at least 60 years.

40. In addition to the work performed by these consultants, BCC personnel inspected the Facilities and discussed their operations with Misoxer personnel.

41. Based on its extensive review of the proposed Misoxer Investment, the UBOC credit committee approved the Misoxer Investment on July 20, 1998. In approving the Investment, the benefits of the transaction were identified as follows:

(a) Attractive and consistent investment economics consistent with the objectives of BCC's leasing business

(b) The quality of the asset and its fit with BCC's leasing activity focus and UBOC's experience in the power generation and distribution markets

(c) Front-loaded earnings under FASB accounting rules

(d) Relatively low risk

(e) Tax benefits of leasing

42. BCC expects a pre-tax economic profit of at least $33,093,279 from the Misoxer Investment. This pre-tax profit would provide a pre-tax yield on the Misoxer Investment for accounting and financial purposes of approximately 21.6%.

43. BCC, together with BTM and MLIC, formed a trust (which is treated as a partnership for Federal tax purposes) to enter into the various leases and other agreements that were involved in the Misoxer Investment. The role of the trust does not affect the tax treatment

of the Misoxer Investment. Thus, for simplicity, this Complaint describes the Misoxer Investment as if BCC had invested directly in the Facilities.

44. On September 11, 1998 (the "Closing Date"), BCC and Misoxer entered into a lease and sublease of the Facilities, whereby BCC leased a 40.5% undivided interest in the Facilities from Misoxer until September 11, 2046, or approximately 48 years, ("Misoxer Headlease"), and then subleased its interest in the Facilities back to Misoxer for approximately 19.31 years ("Misoxer Sublease").

45. Under the Misoxer Headlease, BCC, as lessee, is obligated to make two lump-sum payments of rent to Misoxer. The first payment was due on the Closing Date, September 11, 1998, and the second payment is due September 11, 2051, on the fifth anniversary of the last day of the Misoxer Headlease.

46. BCC funded its portion of the initial payment of rent due under the Misoxer Headlease by investing $37,375,000 of its own cash and by borrowing $71,244,768.75 from Hollandsche Bank-Unie N.V. ("Hollandsche") and $7,916,085.42 from Landeskreditbank Baden-Württemberg ("Landeskreditbank"). BCC also paid $1,625,000 in transaction costs in connection with entering into the Misoxer Investment.

47. At the end of the Misoxer Headlease in 2046, the Facilities will have a remaining useful life of at least 12 years. This is 20% of the 60-year useful life of the Facilities as of September 11, 1998, as determined by Deloitte & Touche. Tax law has long recognized that if an asset has a residual life at the end of the lease of 20% of the asset's original useful life, then the lease qualifies as a "true lease" for Federal income tax purposes.

48. Deloitte & Touche also determined that at the end of the Misoxer Headlease, the Facilities will have a remaining residual value of about 40% of the fair market value of the

Facilities as of September 11, 1998. Tax law has long recognized that if an asset has a residual value at the end of the lease of 20% of the asset's original cost, then the lease qualifies as a "true lease" for Federal income tax purposes.

49. The Misoxer Sublease set out the terms under which BCC leased its interest in the Facilities to Misoxer. Under the Misoxer Sublease, the events of default by Misoxer include, but are not limited to:

(a) Failure to pay rent;

(b) Any material inaccuracy in representations made by Misoxer;

(c) Failure to maintain or modify the Facilities in accordance with the lessees' own maintenance standards, governing law, and insurance covenants;

(d) Failure to comply with return covenants, including:

i) Maintenance requirements;

ii) Commercial performance and facility condition requirements; and

iii) Verification of the Facilities' condition by an independent engineer;

(e) An assignment of Misoxer's rights under the Misoxer Headlease;

(f) Failure to comply with covenants regarding insurance of the Facilities and liability risks;

(g) Failure to prevent or remove liens on the Facilities;

(h) Failure to comply with covenants regarding transfers of interest or maintenance of security interests in the Facilities;

(i) A bankruptcy declaration under governing law; and

(j) Any merger of Misoxer or EGL unless certain conditions are satisfied.

50. BCC's remedies upon a default include, but are not limited to, causing Misoxer to return BCC's interest in the Facilities.

51. At the end of the 19.31-year Misoxer Sublease term from BCC, Misoxer has the option to purchase BCC's remaining Misoxer Headlease interest in the Facilities at a fixed price. Deloitte & Touche determined that the price of Misoxer's purchase option will exceed the fair market value of the 28.69-year interest it would obtain, and thus, Misoxer is not likely to exercise that option.

52. If Misoxer does not exercise its purchase option, then BCC has the opportunity to earn additional income by exercising one of the following options: (i) requiring Misoxer to enter into an Operations and Maintenance Agreement pursuant to which Misoxer would operate the Facilities and BCC would sell the produced electricity, (ii) requiring Misoxer to arrange for Power Purchase Agreements with unrelated parties pursuant to which Misoxer would operate the Facilities and arrange, on BCC's behalf, for sales of the power to one or more power purchasers, (iii) exercising a Renewal Option under which BCC would renew its Sublease with Misoxer for a term of 17.01 years for rents that are below the expected fair market value rent for the Facilities, or (iv) reclaiming possession of the Facilities and operating or leasing them as it sees fit.

53. Deloitte & Touche determined that the fixed price of the rental payments due from Misoxer under BCC's Renewal Option will be below the fair market rental value for a lease of a similar facility during the 17.01-year renewal term, and therefore, BCC is not likely to exercise its Renewal Option.

54. If Misoxer does not exercise its purchase option and BCC does not exercise its Renewal Option, which Deloitte & Touche has indicated is the most likely outcome, then BCC will have possession of its interest in the Facilities for the 28.69 years remaining under the

Misoxer Headlease, which is 59.78% of its 48-year term. If BCC exercises its Renewal Option, then at the end of the Renewal Option, BCC will have possession of its interest in the Facilities for the 11.68 years remaining under the Misoxer Headlease, which is 24.33% of its 48-year term. In either case, BCC will have a residual interest in the Facilities that is greater than 20% of the Misoxer Headlease term. The value of BCC's residual interest in the Facilities is also expected to be significantly higher than 20%.

55. At the end of either (i) the Misoxer Sublease in 2018 or (ii) the Renewal Option term in 2035, as applicable, Misoxer is obligated to return to BCC its undivided interest in the Facilities in their original condition, ordinary wear and tear excepted, and the Facilities must pass certain specified redelivery acceptance tests.

56. In entering into the Misoxer Investment, BCC assumed a significant amount of risk, including the risk that Misoxer would not be able to make or would refuse to make its required rent payments, the risk that Misoxer would go bankrupt, and the risk that the leased equipment would be damaged or otherwise suffer an unanticipated diminution in value.

57. As lessor under the Misoxer Headlease, Misoxer assumed the risk that BCC would be unable to make the second lump-sum rent payment due under the terms of the Misoxer Headlease.

58. Hollandsche and Landeskreditbank, BCC's lenders, assumed the risk that BCC would be unable to make the required loan payments.

59. As is typical in conservatively structured transactions, the Misoxer Investment included a number of features that were designed to reduce the financial risks assumed by the parties. These features included collateral deposits, pledges of collateral, and an early buy-out

option. However, these features did not and could not insulate BCC or the other parties from all risks presented by the Misoxer Investment.

**D. The Pond Investment**

60. BCC invested in the Pond because it promised to be a profitable investment in a high-quality asset located in UBOC's and BCC's geographic market. The Pond is a sports and entertainment facility which is the home of the Mighty Ducks, a National Hockey League franchise. It is also used for basketball, boxing, rodeos, concerts, and other events. The Pond includes 82 luxury suites and premium "club level" seating with waiter/waitress service, as well as a restaurant and gift shops. The Pond is located close to Disneyland, Anaheim Stadium, a convention center, hotels, and five major freeways.

61. At the time BCC invested in the Pond, the Pond was managed by Ogden Facility Management Corporation of Anaheim (the "Manager"), a subsidiary of Ogden.

62. Before making a decision to proceed with the Pond Investment, BBC investigated and considered many factors, including: (i) the economic return and accounting income of the Pond Investment; (ii) the quality of the Pond facility; (iii) the financial history of the Pond's operations, (iv) the credit of Anaheim, Ogden, and the Manager; (v) developing a relationship with Anaheim, an important municipality in a local market; (vi) developing a relationship with Ogden because its recycling and energy businesses represented a close fit with BCC's plans to expand its interests in power generation and distribution; (vii) the prevailing economic conditions in Anaheim and the rest of Southern California; (viii) providing BCC with experience in the financial and operational issues relating to a major sports and entertainment venue; and (ix) the terms of the transaction. BCC also considered the potential risks and benefits associated with its residual value interest in the Pond.

63. BCC engaged in a thorough due diligence process and credit analysis with respect to the Anaheim transaction. BCC personnel inspected and evaluated the facility and found it to be "exceptionally well built, managed and maintained." In addition, BCC engaged a reputable, independent third-party appraiser, Deloitte & Touche to perform an appraisal of the Pond using widely recognized and approved appraisal methods.

64. On behalf of BCC, Deloitte & Touche performed a comprehensive valuation assessment of the Pond. Deloitte & Touche conducted a physical inspection of the facility, obtained information regarding its operations and specifications, interviewed members of Ogden management, and analyzed the sports arena industry.

65. To arrive at a fair market value for the Pond, Deloitte & Touche analyzed Anaheim's financial statements, the Pond's construction expenses and projected operating and other expenses, comparable market transactions, and similar sports facilities and arenas. Deloitte & Touche then studied sports facilities useful life data to determine the Pond's useful life and residual value. Finally, Deloitte & Touche assessed the various options available to Anaheim and BCC under the proposed Investment.

66. Deloitte & Touche concluded that, as of January 26, 1999, the closing date for the Pond Investment, the Pond had a remaining useful life of at least 49 years.

67. Based upon its extensive review of the proposed Pond Investment, the UBOC credit committee approved the Pond Investment on December 24, 1998. The major benefits of the transaction were identified as follows:

(a) Attractive and consistent investment economics consistent with the objectives of BCC's leasing business.

(b) The high quality of the asset.

(c) Front-loaded earnings under FASB accounting rules

(d) Good to excellent investment yields

(e) Relatively low risk

(f) Tax benefits of leasing

(g) Strategic value of leasing, *i.e.*, the transaction provided BCC with valuable experience with the financial and operational activities surrounding a major sports and entertainment venue, and the opportunity for BCC to build a relationship with Ogden, whose recycling and energy business is a close fit with BCC's plan to expand its interests in power generation and distribution. The proximity of the facility to UBOC's geographic focus and the opportunity to build a relationship with the City of Anaheim enhanced the value of the transaction as well.

68. BCC expected a pre-tax economic profit of at least $28,880,195 from the Pond Investment. This pre-tax profit would provide a pre-tax yield on the Pond Investment for accounting and financial purposes of approximately 19.15%.

69. BCC formed a trust to enter into the various leases and other agreements that were involved in the Pond Investment. The role of the trust has no effect on the tax treatment of the Pond Investment. Thus, for simplicity, this Complaint describes the Pond Investment as if BCC had invested directly in the Pond.

70. On January 26, 1999 (the "Closing Date"), UBOC, through its subsidiary BCC, and Anaheim entered into a lease and sublease of the Pond, whereby BCC leased an undivided interest in the Pond from Anaheim for approximately 39.18 years (the "Anaheim Headlease"), and then subleased the Pond back to Anaheim for approximately 19.93 years (the "Anaheim Sublease").

71. Under the Anaheim Headlease, BCC, as lessee, is obligated to make two lump-sum payments of rent to Anaheim. The first payment was due on the Closing Date, January 26, 1999, and the second payment is due April 1, 2043, on the fifth anniversary of the last day of the

Anaheim Headlease. The amounts of these rent payments were based on the fair market rental value of the Pond as of January 26, 1999.

72. BCC funded its initial payment of rent under the Anaheim Headlease by investing $39,147,500 of its own cash and by borrowing $93,142,279 from AIG-FP Funding (Cayman) Limited ("AIG"). BCC also paid $3,352,500 in transaction costs in connection with entering into the Pond Investment.

73. At the end of the Anaheim Headlease in 2038, the Pond will have a remaining useful life of at least 9.8 years. This period is 20% of the 49-year useful life of the Pond as of January 26, 1999, as determined by Deloitte & Touche. Tax law has long recognized that if an asset has a residual life at the end of the lease of 20% of the asset's original useful life, then the lease qualifies as a "true lease" for Federal income tax purposes.

74. Deloitte & Touche also determined that at the end of the Anaheim Headlease, the Pond will have a remaining residual value of at least 20% of the fair market value of the Pond as of January 26, 1999. Tax law has long recognized that if an asset has a residual value at the end of the lease of 20% of the asset's original cost, then the lease qualifies as a "true lease" for Federal income tax purposes.

75. The Anaheim Sublease sets forth the terms under which BCC leased its undivided interest in the Pond to Anaheim. Events of default under the Anaheim Sublease include, but are not limited to:

(a) Anaheim's failure to make rent payments;

(b) Any material inaccuracy in representations made by Anaheim, the Manager, or Ogden;

(c) Any assignment of Anaheim's rights under the Anaheim Sublease without BCC's permission;

(d) declaration or filing of bankruptcy by Anaheim, the Manager, or Ogden;

(e) failure by Anaheim, the Manager, or Ogden to maintain the Pond; and

(f) failure to maintain appropriate insurance.

76. BCC's remedies upon a default include, but are not limited to, causing Anaheim to return the Pond to BCC.

77. At the end of the 19.93-year term of the Anaheim Sublease from BCC to Anaheim, Anaheim has an option to purchase BCC's remaining 19.25-year interest in the Pond at a fixed price. Deloitte & Touche determined that the price of Anaheim's purchase option will exceed the fair market value of the 19.25-year interest it would obtain and, therefore, Anaheim is not likely to exercise that option.

78. If Anaheim does not exercise its purchase option, then BCC, as lessee, has the opportunity to earn additional income by (i) claiming possession of its interest in the Pond for the remaining 19.25 years of the Anaheim Headlease; (ii) subleasing the Pond to a third party for the remaining 19.25 years; or (iii) renewing the Anaheim Sublease with Anaheim for an additional 11.5 years through the exercise of a "Renewal Option."

79. Deloitte & Touche determined that the fixed price of the rental payments due from Anaheim under BCC's Renewal Option will be below the fair market rental value for a lease of a similar facility during the 11.5-year renewal term, and therefore, BCC is not likely to exercise its Renewal Option.

80. If Anaheim does not exercise its purchase option and BCC does not exercise its Renewal Option, which Deloitte & Touche indicated is the most likely outcome, then BCC will have possession of its interest in the Pond for the 19.25 years remaining under the Anaheim Headlease, which is 49.1% of its 39.18-year term. If BCC does exercise its Renewal Option,

then at the end of the Renewal Option, BCC will have possession of its interest in the Pond for the 7.75 years remaining under the Anaheim Headlease, which is 20% of its 39.18-year term. In either case, BCC will have a residual interest in the Pond that is greater than or equal to 20% of the Anaheim Headlease term. The value of BCC's residual interest in the Pond is also expected to be significantly higher than 20%.

81. At the end of either (i) the Anaheim Sublease in 2019 or (ii) the Renewal Option term in 2030, as applicable, Anaheim is obligated to return to BCC its undivided interest in the Pond in its original condition, ordinary wear and tear excepted, and the Pond must pass certain specified redelivery acceptance tests.

82. In entering into the Pond Investment, BCC assumed a significant amount of risk, including the risk that Anaheim would not be able to make or would refuse to make its required rent payments, the risk that Anaheim and/or Ogden would go bankrupt, and the risk that the leased facility would be damaged or otherwise suffer an unanticipated diminution in value.

83. Subsequent to BCC's investment in the Pond, Ogden changed its name to Covanta Energy Corporation ("Covanta"). In 2002, as a result of a downgrade in Covanta's credit rating and Covanta's subsequent bankruptcy, an event of default occurred under the Anaheim Sublease. This default also resulted in AIG declaring a default under its loan agreement with BCC.

84. As a result of Covanta's default under the Anaheim Sublease, BCC had a variety of remedies available to protect its interest in the Pond. BCC and AIG ultimately agreed to a restructuring and sale of Covanta's management interest in the Pond. BCC was paid additional consideration in exchange for its agreement to allow the restructuring and sale of Covanta's management interest.

85. As lessor under the Anaheim Headlease, Anaheim assumed the risk that BCC would be unable to make the second lump-sum rent payment due under the terms of the Anaheim Headlease.

86. AIG, BCC's lender, assumed the risk that BCC would be unable to make the required loan payments.

87. As is typical in conservatively structured transactions, the Pond Investment included a number of features that were designed to reduce the financial risks assumed by the parties. These features included collateral deposits, pledges of collateral, and an early buy-out option. However, these features did not and could not insulate BCC or the other parties from all risks presented by the Pond Investment.

## COUNT ONE: THE IRS'S PROPOSED TAX TREATMENT OF THE MISOXER & POND INVESTMENTS WAS ERRONEOUS

### A. The Misoxer Headlease and Sublease Between BCC and Misoxer Should Be Respected Because BCC Retains Sufficient Benefits and Burdens of Ownership With Respect To Its Leasehold Investment in the Facilities.

88. UBOC incorporates by reference and re-alleges the facts set forth in paragraphs 1 through 87 above.

89. Generally, a lease is an arrangement where one party (the "lessor") has a property interest in an asset or a right to use an asset and provides possession and the right to use that asset to another party (the "lessee") for a fixed period of time in exchange for payment of rent.

90. For Federal income tax purposes, a lease arrangement will be respected as a "true lease" (instead of a loan or other form of transaction) if the lessor retains sufficient benefits and burdens of ownership. This determination generally depends on whether the lessor has a meaningful equity investment in the asset throughout the entire lease term and a meaningful residual interest in the asset at the end of the lease term. Decades of judicial authority have

found a 20% residual value to be meaningful. Thus, if at the end of the lease term, the asset is expected to have a remaining useful life (and remaining value) equal to at least 20% of its original estimated useful life (and original cost), the arrangement will be respected for tax purposes as a true lease or sublease, as the case may be.

91. The lessor in a lease transaction can use either equity or a combination of equity and debt to finance the purchase or lease of the asset. When a lessor uses non-recourse debt to finance the purchase or lease of the asset, the transaction is called a leveraged lease.

92. In a typical leveraged lease transaction, an investor purchases or leases an asset and borrows money to finance some or all of the investment. The investor then leases the asset to a third party who uses the asset in its business operations. In this type of transaction, it is a common business practice for the investor to lease the asset to the party which originally sold or leased it to the investor, *i.e.*, a "sale-leaseback" or "lease-leaseback" transaction.

93. In leveraged lease transactions the lessor will earn profits from the rent payments it receives and from the residual value of the property once the lease expires. Additionally, a leveraged lease transaction will often provide a benefit in the form of a limited tax deferral, in which an amount of Federal income tax that would otherwise have been paid one year is deferred until a later year. This is so because leveraged lease transactions often produce losses for Federal income tax purposes in the early years of the transaction due to depreciation, rental expense, amortization, and interest deductions. These losses are offset by profits or gains for Federal income tax purposes in the later years of the transaction. This tax deferral effect of leveraged lease transactions has been approved by the courts and the IRS for many years.

94. The Misoxer Investment, entered into by BCC and Misoxer on September 11, 1998, was a leveraged lease transaction because a portion of BCC's investment was financed through non-recourse loans from Hollandsche and Landeskreditbank.

95. The Misoxer Headlease from Misoxer to BCC and the Misoxer Sublease from BCC to Misoxer both qualify as leases for federal tax purposes because in each case (i) the leases transferred possession of the property interest in return for the obligation to pay rent and provided for transfer of possession back to the lessor in the event of a default, and (ii) the lessors' return depended upon the residual value of the property at the end of the respective lease.

96. As a result of entering into the Misoxer Headlease and the Misoxer Sublease, BCC acquired the benefits and burdens of ownership with respect to its interest in the Misoxer Headlease.

**B. The Anaheim Headlease and Sublease Between BCC and Anaheim Should Be Respected Because BCC Retains Sufficient Benefits and Burdens of Ownership With Respect To Its Leasehold Investment in the Pond.**

97. The Pond Investment, entered into by BCC and Anaheim on January 26, 1999, was a leveraged lease transaction because a portion of BCC's investment was financed through a non-recourse loan from AIG.

98. The Anaheim Headlease from Anaheim to BCC and the Anaheim Sublease from BCC to Anaheim both qualify as leases for Federal tax purposes because in each case (i) the leases transferred possession of the property interest in return for the obligation to pay rent and provided for transfer of possession back to the lessor in the event of a default, and (ii) the lessors' return depended upon the residual value of the property at the end of the respective lease.

99. As a result of entering into the Anaheim Headlease and the Anaheim Sublease, BCC acquired the benefits and burdens of ownership with respect to its interest in the Anaheim Headlease.

**C. UBOC Properly Reported the Misoxer Investment on Its 1998, 1999, 2000, 2001, and 2002 Tax Returns.**

100. UBOC properly reported income and claimed deductions on its 1998, 1999, 2000, 2001, and 2002 tax returns in connection with the Misoxer Investment.

101. As lessee under the Misoxer Headlease, BCC is required to make rent payments to Misoxer. BCC accrued rental deductions on its 1998, 1999, 2000, 2001, and 2002 tax returns for these payments in accordance with the terms of the Misoxer Headlease.

102. As lessee under the Misoxer Sublease, Misoxer is required to make rent payments to BCC. BCC accrued income on its 1998, 1999, 2000, 2001, and 2002 tax returns with respect to these payments in accordance with the terms of the Misoxer Sublease.

103. UBOC properly reported deductions for accrual of interest expense with respect to its loans from Hollandsche and Landeskreditbank.

104. UBOC properly reported deductions for the amortization of transaction costs incurred with respect to the Misoxer Investment.

**D. UBOC Properly Reported the Pond Investment on Its 1999, 2000, 2001, and 2002 Tax Returns.**

105. UBOC properly reported income and claimed deductions on its 1999, 2000, 2001, and 2002 tax returns in connection with the Pond Investment.

106. As lessee under the Anaheim Headlease, BCC is required to make rent payments to Anaheim. BCC accrued rental deductions on its 1999, 2000, 2001, and 2002 tax returns for these payments in accordance with the terms of the Anaheim Headlease.

107. As lessee under the Anaheim Sublease, Anaheim is required to make rent payments to BCC. BCC accrued income on its 1999, 2000, 2001, and 2002 tax returns with respect to these payments in accordance with the terms of the Anaheim Sublease.

108. UBOC properly reported deductions for accrual of interest expense with respect to its loan from AIG.

109. UBOC properly reported deductions for the amortization of transaction costs incurred with respect to the Pond Investment.

**COUNT TWO: UBOC IS ENTITLED TO A REFUND OF TAXES IN CONNECTION WITH THE MISOXER INVESTMENT FOR 1998**

110. UBOC incorporates by reference and re-alleges the facts set forth in paragraphs 1 through 109 above.

111. Pursuant to 26 U.S.C. §§ 61 and 467, UBOC included $1,870,398 in rental income on its income tax return for the 1998 taxable year with respect to Misoxer's obligation to pay rent under the terms of the Misoxer Sublease.

112. Pursuant to 26 U.S.C. §§ 162(a)(3) and 467, UBOC deducted $9,004,367 in rental expense on its income tax return for the 1998 taxable year with respect to its obligation to make rental payments to Misoxer under the terms of the Misoxer Headlease.

113. Pursuant to 26 U.S.C. § 167, UBOC deducted $16,577 for transaction costs on its income tax return for the 1998 taxable year as the result of the amortization of transaction costs related to the Misoxer Headlease.

114. Pursuant to 26 U.S.C. § 163, UBOC deducted $1,810,488 in interest expense on its income tax return for the 1998 taxable year as a result of interest accruing on the bank loans it obtained to fund a portion of its rental payments under the Misoxer Headlease.

115. The IRS proposed to disallow all of UBOC's deductions for (i) rental payments required to be made to Misoxer under the terms of the Misoxer Headlease, (ii) the interest payments required to be made to Hollandsche and Landeskreditbank, and (iii) the amortization of transaction costs.

116. The IRS also proposed to reduce UBOC's rental income by the amount of rental payments due from Misoxer under the Misoxer Sublease.

117. The IRS further proposed to increase UBOC's interest income by $473,046 to reflect income earned by Misoxer.

118. These proposed adjustments had the effect of recalculating UBOC's taxable income for the 1998 taxable year as if UBOC had not engaged in a leasing transaction with Misoxer.

119. The changes proposed by the IRS increased UBOC's taxable income for the 1998 taxable year by a net amount of $9,434,080.

120. As a result of this proposed increase in taxable income, the IRS demanded an additional $2,967,158 in Federal income tax from UBOC for the 1998 taxable year.

121. On or about July 2, 2003 and December 5, 2005, UBOC paid in two installments to the IRS an amount equaling the 1998 proposed tax deficiency of $2,967,158.

122. The adjustments made by the IRS to UBOC's taxable income for the 1998 taxable year are contrary to controlling tax law, and UBOC is entitled to a complete refund of the $3,301,928 of Federal income taxes erroneously paid with respect to the Misoxer Investment.

**COUNT THREE: UBOC IS ENTITLED TO A REFUND OF TAXES IN CONNECTION WITH THE MISOXER INVESTMENT AND POND INVESTMENT FOR 1999**

123. UBOC incorporates by references and re-alleges the facts set forth in paragraphs 1 through 122 above.

124. Pursuant to 26 U.S.C. §§ 61 and 467, UBOC included $6,121,303 in rental income on its income tax return for the 1999 taxable year with respect to Misoxer's obligation to pay rent under the terms of the Misoxer Sublease.

125. Pursuant to 26 U.S.C. §§ 61 and 467, UBOC included $3,151,164 in rental income on its income tax return for the 1999 taxable year with respect to Anaheim's obligation to pay rent under the terms of the Anaheim Sublease.

126. Pursuant to 26 U.S.C. §§ 162(a)(3) and 467, UBOC deducted $29,468,837 in rental expense on its income tax return for the 1999 taxable year with respect to its obligation to make rental payments to Misoxer under the terms of the Misoxer Headlease.

127. Pursuant to 26 U.S.C. §§ 162(a)(3) and 467, UBOC deducted $28,950,338 in rental expense on its income tax return for the 1999 taxable year with respect to its obligation to make rental payments to Anaheim under the terms of the Anaheim Headlease.

128. Pursuant to 26 U.S.C. § 167, UBOC deducted $54,253 for transaction costs on its income tax return for the 1999 taxable year as the result of the amortization of transaction costs related to the Misoxer Headlease.

129. Pursuant to 26 U.S.C. § 167, UBOC deducted $89,581 for transaction costs on its income tax return for the 1999 taxable year as the result of the amortization of transaction costs related to the Anaheim Headlease.

130. Pursuant to 26 U.S.C. § 163, UBOC deducted $6,061,603 in interest expense on its income tax return for the 1999 taxable year as a result of interest accruing on the bank loans it obtained to fund a portion of its rental payments under the Misoxer Headlease.

131. Pursuant to 26 U.S.C. § 163, UBOC deducted $5,126,747 in interest expense on its income tax return for the 1999 taxable year as a result of interest accruing on the bank loan it obtained to fund a portion of its rental payments under the Anaheim Headlease.

132. The IRS proposed to disallow all of UBOC's deductions for (i) rental payments required to be made to Misoxer and Anaheim under the terms of the respective Misoxer and Anaheim Headleases, (ii) the interest payments required to be made to Hollandsche, Landeskreditbank, and AIG, and (iii) the amortization of transaction costs.

133. The IRS also proposed to reduce UBOC's rental income by the amount of rental payments due from Misoxer and Anaheim under the Misoxer Sublease and Anaheim Sublease, respectively.

134. The IRS further proposed to increase UBOC's interest income by $1,434,203 and $1,253,386 to reflect income earned by Misoxer and Anaheim, respectively.

135. These proposed adjustments had the effect of recalculating UBOC's taxable income for the 1999 taxable year as if UBOC had not engaged in a leasing transaction with Misoxer or Anaheim.

136. The changes proposed by the IRS in connection with the Misoxer Investment increased UBOC's taxable income for the 1999 taxable year by $30,897,593.

137. The changes proposed by the IRS in connection with the Pond Investment similarly increased UBOC's taxable income for the 1999 taxable year by $32,268,888.

138. The changes proposed by the IRS increased UBOC's taxable income for the 1999 taxable year by a net amount of $63,166,481.

139. As a result of this proposed increase in taxable income, the IRS demanded an additional $19,200,319 in Federal income tax from UBOC for the 1999 taxable year.

140. On or about July 2, 2003 and December 5, 2005, UBOC paid in two installments to the IRS an amount equaling the 1999 proposed tax deficiency of $19,200,319.

141. The adjustments made by the IRS to UBOC's taxable income for the 1999 taxable year are contrary to controlling tax law, and UBOC is entitled to a complete refund of the $22,108,268 of Federal income taxes erroneously paid with respect to the Misoxer and Pond Investments.

**COUNT FOUR: UBOC IS ENTITLED TO A REFUND OF TAXES IN CONNECTION WITH THE MISOXER INVESTMENT AND POND INVESTMENT FOR 2000**

142. UBOC incorporates by references and re-alleges the facts set forth in paragraphs 1 through 141 above.

143. Pursuant to 26 U.S.C. §§ 61 and 467, UBOC included $6,121,303 in rental income on its income tax return for the 2000 taxable year with respect to Misoxer's obligation to pay rent under the terms of the Misoxer Sublease.

144. Pursuant to 26 U.S.C. §§ 61 and 467, UBOC included $3,760,420 in rental income on its income tax return for the 2000 taxable year with respect to Anaheim's obligation to pay rent under the terms of the Anaheim Sublease.

145. Pursuant to 26 U.S.C. §§ 162(a)(3) and 467, UBOC deducted $29,468,837 in rental expense on its income tax return for the 2000 taxable year with respect to its obligation to make rental payments to Misoxer under the terms of the Misoxer Headlease.

146. Pursuant to 26 U.S.C. §§ 162(a)(3) and 467, UBOC deducted $31,110,811 in rental expense on its income tax return for the 2000 taxable year with respect to its obligation to make rental payments to Anaheim under the terms of the Anaheim Headlease.

147. Pursuant to 26 U.S.C. § 167, UBOC deducted $54,253 for transaction costs on its income tax return for the 2000 taxable year as the result of the amortization of transaction costs related to the Misoxer Headlease.

148. Pursuant to 26 U.S.C. § 167, UBOC deducted $96,266 for transaction costs on its income tax return for the 2000 taxable year as the result of the amortization of transaction costs related to the Anaheim Headlease.

149. Pursuant to 26 U.S.C. § 163, UBOC deducted $6,066,305 in interest expense on its income tax return for the 2000 taxable year as a result of interest accruing on the bank loans it obtained to fund a portion of its rental payments under the Misoxer Headlease.

150. Pursuant to 26 U.S.C. § 163, UBOC deducted $5,812,646 in interest expense on its income tax return for the 2000 taxable year as a result of interest accruing on the bank loan it obtained to fund a portion of its rental payments under the Anaheim Headlease.

151. The IRS proposed to disallow all of UBOC's deductions for (i) rental payments required to be made to Misoxer and Anaheim under the terms of the respective Misoxer and Anaheim Headleases, (ii) the interest payments required to be made to Hollandsche, Landeskreditbank, and AIG, and (iii) the amortization of transaction costs.

152. The IRS also proposed to reduce UBOC's rental income by the amount of rental payments due from Misoxer and Anaheim under the Misoxer Sublease and Anaheim Sublease, respectively.

153. The IRS further proposed to increase UBOC's interest income by $1,514,981 and $1,419,168 to reflect income earned by Misoxer and Anaheim, respectively.

154. These proposed adjustments had the effect of recalculating UBOC's taxable income for the 2000 taxable year as if UBOC had not engaged in a leasing transaction with Misoxer or Anaheim.

155. The changes proposed by the IRS in connection with the Misoxer Investment increased the UBOC's taxable income for the 2000 taxable year by $30,983,073.

156. The changes proposed by the IRS in connection with the Anaheim Investment similarly increased the UBOC's taxable income for the 2000 taxable year by $34,678,471.

157. The changes proposed by the IRS increased UBOC's taxable income for the 2000 taxable year by a net amount of $65,661,544.

158. As a result of this proposed increase in taxable income, the IRS demanded an additional $22,793,179 in Federal income tax from UBOC for the 2000 taxable year.

159. On or about July 2, 2003 and December 5, 2005, UBOC paid in two installments to the IRS an amount equaling the 2000 proposed tax deficiency of $22,793,179.

160. The adjustments made by the IRS to UBOC's taxable income for the 2000 taxable year are contrary to controlling tax law, and UBOC is entitled to a complete refund of the $22,981,540 of Federal income taxes erroneously paid with respect to the Misoxer and Pond Investments.

**COUNT FIVE: UBOC IS ENTITLED TO A REFUND OF TAXES IN CONNECTION WITH THE MISOXER INVESTMENT AND POND INVESTMENT FOR 2001**

161. UBOC incorporates by references and re-alleges the facts set forth in paragraphs 1 through 160 above.

162. Pursuant to 26 U.S.C. §§ 61 and 467, UBOC included $6,121,303 in rental income on its income tax return for the 2001 taxable year with respect to Misoxer's obligation to pay rent under the terms of the Misoxer Sublease.

163. Pursuant to 26 U.S.C. §§ 61 and 467, UBOC included $4,180,980 in rental income on its income tax return for the 2001 taxable year with respect to Anaheim's obligation to pay rent under the terms of the Anaheim Sublease.

164. Pursuant to 26 U.S.C. §§ 162(a)(3) and 467, UBOC deducted $29,468,837 in rental expense on its income tax return for the 2001 taxable year with respect to its obligation to make rental payments to Misoxer under the terms of the Misoxer Headlease.

165. Pursuant to 26 U.S.C. §§ 162(a)(3) and 467, UBOC deducted $31,110,811 in rental expense on its income tax return for the 2001 taxable year with respect to its obligation to make rental payments to Anaheim under the terms of the Anaheim Headlease.

166. Pursuant to 26 U.S.C. § 167, UBOC deducted $54,253 for transaction costs on its income tax return for the 2001 taxable year as a result of the amortization of transaction costs related to the Misoxer Headlease.

167. Pursuant to 26 U.S.C. § 167, UBOC deducted $96,266 for transaction costs on its income tax return for the 2001 taxable year as the result of the amortization of transaction costs related to the Anaheim Headlease.

168. Pursuant to 26 U.S.C. § 163, UBOC deducted $6,062,213 in interest expense on its income tax return for the 2001 taxable year as a result of interest accruing on the bank loans it obtained to fund a portion of its rental payments under the Misoxer Headlease.

169. Pursuant to 26 U.S.C. § 163, UBOC deducted $6,156,402 in interest expense on its income tax return for the 2001 taxable year as a result of interest accruing on the bank loan it obtained to fund a portion of its rental payments under the Anaheim Headlease.

170. The IRS proposed to disallow all of UBOC's deductions for (i) rental payments required to be made to Misoxer and Anaheim under the terms of the respective Misoxer and Anaheim Headleases, (ii) the interest payments required to be made to Hollandsche, Landeskreditbank, and AIG, and (iii) the amortization of transaction costs.

171. The IRS also proposed to reduce UBOC's rental income by the amount of rental payments due from Misoxer and Anaheim under the Misoxer Sublease and Anaheim Sublease, respectively.

172. The IRS further proposed to increase UBOC's interest income by $1,490,665 and $1,419,313 to reflect income earned by Misoxer and Anaheim, respectively.

173. These proposed adjustments had the effect of recalculating UBOC's taxable income for the 2001 taxable year as if UBOC had not engaged in a leasing transaction with Misoxer or Anaheim.

174. The changes proposed by the IRS in connection with the Misoxer Investment increased UBOC's taxable income for the 2001 taxable year by $30,954,665.

175. The changes proposed by the IRS in connection with the Anaheim Investment similarly increased UBOC's taxable income for the 2001 taxable year by $34,601,812.

176. The changes proposed by the IRS increased UBOC's taxable income for the 2001 taxable year by a net amount of $65,556,477.

177. As a result of this proposed increase in taxable income, the IRS demanded an additional $24,428,897 in Federal income tax from UBOC for the 2001 taxable year.

178. On or about July 2, 2003 and December 5, 2005, UBOC paid in two installments to the IRS an amount equaling the 2001 proposed tax deficiency of $24,428,897.

179. The adjustments made by the IRS to UBOC's taxable income for the 2001 taxable year are contrary to controlling tax law, and UBOC is entitled to a complete refund of the $22,944,767 of Federal income taxes erroneously paid with respect to the Misoxer and Pond Investments.

**COUNT SIX: UBOC IS ENTITLED TO A REFUND OF TAXES IN CONNECTION WITH THE MISOXER INVESTMENT AND POND INVESTMENT FOR 2002**

180. UBOC incorporates by references and re-alleges the facts set forth in paragraphs 1 through 179 above.

181. Pursuant to 26 U.S.C. §§ 61 and 467, UBOC included $6,121,303 in rental income on its income tax return for the 2002 taxable year with respect to Misoxer's obligation to pay rent under the terms of the Misoxer Sublease.

182. Pursuant to 26 U.S.C. §§ 61 and 467, UBOC included $4,647,943 in rental income on its income tax return for the 2002 taxable year with respect to Anaheim's obligation to pay rent under the terms of the Anaheim Sublease.

183. Pursuant to 26 U.S.C. §§ 162(a)(3) and 467, UBOC deducted $19,595,450 in rental expense on its income tax return for the 2002 taxable year with respect to its obligation to make rental payments to Misoxer under the terms of the Misoxer Headlease.

184. Pursuant to 26 U.S.C. §§ 162(a)(3) and 467, UBOC deducted $31,110,811 in rental expense on its income tax return for the 2002 taxable year with respect to its obligation to make rental payments to Anaheim under the terms of the Anaheim Headlease.

185. Pursuant to 26 U.S.C. § 167, UBOC deducted $54,253 for transaction costs on its income tax return for the 2002 taxable year as the result of the amortization of transaction costs related to the Misoxer Headlease.

186. Pursuant to 26 U.S.C. § 167, UBOC deducted $96,266 for transaction costs on its income tax return for the 2002 taxable year as the result of the amortization of transaction costs related to the Anaheim Headlease.

187. Pursuant to 26 U.S.C. § 163, UBOC deducted $6,057,790 in interest expense on its income tax return for the 2002 taxable year as a result of interest accruing on the bank loans it obtained to fund a portion of its rental payments under the Misoxer Headlease.

188. Pursuant to 26 U.S.C. § 163, UBOC deducted $6,520,551 in interest expense on its income tax return for the 2002 taxable year as a result of interest accruing on the bank loans it obtained to fund a portion of its rental payments under the Anaheim Headlease.

189. The IRS proposed to disallow all of UBOC's deductions for (i) rental payments required to be made to Misoxer and Anaheim under the terms of the respective Misoxer and Anaheim Headleases, (ii) the interest payments required to be made to Hollandsche, Landeskreditbank, and AIG, and (iii) the amortization of transaction costs.

190. The IRS also proposed to reduce UBOC's rental income by the amount of rental payments due from Misoxer and Anaheim under the Misoxer Sublease and Anaheim Sublease, respectively.

191. The IRS further proposed to increase UBOC's interest income by $1,575,311 and $1,502,680 to reflect income earned by Misoxer and Anaheim, respectively.

192. These proposed adjustments had the effect of recalculating UBOC's taxable income for the 2002 taxable year as if UBOC had not engaged in a leasing transaction with Misoxer or Anaheim.

193. The changes proposed by the IRS in connection with the Misoxer Investment increased UBOC's taxable income for the 2002 taxable year by $21,161,501.

194. The changes proposed by the IRS in connection with the Anaheim Investment similarly increased UBOC's taxable income for the 2002 taxable year by $34,582,365.

195. The changes proposed by the IRS increased UBOC's taxable income for the 2002 taxable year by a net amount of $55,743,866.

196. As a result of this proposed increase in taxable income, the IRS demanded an additional $11,131,710 in Federal income tax from UBOC for the 2002 taxable year.

197. On or about July 2, 2003 and December 5, 2005, UBOC paid in two installments to the IRS an amount equaling the 2002 proposed tax deficiency of $11,131,710.

198. The adjustments made by the IRS to UBOC's taxable income for the 2002 taxable year are contrary to controlling tax law, and UBOC is entitled to a complete refund of the $19,510,353 of Federal income taxes erroneously paid with respect to the Misoxer and Pond Investments.

**COUNT SEVEN: UBOC IS ENTITLED TO A REFUND OF TAXES DEMAND FOR JUDGMENT**

WHEREFORE, UBOC respectfully requests that this Court enter judgment in its favor and against the Defendant in the amounts listed below, plus interest and costs allowed by law, and provide such other relief as the Court may deem just.

| Taxable Year | Refund Requested |
|---|---|
| 1998 | $3,301,928 |
| 1999 | $22,108,268 |
| 2000 | $22,981,540 |
| 2001 | $22,944,767 |
| 2002 | $19,510,353 |

Respectfully submitted this 11th day of August, 2006.

Respectfully Submitted,

Thomas C. Durham
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 701-7216
Fax: (312) 706-9187
tdurham@mayerbrownrowe.com

Attorney for Plaintiff

OF COUNSEL:

David F. Abbott
MAYER, BROWN, ROWE & MAW LLP
1675 Broadway
New York, New York 10019
Tel: (212) 506-2500
Fax: (212) 262-1910

Thomas Kittle-Kamp
Kelly M. Glynn
Brian W. Kittle
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 782-0600
Fax: (312) 701-7711

UNION BANK OF CALIFORNIA

January 4, 2006

Wolfgang Scholz
Internal Revenue Service
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Wolfgang:

Enclosed for your files are copies of the claims for refund we have filed today with the Internal Revenue Service Center in Ogden, Utah.

Assuming these claims will be denied, I would appreciate your assistance in processing the denials as soon as possible.

Thank you for your consideration, and Happy New Year.

Yours truly,

Barbara Kosnar

Barbara Kosnar,
Senior Vice President and
Corporate Tax Manager

Enclosures

cc: Tom Durham



EXHIBIT A

Form **1120X** (Rev. December 2004)
Department of the Treasury Internal Revenue Service

# Amended U.S. Corporation Income Tax Return

OMB No. 1545-0132
For tax year ending ▶ 1998 (Enter month and year.)

Please Type or Print

Name: UNIONBANCAL CORPORATION AND SUBSIDIARIES
Employer identification number: 94-1234979
Number, street, and room or suite no. (If a P.O. box, see instructions.): 400 CALIFORNIA STREET, 13TH FLOOR
City or town, state, and ZIP code: SAN FRANCISCO, CA 94104
Telephone number (optional): (415) 765-2080

Enter name and address used on original return (If same as above, write "Same.")
SAME

Internal Revenue Service Center where original return was filed ▶ OGDEN, UTAH

**Fill in applicable items and use Part II on the back to explain any changes**

**Part I** **Income and Deductions** (see instructions)

| | | | (a) As originally reported or as previously adjusted | (b) Net change—increase or (decrease)—explain in Part II | (c) Correct amount |
|---|---|---|---|---|---|
| 1 | Total income (Form 1120 or 1120-A, line 11) STMT. 2 | 1 | 3,021,264,720 | 1,397,352 | 3,022,662,072 |
| 2 | Total deductions (total of lines 27 and 29c, Form 1120, or lines 23 and 25c, Form 1120-A) STMT. 2 | 2 | 2,408,848,874 | 10,831,432 | 2,419,680,306 |
| 3 | Taxable income. Subtract line 2 from line 1 | 3 | 612,415,846 | (9,434,080) | 602,981,766 |
| 4 | Tax (Form 1120, line 31, or Form 1120-A, line 27) STMT. 3 | 4 | 209,379,710 | (3,301,928) | 206,077,782 |

**Payments and Credits** (see instructions)

| | | | (a) | (b) | (c) |
|---|---|---|---|---|---|
| 5a | Overpayment in prior year allowed as a credit | 5a | 16,377,604 | 0 | 16,377,604 |
| b | Estimated tax payments | 5b | 218,750,000 | 0 | 218,750,000 |
| c | Refund applied for on Form 4466 | 5c | | 0 | |
| d | Subtract line 5c from the sum of lines 5a and 5b | 5d | 235,127,604 | 0 | 235,127,604 |
| e | Tax deposited with Form 7004 | 5e | | 0 | |
| f | Credit from Form 2439 | 5f | | 0 | |
| g | Credit for Federal tax on fuels | 5g | | 0 | |

| | | | |
|---|---|---|---|
| 6 | Tax deposited or paid with (or after) the filing of the original return | 6 | 2,967,158 |
| 7 | Add lines 5d through 6, column (c) | 7 | 238,094,762 |
| 8 | Overpayment, if any, as shown on original return or as later adjusted | 8 | 28,715,052 |
| 9 | Subtract line 8 from line 7 | 9 | 209,379,710 |

**Tax Due or Overpayment** (see instructions)

| | | | |
|---|---|---|---|
| 10 | **Tax due.** Subtract line 9 from line 4, column (c). If paying by check, make it payable to the **"United States Treasury"** ▶ | 10 | 0 |
| 11 | **Overpayment.** Subtract line 4, column (c), from line 9 ▶ | 11 | 3,301,928 |
| 12 | Enter the amount of line 11 you want: **Credited to 20__ estimated tax** ▶ **Refunded** ▶ | 12 | 3,301,928 |

**Sign Here**

Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

▶ [signature] Signature of officer | 1/4/06 Date | ▶ SENIOR VICE PRESIDENT Title

**Paid Preparer's Use Only**

Preparer's signature ▶ | Date | Check if self-employed ☐ | Preparer's SSN or PTIN
Firm's name (or yours if self-employed), address, and ZIP code ▶ | EIN | Phone no.

**Part II** **Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** on page 3 of the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see **Carryback Claims** on page 3, and check here . . . . ▶ ☐

See Statement 1.

**UnionBanCal Corporation & Subsidiaries**
**94-1234979**

**Attachment to Form 1120X**
**Tax Year Ending December 31, 1998**

**Explanation of changes to Items in Part I**

UnionBanCal Corporation and Subsidiaries reported income and deductions in its originally filed tax return with respect to the "LILO" transaction named below. The IRS has disallowed the income and deductions claimed.
The IRS also adjusted interest income with respect to this transaction.
We are claiming a refund of all taxes paid with respect to the amounts adjusted by the IRS.

The additional tax resulting from these adjustments was paid in two installments on July 2, 2003 and December 5, 2005.

Assuming that the IRS intends to deny this refund claim, the taxpayer requests that IRS do so as soon as possible.

| | Engelhard Equipment Trust-1998 |
|---|---|
| Line 1: Total Income | |
| Interest income | (473,046) |
| Gross rents | 1,870,398 |
| Line 2: Total Deductions | |
| Rent expense | 9,004,367 |
| Interest expense | 1,810,488 |
| Amortization | 16,577 |
| Taxable Income | (9,434,080) |

**Statement 1**

**U-'onBancal Corporation & Subsidiaries**
**. .nded Federal Tax Return - Form 1120X**
**For Tax Year Ended: 12/31/1998**

**FEIN: 94-1234979**

**Statement 2**

| Line # | Description | Exhibit 1 Form 1120 as originally filed Amount | Exhibit 2 IRS Audit Form 4549 | Exhibit 3 IRS Audit Form 4549-A | 1120 X (a) Form 1120 As Previously Adjusted | 1120X (b) Net change Increase (Decrease) | 1120X c) Correct Amount |
|---|---|---|---|---|---|---|---|
| | Income: | | | | | | |
| 1 | Gross receipts | 494,312 | | | 494,312 | | 494,312 |
| 2 | Cost of goods sold | (30,124) | | | (30,124) | | (30,124) |
| 3 | Gross profit | 464,188 | | | 464,188 | | 464,188 |
| 4 | Dividends | 42,734 | | | 42,734 | | 42,734 |
| 5 | Interest | 2,229,641,953 | | 804,180 | 2,230,446,133 | (473,046) | 2,229,973,087 |
| 6 | Gross rents | 112,936,077 | | (1,870,398) | 111,065,679 | 1,870,398 | 112,936,077 |
| 8 | Capital gains | 3,936,525 | | | 3,936,525 | | 3,936,525 |
| 9 | Net gain (Form 4797) | 73,451,507 | | | 73,451,507 | | 73,451,507 |
| 10-Stmt 1 | Other income | 601,863,758 | 5,223 | (11,027) | 601,857,954 | | 601,857,954 |
| 11 | Total income | 3,022,336,742 | 5,223 | (1,077,245) | 3,021,264,720 | 1,397,352 | 3,022,662,072 |
| | Expenses: | | | | | | |
| 13 | Salaries and wages | 520,039,323 | | | 520,039,323 | | 520,039,323 |
| 14 | Repairs and maint. | 35,405,393 | | (382,858) | 35,022,535 | | 35,022,535 |
| | Bad debts | 35,307,831 | | | 35,307,831 | | 35,307,831 |
| 16 | Rents | 62,273,336 | | (9,004,367) | 53,268,969 | 9,004,367 | 62,273,336 |
| 17-Stmt 1 | Taxes and licenses | 43,005,730 | | | 43,005,730 | | 43,005,730 |
| 18 | Interest | 970,935,915 | | (1,810,488) | 969,125,427 | 1,810,488 | 970,935,915 |
| 19 | Charitable contrib. | 7,849,322 | | | 7,849,322 | | 7,849,322 |
| 20 | Depreciation | 309,078,966 | | 58,360 | 309,137,326 | | 309,137,326 |
| 23 | Advertising | 26,724,169 | | | 26,724,169 | | 26,724,169 |
| 24 | Pension, plans etc | 25,746,691 | | | 25,746,691 | | 25,746,691 |
| 25 | Employee benefits | 59,382,300 | | | 59,382,300 | | 59,382,300 |
| 26-Stmt 2 | Other deductions | 322,626,732 | | 1,589,734 | 324,216,466 | 16,577 | 324,233,043 |
| 27 | Total deductions | 2,418,375,708 | - | (9,549,619) | 2,408,826,089 | 10,831,432 | 2,419,657,521 |
| 28 | TI before NOL deduc | 603,961,034 | 5,223 | 8,472,374 | 612,438,631 | (9,434,080) | 603,004,551 |
| 29 | Special deduction | 22,785 | | | 22,785 | | 22,785 |
| 30 | Taxable income | 603,938,249 | 5,223 | 8,472,374 | 612,415,846 | (9,434,080) | 602,981,766 |
| 31 | Total tax (scheduleJ) | 206,412,552 | 1,828 | 2,965,330 | 209,379,710 | (3,301,928) | 206,077,782 |
| 32 | Payments | 235,127,604 | 1,828 | 2,965,330 | 238,094,762 | | |
| 34 | Tax due | | | | | | |
| 35 | O'pmt to be applied | 28,715,052 | - | - | 28,715,052 | 3,301,928 | to be refunded |

**U··onBancal Corporation & Subsidiaries** **FEIN: 94-1234979**
**·nded Federal Tax Return - Form 1120X, Schedule J**
**For Tax Year Ended: 12/31/1998** **Statement 3**

| Line # | Description | Total Tax as originally filed Amount | IRS Audit Form 4549 | IRS Audit Form 4549-A | 1120 X (a) Total Tax As Previously Adjusted | 1120X (b) Net change Increase (Decrease) | 1120X (c) Correct Amount |
|---|---|---|---|---|---|---|---|
| 30 | Page 1 - Taxable income | 603,938,249 | 5,223 | 8,472,374 | 612,415,846 | (9,434,080) | 602,981,766 |
| 3 | Income tax - 35% | 211,378,388 | 1,828 | 2,965,331 | 214,345,546 | (3,301,928) | 211,043,618 |
| 4a | Foreign tax credit - Form 1118 | 2,414,850 | | | 2,414,850 | | 2,414,850 |
| 4c | Nonconventional source fuel credit | 17,842 | | | 17,842 | | |
| 4d | Business credit - Form 3800 | 2,533,144 | | | 2,533,144 | | 2,533,144 |
| 5 | Total credits | 4,965,836 | - | - | 4,965,836 | - | 4,965,836 |
| 6 | Subtract line 7 from line 5 | 206,412,552 | 1,828 | 2,965,331 | 209,379,710 | (3,301,928) | 206,077,782 |
| 11 | Total tax | 206,412,552 | 1,828 | 2,965,331 | 209,379,710 | (3,301,928) | 206,077,782 |

Form **1120X** (Rev. December 2004) Department of the Treasury Internal Revenue Service

# Amended U.S. Corporation Income Tax Return

OMB No. 1545-0132

For tax year ending ▶ 1999 (Enter month and year.)

Please Type or Print

Name: UNIONBANCAL CORPORATION & SUBSIDIARIES

Employer identification number: 94-1234979

Number, street, and room or suite no. (If a P.O. box, see instructions.): c/o UNION BANK OF CALIFORNIA, 400 CALIFORNIA STREET, 13TH FL

City or town, state, and ZIP code: SAN FRANCISCO, CA 94104

Telephone number (optional): (415) 765-2080

Enter name and address used on original return (If same as above, write "Same."): SAME

Internal Revenue Service Center where original return was filed ▶ OGDEN, UTAH

**Fill in applicable items and use Part II on the back to explain any changes**

**Part I** **Income and Deductions** (see instructions)

| | | | (a) As originally reported or as previously adjusted | (b) Net change—increase or (decrease)—explain in Part II | (c) Correct amount |
|---|---|---|---|---|---|
| 1 | Total income (Form 1120 or 1120-A, line 11) STMT. 2 | 1 | 3,199,954,269 | 6,584,878 | 3,206,539,147 |
| 2 | Total deductions (total of lines 27 and 29c, Form 1120, or lines 23 and 25c, Form 1120-A) STMT. 2 | 2 | 2,522,718,114 | 69,751,359 | 2,592,469,473 |
| 3 | Taxable income. Subtract line 2 from line 1 | 3 | 677,236,155 | (63,166,481) | 614,069,674 |
| 4 | Tax (Form 1120, line 31, or Form 1120-A, line 27) STMT. 3 | 4 | 224,179,344 | (22,108,268) | 202,071,076 |

**Payments and Credits** (see instructions)

| | | | (a) | (b) | (c) |
|---|---|---|---|---|---|
| 5a | Overpayment in prior year allowed as a credit | 5a | 28,715,052 | 0 | 28,715,052 |
| b | Estimated tax payments | 5b | 200,800,001 | 0 | 200,800,001 |
| c | Refund applied for on Form 4466 | 5c | | 0 | |
| d | Subtract line 5c from the sum of lines 5a and 5b | 5d | 229,515,053 | 0 | 229,515,053 |
| e | Tax deposited with Form 7004 | 5e | | 0 | |
| f | Credit from Form 2439 | 5f | | 0 | |
| g | Credit for Federal tax on fuels | 5g | | 0 | |

| | | | |
|---|---|---|---|
| 6 | Tax deposited or paid with (or after) the filing of the original return | 6 | 19,200,319 |
| 7 | Add lines 5d through 6, column (c) | 7 | 248,715,372 |
| 8 | Overpayment, if any, as shown on original return or as later adjusted | 8 | 24,536,028 |
| 9 | Subtract line 8 from line 7 | 9 | 224,179,344 |

**Tax Due or Overpayment** (see instructions)

| | | | |
|---|---|---|---|
| 10 | **Tax due.** Subtract line 9 from line 4, column (c). If paying by check, make it payable to the **"United States Treasury"** ▶ | 10 | 0 |
| 11 | **Overpayment.** Subtract line 4, column (c), from line 9 ▶ | 11 | 22,108,268 |
| 12 | Enter the amount of line 11 you want: **Credited to 20__ estimated tax** ▶ **Refunded** ▶ | 12 | 22,108,268 |

**Sign Here**

Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

▶ [signature] Signature of officer — Date: 1/4/06 — ▶ SENIOR VICE PRESIDENT Title

**Paid Preparer's Use Only**

Preparer's signature ▶ — Date — Check if self-employed ☐ — Preparer's SSN or PTIN

Firm's name (or yours if self-employed), address, and ZIP code ▶ — EIN — Phone no.

**For Privacy Act and Paperwork Reduction Act Notice, see page 4.**

ISA STF FED4298F.1

Form **1120X** (Rev. 12-2004)

Form 1120X (Rev. 12-2004) Page 2

**Part II** **Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** on page 3 of the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see **Carryback Claims** on page 3, and check here ▶ ☐

See Statement 1.

**UnionBanCal Corporation & Subsidiaries**
**94-1234979**

**Attachment to Form 1120X**
**Tax Year Ending December 31, 1999**

**Explanation of changes to items in Part I**

UnionBanCal Corporation and Subsidiaries reported income and deductions in its originally filed tax return with respect to the two "LILO" transactions named below. The IRS has disallowed the income and deductions claimed.
The IRS also adjusted interest income with respect to these two transactions.
We are claiming a refund of all taxes paid with respect to the amounts adjusted by the IRS.

The additional tax resulting from these adjustments was paid in two installments on July 2, 2003 and December 5, 2005.

Assuming that the IRS intends to deny this refund claim, the taxpayer requests that IRS do so as soon as possible.

| | Engelhard Equipment Trust-1998 | Anaheim Pond | Total |
|---|---|---|---|
| Line 1: Total Income | | | |
| Interest income | (1,434,203) | (1,253,386) | (2,687,589) |
| Gross rents | 6,121,303 | 3,151,164 | 9,272,467 |
| Line 2: Total Deductions | | | |
| Rent expense | 29,468,837 | 28,950,338 | 58,419,175 |
| Interest expense | 6,061,603 | 5,126,747 | 11,188,350 |
| Amortization | 54,253 | 89,581 | 143,834 |
| Taxable income | (30,897,593) | (32,268,888) | (63,166,481) |

**UnionBancal Corporation & Subsidiaries**
**nded Federal Tax Return - Form 1120X**
**For Tax Year Ended: 12/31/1999**

**FEIN: 94-1234979**

**Statement 2**

| Line # | Description | Exhibit 1 Form 1120 as originally filed Amount | Exhibit 2 IRS Audit Form 4549-A | 1120 X (a) Form 1120 As Previously Adjusted | 1120X (b) Net change Increase (Decrease) | 1120X c) Correct Amount |
|---|---|---|---|---|---|---|
| | Income: | | | | | |
| 1 | Gross receipts | 1,793,115 | | 1,793,115 | | 1,793,115 |
| 2 | Cost of goods sold | (63,990) | | (63,990) | | (63,990) |
| 3 | Gross profit | 1,729,125 | | 1,729,125 | | 1,729,125 |
| 4 | Dividends | 27,900 | | 27,900 | | 27,900 |
| 5-Stmt 6 | Interest | 2,222,287,123 | 4,321,628 | 2,226,608,751 | (2,687,589) | 2,223,921,162 |
| 6 | Gross rents | 132,239,645 | (9,272,467) | 122,967,178 | 9,272,467 | 132,239,645 |
| 8 | Capital gains | 13,181,591 | | 13,181,591 | | 13,181,591 |
| 9 | Net gain (Form 4797) | 103,894,711 | | 103,894,711 | | 103,894,711 |
| 10-Stmt 11 | Other income | 732,562,436 | (1,017,423) | 731,545,013 | | 731,545,013 |
| 11 | Total income | 3,205,922,531 | (5,968,262) | 3,199,954,269 | 6,584,878 | 3,206,539,147 |
| | Expenses: | | | | | |
| [illegible] | Salaries and wages | 553,367,950 | | 553,367,950 | | 553,367,950 |
| 14 | Repairs and maint. | 37,501,945 | (826,615) | 36,675,330 | | 36,675,330 |
| 15 | Bad debts | 49,419,155 | | 49,419,155 | | 49,419,155 |
| 16 | Rents | 114,790,635 | (58,419,175) | 56,371,460 | 58,419,175 | 114,790,635 |
| 17-Stmt 17 | Taxes and licenses | 43,861,239 | | 43,861,239 | | 43,861,239 |
| 18 | Interest | 947,283,337 | (11,012,295) | 936,271,042 | 11,188,350 | 947,459,392 |
| 19 | Charitable contrib. | 7,972,237 | | 7,972,237 | | 7,972,237 |
| 20 | Depreciation | 331,034,658 | 239,676 | 331,274,334 | | 331,274,334 |
| 23 | Advertising | 22,160,230 | | 22,160,230 | | 22,160,230 |
| 24 | Pension, plans etc | 29,020,820 | | 29,020,820 | | 29,020,820 |
| 25 | Employee benefits | 61,885,643 | | 61,885,643 | | 61,885,643 |
| 26-Stmt 24 | Other deductions | 392,262,793 | 2,156,351 | 394,419,144 | 143,834 | 394,562,978 |
| 27 | Total deductions | 2,590,560,642 | (67,862,058) | 2,522,698,584 | 69,751,359 | 2,592,449,943 |
| 28 | TI before NOL deduc | 615,361,889 | 61,893,796 | 677,255,685 | (63,166,481) | 614,089,204 |
| 29 | Special deduction | 19,530 | | 19,530 | | 19,530 |
| 30 | Taxable income | 615,342,359 | 61,893,796 | 677,236,155 | (63,166,481) | 614,069,674 |
| 31 | Total tax (scheduleJ) | 204,979,025 | 19,200,319 | 224,179,344 | (22,108,268) | 202,071,076 |
| 32 | Payments | 229,515,053 | 19,200,319 | 248,715,372 | | |
| 34 | Tax due | | | | - | |
| 35 | O'pmt to be applied | 24,536,028 | - | 24,536,028 | 22,108,268 | to be refunded |

**UnionBancal Corporation & Subsidiaries**
**ended Federal Tax Return - Form 1120X, Schedule J**
**For Tax Year Ended: 12/31/1999**

**FEIN: 94-1234979**

**Statement 3**

| Line # | Description | Total Tax as originally filed Amount | IRS Audit Form 4549-A | 1120 X (a) Total Tax As Previously Adjusted | 1120X (b) Net change Increase (Decrease) | 1120X (c) Correct Amount |
|---|---|---|---|---|---|---|
| 30 | Page 1 - Taxable income | 615,342,359 | 61,893,796 | 677,236,155 | (63,166,481) | 614,069,674 |
| 3 | Income tax - 35% | 215,369,826 | 21,662,828 | 237,032,654 | (22,108,268) | 214,924,386 |
| 4a | Foreign tax credit - Form 1118 | NONE | 1,738,584 | 1,738,584 | | 1,738,584 |
| 4c | Nonconventional source fuel credit | 12,783 | | 12,783 | | |
| 4d | Business credit - Form 3800 | 10,378,018 | 723,925 | 11,101,943 | | 11,101,943 |
| 5 | Total credits | 10,390,801 | 2,462,509 | 12,853,310 | - | 12,853,310 |
| 6 | Subtract line 7 from line 5 | 204,979,025 | 19,200,319 | 224,179,344 | (22,108,268) | 202,071,076 |
| 11 | Total tax | 204,979,025 | 19,200,319 | 224,179,344 | (22,108,268) | 202,071,076 |

Form **1120X** (Rev. December 2004) Department of the Treasury Internal Revenue Service

# Amended U.S. Corporation Income Tax Return

OMB No. 1545-0132

For tax year ending 2000 (Enter month and year.)

Please Type or Print

Name: UNIONBANCAL CORPORATION & SUBSIDIARIES

Employer identification number: 94-1234979

Number, street, and room or suite no. (If a P.O. box, see instructions.): c/o UNION BANK OF CALIFORNIA, 400 CALIFORNIA STREET, 13TH FL

City or town, state, and ZIP code: SAN FRANCISCO, CA 94104

Telephone number (optional): (415) 765-2080

Enter name and address used on original return (If same as above, write "Same.")
SAME

Internal Revenue Service Center where original return was filed ▶ OGDEN, UTAH

## Fill in applicable items and use Part II on the back to explain any changes

**Part I** **Income and Deductions** (see instructions)

| | | | (a) As originally reported or as previously adjusted | (b) Net change—increase or (decrease)—explain in Part II | (c) Correct amount |
|---|---|---|---|---|---|
| 1 | Total income (Form 1120 or 1120-A, line 11) STMT. 2 | 1 | 3,674,503,242 | 6,947,574 | 3,681,450,816 |
| 2 | Total deductions (total of lines 27 and 29c, Form 1120, or lines 23 and 25c, Form 1120-A) STMT. 2 | 2 | 2,945,031,026 | 72,609,118 | 3,017,640,144 |
| 3 | Taxable income. Subtract line 2 from line 1 | 3 | 729,472,216 | (65,661,544) | 663,810,672 |
| 4 | Tax (Form 1120, line 31, or Form 1120-A, line 27) STMT. 3 | 4 | 235,404,874 | (22,981,540) | 212,423,334 |

**Payments and Credits** (see instructions)

| | | | (a) | (b) | (c) |
|---|---|---|---|---|---|
| 5a | Overpayment in prior year allowed as a credit | 5a | 24,535,975 | 0 | 24,535,975 |
| b | Estimated tax payments | 5b | 252,837,000 | 0 | 252,837,000 |
| c | Refund applied for on Form 4466 | 5c | | 0 | |
| d | Subtract line 5c from the sum of lines 5a and 5b | 5d | 277,372,975 | 0 | 277,372,975 |
| e | Tax deposited with Form 7004 | 5e | | 0 | |
| f | Credit from Form 2439 | 5f | | 0 | |
| g | Credit for Federal tax on fuels | 5g | | 0 | |

| | | | |
|---|---|---|---|
| 6 | Tax deposited or paid with (or after) the filing of the original return | 6 | 22,793,179 |
| 7 | Add lines 5d through 6, column (c) | 7 | 300,166,154 |
| 8 | Overpayment, if any, as shown on original return or as later adjusted | 8 | 64,761,280 |
| 9 | Subtract line 8 from line 7 | 9 | 235,404,874 |

**Tax Due or Overpayment** (see instructions)

| | | | |
|---|---|---|---|
| 10 | **Tax due.** Subtract line 9 from line 4, column (c). If paying by check, make it payable to the **"United States Treasury"** ▶ | 10 | 0 |
| 11 | **Overpayment.** Subtract line 4, column (c), from line 9 ▶ | 11 | 22,981,540 |
| 12 | Enter the amount of line 11 you want: **Credited to 20__ estimated tax** ▶ **Refunded** ▶ | 12 | 22,981,540 |

**Sign Here**

Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

[signature] Signature of officer — Date: 1/4/06 — Title: SENIOR VICE PRESIDENT

**Paid Preparer's Use Only**

Preparer's signature ▶ | Date | Check if self-employed ☐ | Preparer's SSN or PTIN

Firm's name (or yours if self-employed), address, and ZIP code ▶ | EIN | Phone no.

UNIONBANCAL CORPORATION AND SUB YEAR: 2000 FEIN: 94-1234979

Form 1120X (Rev. 12-2004) Page 2

**Part II** **Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** on page 3 of the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see **Carryback Claims** on page 3, and check here ▶ ☐

See Statement 1.

**UnionBanCal Corporation & Subsidiaries**
**94-1234979**

**Attachment to Form 1120X**
**Tax Year Ending December 31, 2000**

**Explanation of changes to items in Part I**

UnionBanCal Corporation and Subsidiaries reported income and deductions in its originally filed tax return with respect to the two "LILO" transactions named below. The IRS has disallowed the income and deductions claimed.
The IRS also adjusted interest income with respect to these two transactions.
We are claiming a refund of all taxes paid with respect to the amounts adjusted by the IRS.

The additional tax resulting from these adjustments was paid in two installments on July 2, 2003 and December 5, 2005.

Assuming that the IRS intends to deny this refund claim, the taxpayer requests that IRS do so as soon as possible.

| | Engelhard Equipment Trust-1998 | Anaheim Pond | Total |
|---|---|---|---|
| Line 1: Total Income | | | |
| Interest income | (1,514,981) | (1,419,168) | (2,934,149) |
| Gross rents | 6,121,303 | 3,760,420 | 9,881,723 |
| Line 2: Total Deductions | | | |
| Rent expense | 29,468,837 | 31,110,811 | 60,579,648 |
| Interest expense | 6,066,305 | 5,812,646 | 11,878,951 |
| Amortization | 54,253 | 96,266 | 150,519 |
| Taxable Income | (30,983,073) | (34,678,471) | (65,661,544) |

**UnionBancal Corporation & Subsidiaries** | **FEIN: 94-1234979**
**…nded Federal Tax Return - Form 1120X**
**For Tax Year Ended: 12/31/2000** | **Statement 2**

| Line # | Description | Exhibit 1 Form 1120 as originally filed Amount | Exhibit 2 IRS Audit Form 4549-A | 1120 X (a) Form 1120 As Previously Adjusted | 1120X (b) Net change Increase (Decrease) | 1120X c) Correct Amount |
|---|---|---|---|---|---|---|
| 1 | Gross receipts | | | - | | - |
| 2 | Cost of goods sold | (107) | | (107) | | (107) |
| 3 | Gross profit | (107) | | (107) | | (107) |
| 4 | Dividends | 1,345,547 | | 1,345,547 | | 1,345,547 |
| 5-Stmt 6 | Interest | 2,577,568,388 | 5,898,709 | 2,583,467,097 | (2,934,149) | 2,580,532,948 |
| 6 | Gross rents | 159,514,733 | (9,881,723) | 149,633,010 | 9,881,723 | 159,514,733 |
| 8 | Capital gains | 24,129,218 | | 24,129,218 | | 24,129,218 |
| 9 | Net gain (Form 4797) | 94,916,870 | | 94,916,870 | | 94,916,870 |
| 10-Stmt 11 | Other income | 822,071,506 | (1,059,899) | 821,011,607 | | 821,011,607 |
| 11 | Total income | 3,679,546,155 | (5,042,913) | 3,674,503,242 | 6,947,574 | 3,681,450,816 |
| 12 | Salaries and wages | 512,083,305 | | 512,083,305 | | 512,083,305 |
| | Repairs and maint. | 37,138,461 | (864,079) | 36,274,382 | | 36,274,382 |
| 15 | Bad debts | 296,066,743 | 81,388 | 296,148,131 | | 296,148,131 |
| 16 | Rents | 125,671,618 | (60,579,648) | 65,091,970 | 60,579,648 | 125,671,618 |
| 17-Stmt 16 | Taxes and licenses | 44,371,082 | | 44,371,082 | | 44,371,082 |
| 18 | Interest | 1,168,090,001 | (9,416,992) | 1,158,673,009 | 11,878,951 | 1,170,551,960 |
| 19-Stmt 27 | Charitable contrib. | 7,217,659 | | 7,217,659 | | 7,217,659 |
| 20 | Depreciation | 341,669,986 | 459,250 | 342,129,236 | | 342,129,236 |
| 23 | Advertising | 23,644,301 | | 23,644,301 | | 23,644,301 |
| 24 | Pension, plans etc | 18,686,000 | | 18,686,000 | | 18,686,000 |
| 25 | Employee benefits | 51,149,868 | | 51,149,868 | | 51,149,868 |
| 26-Stmt 2 | Other deductions | 388,527,724 | (302,818) | 388,224,906 | 150,519 | 388,375,425 |
| 27 | Total deductions | 3,014,316,748 | (70,622,899) | 2,943,693,849 | 72,609,118 | 3,016,302,967 |
| 28 | TI before NOL deduc | 665,229,407 | 65,579,986 | 730,809,393 | (65,661,544) | 665,147,849 |
| 29 | Special deduction | 1,337,177 | | 1,337,177 | | 1,337,177 |
| 30 | Taxable income | 663,892,230 | 65,579,986 | 729,472,216 | (65,661,544) | 663,810,672 |
| 31 | Total tax (scheduleJ) | 212,611,695 | 22,793,179 | 235,404,874 | (22,981,540) | 212,423,334 |
| 32 | Payments | 277,372,975 | 22,793,179 | 300,166,154 | - | |
| 34 | Tax due | | | | | |
| 35 | O'pmt to be applied | 64,761,280 | - | 64,761,280 | 22,981,540 | to be refunded |

UnionBancal Corporation & Subsidiaries
ænded Federal Tax Return - Form 1120X, Schedule J
For Tax Year Ended: 12/31/2000

FEIN: 94-1234979

Statement 3

| Line # | Description | Total Tax as originally filed Amount | IRS Audit Form 4549-A | 1120 X (a) Total Tax As Previously Adjusted | 1120X (b) Net change Increase (Decrease) | 1120X (c) Correct Amount |
|---|---|---|---|---|---|---|
| 30 | Page 1 - Taxable income | 663,892,230 | 65,579,986 | 729,472,216 | (65,661,544) | 663,810,672 |
| 3 | Income tax - 35% | 232,362,281 | 22,952,995 | 255,315,276 | (22,981,540) | 232,333,736 |
| 4 | Alternative minimum tax | NONE | | | | |
| 5 | Total lines 3 and 4 | 232,362,281 | 22,952,995 | 255,315,276 | (22,981,540) | 232,333,736 |
| 6a | Foreign tax credit - Form 1118 | 1,295,906 | | 1,295,906 | | 1,295,906 |
| 6d | Business credit - Form 3800 | 18,454,680 | 159,816 | 18,614,496 | | 18,614,496 |
| 7 | Total credits | 19,750,586 | 159,816 | 19,910,402 | - | 19,910,402 |
| 8 | Subtract line 7 from line 5 | 212,611,695 | 22,793,179 | 235,404,874 | (22,981,540) | 212,423,334 |
| ,1 | Total tax | 212,611,695 | 22,793,179 | 235,404,874 | (22,981,540) | 212,423,334 |

Form **1120X** (Rev. December 2004) Department of the Treasury Internal Revenue Service

# Amended U.S. Corporation Income Tax Return

OMB No. 1545-0132

For tax year ending 2001 (Enter month and year.)

Please Type or Print

Name: UNIONBANCAL CORPORATION & SUBSIDIARIES

Employer identification number: 94-1234979

Number, street, and room or suite no. (If a P.O. box, see instructions.): c/o UNION BANK OF CALIFORNIA, 400 CALIFORNIA STREET, 13TH FL

City or town, state, and ZIP code: SAN FRANCISCO, CA 94104

Telephone number (optional): (415) 765-2080

Enter name and address used on original return (If same as above, write "Same."): SAME

Internal Revenue Service Center where original return was filed ▶ OGDEN, UTAH

**Fill in applicable items and use Part II on the back to explain any changes**

**Part I** **Income and Deductions** (see instructions)

| | | | (a) As originally reported or as previously adjusted | (b) Net change—increase or (decrease)—explain in Part II | (c) Correct amount |
|---|---|---|---|---|---|
| 1 | Total income (Form 1120 or 1120-A, line 11) STMT. 2 | 1 | 3,347,087,245 | 7,392,305 | 3,354,479,550 |
| 2 | Total deductions (total of lines 27 and 29c, Form 1120, or lines 23 and 25c, Form 1120-A) STMT. 2 | 2 | 2,753,718,063 | 72,948,782 | 2,826,666,845 |
| 3 | Taxable income. Subtract line 2 from line 1 | 3 | 593,369,182 | (65,556,477) | 527,812,705 |
| 4 | Tax (Form 1120, line 31, or Form 1120-A, line 27) STMT. 3 | 4 | 177,369,987 | (22,944,767) | 154,425,220 |

**Payments and Credits** (see instructions)

| | | | (a) | (b) | (c) |
|---|---|---|---|---|---|
| 5a | Overpayment in prior year allowed as a credit | 5a | 64,761,280 | 0 | 64,761,280 |
| b | Estimated tax payments | 5b | 118,300,000 | 0 | 118,300,000 |
| c | Refund applied for on Form 4466 | 5c | | 0 | |
| d | Subtract line 5c from the sum of lines 5a and 5b | 5d | 183,061,280 | 0 | 183,061,280 |
| e | Tax deposited with Form 7004 | 5e | | 0 | |
| f | Credit from Form 2439 | 5f | | 0 | |
| g | Credit for Federal tax on fuels | 5g | | 0 | |

| | | | |
|---|---|---|---|
| 6 | Tax deposited or paid with (or after) the filing of the original return | 6 | 24,428,897 |
| 7 | Add lines 5d through 6, column (c) | 7 | 207,490,177 |
| 8 | Overpayment, if any, as shown on original return or as later adjusted | 8 | 30,120,190 |
| 9 | Subtract line 8 from line 7 | 9 | 177,369,987 |

**Tax Due or Overpayment** (see instructions)

| | | | |
|---|---|---|---|
| 10 | **Tax due.** Subtract line 9 from line 4, column (c). If paying by check, make it payable to the **"United States Treasury"** ▶ | 10 | 0 |
| 11 | **Overpayment.** Subtract line 4, column (c), from line 9 ▶ | 11 | 22,944,767 |
| 12 | Enter the amount of line 11 you want: **Credited to 20__ estimated tax** ▶ **Refunded** ▶ | 12 | 22,944,767 |

**Sign Here**

Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

▶ [signature] Signature of officer | 1/4/06 Date | ▶ SENIOR VICE PRESIDENT Title

**Paid Preparer's Use Only**

Preparer's signature ▶ | Date | Check if self-employed ☐ | Preparer's SSN or PTIN

Firm's name (or yours if self-employed), address, and ZIP code ▶ | EIN | Phone no.

UNIONBANCAL CORPORATION AND SUB YEAR: 2001 FEIN: 94-1234979



**Part II** **Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** on page 3 of the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see **Carryback Claims** on page 3, and check here . . . . ▶ ☐

See Statement 1.



STF FED4298F.2

**UnionBanCal Corporation & Subsidiaries**
**94-1234979**

**Attachment to Form 1120X**
**Tax Year Ending December 31, 2001**

**Explanation of changes to items in Part I**

UnionBanCal Corporation and Subsidiaries reported income and deductions in its originally filed tax return with respect to the two "LILO" transactions named below. The IRS has disallowed the income and deductions claimed.
The IRS also adjusted interest income with respect to these two transactions.
We are claiming a refund of all taxes paid with respect to the amounts adjusted by the IRS.

The additional tax resulting from these adjustments was paid on December 5, 2005.

Assuming that the IRS intends to deny this refund claim, the taxpayer requests that IRS do so as soon as possible.

| | Engelhard Equipment Trust-1998 | Anaheim Pond | Total |
|---|---|---|---|
| Line 1: Total Income | | | |
| Interest income | (1,490,665) | (1,419,313) | (2,909,978) |
| Gross rents | 6,121,303 | 4,180,980 | 10,302,283 |
| Line 2: Total Deductions | | | |
| Rent expense | 29,468,837 | 31,110,811 | 60,579,648 |
| Interest expense | 6,062,213 | 6,156,402 | 12,218,615 |
| Amortization | 54,253 | 96,266 | 150,519 |
| Taxable Income | (30,954,665) | (34,601,812) | (65,556,477) |

**Statement 1**

**UnionBancal Corporation & Subsidiaries**
**ended Federal Tax Return - Form 1120**
**For Tax Year Ended: 12/31/2001**

**FEIN: 94-1234979**

**Statement 2**

| Line # | Description | Exhibit 1 Form 1120 as originally filed Amount | Exhibit 2 IRS Audit Form 4549-A | 1120 X (a) Form 1120 As Previously Adjusted | 1120X (b) Net change Increase (Decrease) | 1120X c) Correct Amount |
|---|---|---|---|---|---|---|
| 1 | Gross receipts | | | - | | - |
| 2 | Cost of goods sold | | | - | | - |
| 3 | Gross profit | - | | - | | - |
| 4 | Dividends | 914,905 | | 914,905 | | 914,905 |
| 5-Stmt 6 | Interest | 2,212,954,971 | 6,772,542 | 2,219,727,513 | (2,909,978) | 2,216,817,535 |
| 6 | Gross rents | 156,104,766 | (10,302,283) | 145,802,483 | 10,302,283 | 156,104,766 |
| 8 | Capital gains | 15,374,491 | | 15,374,491 | | 15,374,491 |
| 9 | Net gain (Form 4797) | 147,599,159 | | 147,599,159 | | 147,599,159 |
| 10-Stmt 11 | Other income | 816,332,796 | 1,335,898 | 817,668,694 | | 817,668,694 |
| 11 | Total Income | 3,349,281,088 | (2,193,843) | 3,347,087,245 | 7,392,305 | 3,354,479,550 |
| | Salaries and wages | 570,525,848 | | 570,525,848 | | 570,525,848 |
| 14 | Repairs and maint. | 37,670,456 | (307,016) | 37,363,440 | | 37,363,440 |
| 15 | Bad debts | 264,098,986 | 2,934,933 | 267,033,919 | | 267,033,919 |
| 16 | Rents | 116,081,160 | (60,579,648) | 55,501,512 | 60,579,648 | 116,081,160 |
| 17-Stmt 16 | Taxes and licenses | 48,750,719 | | 48,750,719 | | 48,750,719 |
| 18 | Interest | 867,578,269 | (12,218,615) | 855,359,654 | 12,218,615 | 867,578,269 |
| 19-Stmt 27 | Charitable contrib. | 7,445,527 | | 7,445,527 | | 7,445,527 |
| 20 | Depreciation | 330,904,366 | 1,143,824 | 332,048,190 | | 332,048,190 |
| 23 | Advertising | 32,080,897 | | 32,080,897 | | 32,080,897 |
| 24 | Pension, plans etc | 118,288,816 | | 118,288,816 | | 118,288,816 |
| 25 | Employee benefits | 59,709,463 | | 59,709,463 | | 59,709,463 |
| 26-Stmt 2 | Other deductions | 370,982,691 | (2,009,684) | 368,973,007 | 150,519 | 369,123,526 |
| 27 | Total deductions | 2,824,117,198 | (71,036,206) | 2,753,080,992 | 72,948,782 | 2,826,029,774 |
| 28 | TI before NOL deduc | 525,163,890 | 68,842,363 | 594,006,253 | (65,556,477) | 528,449,776 |
| 29 | NOL & special deduc | 637,071 | | 637,071 | | 637,071 |
| 30 | Taxable income | 524,526,819 | 68,842,363 | 593,369,182 | (65,556,477) | 527,812,705 |
| 31 | Total tax -Statement 2 | 152,941,090 | 24,428,897 | 177,369,987 | (22,944,767) | 154,425,220 |
| 32 | Payments | 183,061,280 | 24,428,897 | 207,490,177 | - | |
| 34 | Tax due | | | | | |
| 35 | O'pmt to be applied | 30,120,190 | - | 30,120,190 | (22,944,767) | to be refunded |

**Statement 2**

**UnionBancal Corporation & Subsidiaries**
**. nded Federal Tax Return - Form 1120X, Schedule J**
**For Tax Year Ended: 12/31/2001**

**FEIN: 94-1234979**

**Statement 3**

| Line # | Description | Total Tax as originally filed Amount | IRS Audit Form 4549-A | 1120 X (a) Total Tax As Previously Adjusted | 1120X (b) Net change Increase (Decrease) | 1120X (c) Correct Amount |
|---|---|---|---|---|---|---|
| 30 | Page 1 - Taxable income | 524,526,819 | 68,842,363 | 593,369,182 | (65,556,477) | 527,812,705 |
| 3 | Income tax - 35% | 183,584,387 | 24,094,827 | 207,679,214 | (22,944,767) | 184,734,447 |
| 4 | Alternative minimum tax | NONE | | | | |
| 5 | Total lines 3 and 4 | 183,584,387 | 24,094,827 | 207,679,214 | (22,944,767) | 184,734,447 |
| 6a | Foreign tax credit - Form 1118 | 5,703,921 | | 5,703,921 | | 5,703,921 |
| 6d | Business credit - Form 3800 | 24,939,376 | (334,070) | 24,605,306 | | 24,605,306 |
| 7 | Total credits | 30,643,297 | (334,070) | 30,309,227 | - | 30,309,227 |
| 8 | Subtract line 7 from line 5 | 152,941,090 | 24,428,897 | 177,369,987 | (22,944,767) | 154,425,220 |
| 1 | Total tax | 152,941,090 | 24,428,897 | 177,369,987 | (22,944,767) | 154,425,220 |

Form **1120X** (Rev. December 2004) Department of the Treasury Internal Revenue Service

# Amended U.S. Corporation Income Tax Return

OMB No. 1545-0132

For tax year ending ▶ 2002 (Enter month and year.)

Please Type or Print

Name: UNIONBANCAL CORPORATION & SUBSIDIARIES

Employer identification number: 94-1234979

Number, street, and room or suite no. (If a P.O. box, see instructions.): c/o UNION BANK OF CALIFORNIA, 400 CALIFORNIA STREET, 13TH FL

City or town, state, and ZIP code: SAN FRANCISCO, CA 94104

Telephone number (optional): (415) 765-2080

Enter name and address used on original return (If same as above, write "Same."): SAME

Internal Revenue Service Center where original return was filed ▶ OGDEN, UTAH

**Fill in applicable items and use Part II on the back to explain any changes**

**Part I** **Income and Deductions** (see instructions)

| | | (a) As originally reported or as previously adjusted | (b) Net change—increase or (decrease)—explain in Part II | (c) Correct amount |
|---|---|---|---|---|
| 1 Total income (Form 1120 or 1120-A, line 11) STMT. 2 | 1 | 2,950,691,527 | 7,691,255 | 2,958,382,782 |
| 2 Total deductions (total of lines 27 and 29c, Form 1120, or lines 23 and 25c, Form 1120-A) STMT. 2 | 2 | 2,332,520,162 | 63,435,120 | 2,395,955,282 |
| 3 Taxable income. Subtract line 2 from line 1 | 3 | 618,171,365 | (55,743,865) | 562,427,500 |
| 4 Tax (Form 1120, line 31, or Form 1120-A, line 27) STMT. 3 | 4 | 184,370,892 | (19,510,353) | 164,860,539 |

**Payments and Credits** (see instructions)

| | | (a) | (b) | (c) |
|---|---|---|---|---|
| 5a Overpayment in prior year allowed as a credit | 5a | 30,120,190 | 0 | 30,120,190 |
| b Estimated tax payments | 5b | 163,500,000 | 0 | 163,500,000 |
| c Refund applied for on Form 4466 | 5c | | 0 | |
| d Subtract line 5c from the sum of lines 5a and 5b | 5d | 193,620,190 | 0 | 193,620,190 |
| e Tax deposited with Form 7004 | 5e | | 0 | |
| f Credit from Form 2439 | 5f | | 0 | |
| g Credit for Federal tax on fuels | 5g | | 0 | |

| | | |
|---|---|---|
| 6 Tax deposited or paid with (or after) the filing of the original return | 6 | 11,131,710 |
| 7 Add lines 5d through 6, column (c) | 7 | 204,751,900 |
| 8 Overpayment, if any, as shown on original return or as later adjusted | 8 | 20,381,008 |
| 9 Subtract line 8 from line 7 | 9 | 184,370,892 |

**Tax Due or Overpayment** (see instructions)

| | | |
|---|---|---|
| 10 **Tax due.** Subtract line 9 from line 4, column (c). If paying by check, make it payable to the **"United States Treasury"** ▶ | 10 | 0 |
| 11 **Overpayment.** Subtract line 4, column (c), from line 9 ▶ | 11 | 19,510,353 |
| 12 Enter the amount of line 11 you want: **Credited to 20__ estimated tax** ▶ **Refunded** ▶ | 12 | 19,510,353 |

**Sign Here**

Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

▶ [signature] Signature of officer — Date 1/4/06 — ▶ SENIOR VICE PRESIDENT Title

**Paid Preparer's Use Only**

Preparer's signature ▶ — Date — Check if self-employed ☐ — Preparer's SSN or PTIN

Firm's name (or yours if self-employed), address, and ZIP code ▶ — EIN — Phone no.

**For Privacy Act and Paperwork Reduction Act Notice, see page 4.**

ISA STF FED4298F.1

Form **1120X** (Rev. 12-2004)

**Part II** **Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** on page 3 of the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see **Carryback Claims** on page 3, and check here . . . . ▶ ☐

See Statement 1.

**UnionBanCal Corporation & Subsidiaries**
**94-1234979**

**Attachment to Form 1120X**
**Tax Year Ending December 31, 2002**

**Explanation of changes to items in Part I**

UnionBanCal Corporation and Subsidiaries reported income and deductions in its originally filed tax return with respect to the two "LILO" transactions named below. The IRS has disallowed the income and deductions claimed. The IRS also adjusted interest income with respect to these two transactions. We are claiming a refund of all amounts adjusted by the IRS.

| | Engelhard Equipment Trust-1998 | Anaheim Pond | Total |
|---|---|---|---|
| Line 1: Total Income | | | |
| Interest income | (1,575,311) | (1,502,680) | (3,077,991) |
| Gross rents | 6,121,303 | 4,647,943 | 10,769,246 |
| Line 2: Total Deductions | | | |
| Rent expense | 19,595,450 | 31,110,811 | 50,706,261 |
| Interest expense | 6,057,790 | 6,520,551 | 12,578,341 |
| Amortization | 54,253 | 96,266 | 150,519 |
| Taxable Income | (21,161,501) | (34,582,365) | (55,743,866) |

**UnionBanCal Corporation & Subsidiaries**
**94-1234979**

**Attachment to Form 1120X**
**Tax Year Ending December 31, 2002**

**Explanation of changes to items in Part I**

UnionBanCal Corporation and Subsidiaries reported income and deductions in its originally filed tax return with respect to the two "LILO" transactions named below. The IRS has disallowed the income and deductions claimed.
The IRS also adjusted interest income with respect to these two transactions.
We are claiming a refund of all taxes paid with respect to the amounts adjusted by the IRS.

The additional tax resulting from these adjustments was paid on December 5, 2005.

Assuming that the IRS intends to deny this refund claim, the taxpayer requests that IRS do so as soon as possible.

| | Engelhard Equipment Trust-1998 | Anaheim Pond | Total |
|---|---|---|---|
| Line 1: Total Income | | | |
| Interest income | (1,575,311) | (1,502,680) | (3,077,991) |
| Gross rents | 6,121,303 | 4,647,943 | 10,769,246 |
| Line 2: Total Deductions | | | |
| Rent expense | 19,595,450 | 31,110,811 | 50,706,261 |
| Interest expense | 6,057,790 | 6,520,551 | 12,578,341 |
| Amortization | 54,253 | 96,266 | 150,519 |
| Taxable Income | (21,161,501) | (34,582,365) | (55,743,866) |

**UnionBancal Corporation & Subsidiaries**
**:nded Federal Tax Return - Form 1120X, Schedule J**
**For Tax Year Ended: 12/31/2002**

**FEIN: 94-1234979**

**Statement 3**

| Line # | Description | Total Tax as originally filed Amount | IRS Audit Form 4549-A | 1120 X (a) Total Tax As Previously Adjusted | 1120X (b) Net change increase (Decrease) | 1120X (c) Correct Amount |
|---|---|---|---|---|---|---|
| 30 | Page 1 - Taxable income | 585,579,070 | 32,592,295 | 618,171,365 | (55,743,866) | 562,427,499 |
| 3 | Income tax - 35% | 204,952,675 | 11,407,303 | 216,359,978 | (19,510,353) | 196,849,625 |
| 4 | Alternative minimum tax | NONE | | | | |
| 5 | Total lines 3 and 4 | 204,952,675 | 11,407,303 | 216,359,978 | (19,510,353) | 196,849,625 |
| 6a | Foreign tax credit - Form 1118 | 2,014,226 | | 2,014,226 | | 2,014,226 |
| 6d | Business credit - Form 3800 | 29,699,267 | 275,593 | 29,974,860 | | 29,974,860 |
| 7 | Total credits | 31,713,493 | 275,593 | 31,989,086 | - | 31,989,086 |
| 8 | Subtract line 7 from line 5 | 173,239,182 | 11,131,710 | 184,370,892 | (19,510,353) | 164,860,539 |
| 1 | Total tax | 173,239,182 | 11,131,710 | 184,370,892 | (19,510,353) | 164,860,539 |