# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAYER, BROWN, et al., | ) | |
| Plaintiffs, | ) | 1:04 CV-02187 |
| v. | ) | |
| INTERNAL REVENUE SERVICE | ) | |
| Defendant. | ) | |

SECOND DECLARATION OF DEBORAH LAMBERT-DEAN

I, DEBORAH LAMBERT-DEAN, pursuant to the provisions of 28 U.S.C. § 1746, declare and say:

1. I am an attorney in the Office of Chief Counsel, Disclosure & Privacy Law, Branch 2, Internal Revenue Service [IRS] and, since January 2005, I have been assigned to the above-captioned case. I have been employed as an attorney in Disclosure & Privacy Law since September 1987.

2. As part of my official duties, I am responsible for coordinating with the Department of Justice the IRS's defense of the Freedom of Information Act (FOIA) lawsuit in which this declaration is being filed.

3. I have personally reviewed and am familiar with all the documents at issue in this lawsuit.

4. In the "DECLARATION OF DEBORAH LAMBERT-DEAN" dated December 6, 2005, (hereafter referenced as my "first Declaration" or the "12-06-05 Lambert-Dean Declaration") which was submitted to the Court in conjunction with the Government's Motion for Summary Judgment, I described the IRS search for



DEFENDANT'S EXHIBIT 1

responsive documents and those categories of documents which the IRS has determined to be responsive to plaintiff's Freedom of Information Act (FOIA) request, but which were exempt from disclosure under the FOIA.

5. I am submitting the instant Declaration in response to plaintiff's "Cross-Motion for Summary Judgment," dated January 20, 2006. I have attempted to structure my responses to correspond to certain of the issues that were raised by plaintiff in their "MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE INTERNAL REVENUE SERVICE'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF MAYER BROWN'S CROSS-MOTION FOR SUMMARY JUDGMENT" (hereafter referenced as the "Cross-Motion").

6. Plaintiff has indicated in its "Cross-Motion" that it is interested in a broader interpretation of the documents sought in its FOIA requests, such that all documents "pertaining" to the published guidance as well as "post-decisional interpretive documents" would be responsive. Based on this interpretation of the documents sought, plaintiff has requested that the agency undertake a new search for responsive documents. Such an expansive interpretation of plaintiff's requests, effectively capturing all documents that in any way "pertain" to any of the published guidance at issue, would be an enormous burden to the agency. For example, there were settlement discussions undertaken between the IRS and numerous taxpayers who had engaged in prohibited leasing arrangements which were encompassed under a "global settlement initiative" project. This project, along with initiatives associated with a "joint task force" formed by the IRS with respect to these leasing

practices resulted in the creation of thousands of pages of documents, of which I am aware. These "global settlement initiative" documents as well as the documents generated as a result of the "joint task force" were not pertinent to the formulation of any published guidance, but rather are documents that were generated after the agency had finalized its position with respect to LILO transactions. These documents are associated with the agency's enforcement proceedings with respect to identified taxpayers who had been involved in these types of prohibited leasing practices. Additionally, such documents would most likely consist in large-part of data that is subject to the confidentiality provisions of 26 U.S.C. § 6103, the type of information which plaintiff has indicated it is not interested in obtaining. Further, having not represented to those functions that were asked to search that responsive documents would encompass all documents that "pertain" to LILO and SILO the published guidance in any manner, including documents generated after such published guidance was finalized, I do not know that initiatives such as the global settlement and task force projects are the only such initiatives that may generate documents responsive to such an expansive request. There may well be a myriad of further information that is unknown to our office at this time which would in some manner "pertain" to a "post decisional" interpretation of LILO/SILO published guidance.

7. Plaintiff has indicated at page 11 of their "Cross-Motion" that it has narrowed the scope of documents sought to exclude the material withheld under FOIA Exemption 2 (*see* ¶ 28 of the 12-6-05 Lambert-Dean Declaration), FOIA Exemption 3 asserted in conjunction with 26 U.S.C. § 6103 (*see* ¶ 29-31 of the 12-6-

05 Lambert-Dean Declaration), FOIA Exemption 5 as attorney client privileged as described at paragraphs 33(a) and 33(c) of the 12-6-05 Lambert-Dean Declaration, FOIA Exemption 5 as attorney work product as described at ¶ 34 of the 12-6-05 Lambert-Dean Declaration, and FOIA Exemption 6 (*see* ¶ 40-43 of the 12-6-05 Lambert-Dean Declaration).

8. Excluding those documents referenced in paragraph 7, *supra*, the documents that remain at issue fall within either the "deliberative process" or the "attorney-client" component of FOIA, Exemption 5, or FOIA Exemption 7(E).

9. With respect to those documents remaining at issue which the agency asserts are protected by the deliberative process privilege, FOIA Exemption 5, these total approximately 15,701 pages.[1] Of these 15,701 pages, approximately 8,245 pages are drafts of requested published guidance, including the Lease-in Lease-Out Appeals Settlement Guidelines (LILO ASG) (approximately 1,243 pages), the LILO Coordinated Issue Paper (LILO CIP) (approximately 1,592 pages), Revenue Rulings 99-14 (approximately 81 pages) and 2002-69 (approximately 634 pages), and the Sale-in Lease-Out Notice 2005-13 (the SILO Notice) (approximately 4,695 pages). The remainder of the documents at issue for which the Government is asserting FOIA Exemption 5 and the deliberative process privilege total approximately 7,456 pages.

10. Approximately 8,245 pages of documents remaining at issue in the instant case are drafts of published guidance that have been issued and are

---

1 I have personally counted all the pages referenced in this paragraph, but I have only gone through and counted them once. I believe these pages number totals are reasonably accurate, but without double or triple counting for accuracy, I do not feel comfortable making such a definitive statement. Therefore, I have used the qualifier "approximately" prior to each page number total.

available to the public in their final version. Plaintiff has requested that the Court order defendant to prepare a "Vaughn index" with respect to all documents for which the agency has asserted deliberative process privilege. These "draft" documents were described in paragraphs 36 and 37 of my first Declaration and any further attempt to more completely describe drafts of published guidance in various stages of development in a Vaughn index format would be repetitive and time-consuming to the IRS and would not in any meaningful way advance the plaintiff's or the court's understanding of the documents in question for the purpose of the pending cross-motion for summary judgment. As to final decisions that were made by agency executives with respect to agency positions regarding LILO/SILO transactions, the final decisionmakers did not adopt or incorporate the deliberations contained in these drafts documents. Furthermore, drafts of published guidance that are subsequently finalized are not relied upon by the agency in any of its dealings with the taxpaying public as only the final product provides instruction and guidance for decisions made by agency personnel with respect to any tax matter. Such draft documents are maintained by the agency only as an historical record of the deliberations with respect to the guidance that lead up to the formulation of the final product. These draft documents are retained in a case file associated with the guidance project to which they pertain and occasionally also by the individuals who worked on the draft. They are not distributed within the agency, nor are they stored in any database that would be available to agency personnel working on related matters. It is the policy within the Office of Chief Counsel to place reliance only upon finalized published guidance. This policy is reflected in Chief Counsel Notice

2003-014 which clarifies the authoritative position that finalized published guidance has within the Office of Chief Counsel of the IRS by instructing that all Chief Counsel attorneys are required to follow the legal positions established in finalized published guidance in advice and litigation. (A copy of this Notice, CC-2003-014, issued May 8, 2003, is attached as Exhibit A to this Declaration).

11. To estimate the burden that may be placed upon the agency should the court determine to order a Vaughn index of remaining documents at issue, including draft documents, I have attempted to determine the number of hours worked on this specific case (the Mayer, Brown FOIA litigation) by IRS Chief Counsel personnel through the end of the fiscal year that ended September 30, 2005. By my estimate, personnel within the Office of Chief Counsel have worked approximately 2700 hours on the instant litigation through September 30, 2005. This time includes search and processing time for the documents at issue. In an effort that would be more akin to the formulation of a Vaughn Index, myself and a paralegal within the Legal Processing Division of the Office of Associate Chief Counsel for Procedure & Administration worked approximately 530 hours preparing the Privilege Log with respect to the BB&T litigation concerning the LILO Revenue Rulings and LILO CIP documents that is described in my first Declaration at ¶ 25. Given the demands made upon the attorneys in my office by other litigation, advisory opinions, published guidance projects, etc., I believe that any index sufficient to meet the requirements for a Vaughn index would take many months of attorney work time to complete.

12. With respect to the single document described in paragraph 33(b) of my first declaration as pages 5670-71, and which we identified specifically as

falling within the attorney-client privilege as it is articulated at Exemption 5 to the FOIA, plaintiff in its "Cross-Motion" has expressed an interest in more information about this document. It is a memorandum written by an attorney in the Office of the Associate Chief Counsel for Financial Institutions and Products (FIP) in response to a request from an attorney in the Office of Associate Chief Counsel, Passthroughs and Special Industries (PSI). The opening paragraph of the document indicates that the attorney in PSI had provided the FIP attorney with language that had been proposed for inclusion in a Revenue Agents Report and Form 5701 (Notice of Proposed Adjustment) associated with LILO transactions that were being prepared for issuance by a field office of the IRS. The PSI attorney had requested that FIP review the documents and apply its subject matter expertise to the issues raised by the documents and provide any necessary analysis to PSI prior to the finalization of the RAR/Form 5701. The body of the memorandum is a discussion of issues raised by the proposed RAR/Form 5701, for which FIP retains subject matter jurisdiction within the Office of Chief Counsel, with analysis supported in some instances by case law as to whether certain portions of the documents should be revised and suggestions as to nature of those revisions. The tone of the response indicates that the advice rendered was intended to be confidential. This document was provided to our office by the Office of Division Counsel (Large and Mid-Size Business) (LMSB). LMSB was the function charged with preparation of the RAR/Form 5701 at issue in the memorandum and the electronic mail communications that immediately precede pages 5670-71 suggest that LMSB had sought out the advice of both

PSI and FIP with respect to certain issues presented during the drafting of the RAR/Form 5701. There is no indication that this document was dispersed within the agency outside these functions, then or subsequently. Indeed, in my review of all documents responsive to plaintiff's "LILO requests," I found only this one copy of this memorandum. This document is also deliberative in that it is not a final signed document and there are handwritten notations on the document that indicate someone reviewing it was making determinations as to what information would be included within the final version of the memorandum. Therefore, this document is included within those documents described at ¶¶ 36 (generally) and 39(a) (specifically) of my first Declaration where the agency asserted that in addition to falling within the attorney-client privilege at Exemption 5 of the FOIA, this document is also exempt from disclosure under the FOIA under the deliberative process privilege at Exemption 5.

13. With respect to the draft LILO ASGs that are described at ¶ 44 and (more fully) at ¶ 12 and footnote 7 in my first Declaration, certain portions of documents were not released because the material therein is exempt from disclosure pursuant to FOIA exemption (b)(7)(E). Exemption (b)(7)(E) provides an exemption from disclosure for "records or information compiled for law enforcement purposes . . . [which] would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." Certain portions of draft LILO Appeals Settlement Guidelines(LILO ASG) as well as the final version

of that document as it was released to the public, consist of material that falls within Exemption 7(E) because they relate to specific predominately internal settlement guideline ranges. The information at issue consists of an articulation of the Service's ultimate objectives, specific settlement ranges or percentages, and assessments of litigating hazards and vulnerabilities associated with the Service positions. ASGs set parameters by which appeals officers enforce tax laws under the Internal Revenue Code, thus meeting the requirement that they be "records compiled for law enforcement purposes." While it is true that legislative initiatives have resulted in a prohibition of these abusive leasing transactions since 2004, there are still active settlement discussions ongoing between the IRS and taxpayers who engaged in LILO transactions. Plaintiff acknowledges this on-going enforcement activity in their "Cross-Motion" at page 11, stating that the IRS has either "audited or is in the process of conducting audits of substantially all taxpayers which engaged in LILO and tax-exempt sale-leaseback transactions. The total amount at issue will likely be in the billions of dollars." At present, based on information obtained from the Office of the Director of Appeals, there are more than 50 LILO cases open and pending in the Appeals function with an estimated total tax at issue of almost 1.5 billion dollars. There are more than 1 dozen LILO cases open in the Compliance function with an estimated total tax at issue of almost 1.2 billion dollars. There are currently two LILO cases in litigation. The Appeals Division estimates that approximately 80% of the affected LILO taxpayers have not yet resolved their tax liabilities. The revelation of the types of material for which we have asserted Exemption

7(E), including the disclosure of settlement strategies, assessments of litigating hazards, and acceptable ranges or percentages for settlement, and similar "tolerance" information could have a very real and immediate impact upon these open cases resulting in according taxpayers an unfair advantage in the negotiation process to the detriment of the public fisc. Further, these ongoing enforcement actions are being undertaken with respect to those taxpayers who have come forward and identified themselves to the agency as entities that engaged in prohibited leasing practices. There may very well be any number of other participants in such activities who remain unknown to the IRS. Providing information with respect to settlement ranges and hazards assessments to those who may be attempting to assess whether the odds are in their favor if they try to stay hidden or whether they should risk presenting themselves to the IRS, as well as to current and potential future litigants would likewise place the IRS at an unfair disadvantage. Furthermore, disclosure of the guidelines could prejudice the agency's interests in identifying which of the outstanding cases are the "best" cases to litigate in an attempt to establish correct principles of tax law. Moreover, plaintiff's, at page 7 of their Cross-Motion, noted that the issuance of Revenue Ruling 99-14 had resulted in the discontinuance of LILO structured leasing arrangements by taxpayers, but taxpayers continued to enter into SILO transactions as a tax avoidance scheme until legislative initiatives stymied these schemes as well. As plaintiffs have very effectively pointed out in their Cross-Motion, as soon as the IRS or Congress takes action to halt one abusive tax avoidance scheme, taxpayers will attempt to maneuver their transactions in such

a way as to create another. To allow the disclosure of the information at issue in these drafts LILO ASGs which the agency asserts is protected by Exemption 7(E) would unfairly tip the balance in favor of those taxpayers who were attempting to circumvent the law by continuing to engage in activities which the IRS had clearly signaled it considered illegal. As an example of the types of incentives taxpayers have to engage in such risky behavior, LMSB estimates that there were about 50 taxpayers involved in almost 400 SILO transactions for which they claimed tax deductions in excess of 35 billion dollars.

14. With respect to all draft LILO ASG documents which were withheld in their entirety, the agency asserts that these documents fall within the deliberative process exemption to the FOIA, Exemption 5. (See ¶ 37(d) of my first Declaration, with respect to the assertion of Exemption 5 for all draft LILO ASGs withheld in their entirety). With respect to those draft LILO ASGs that were released in part, and which are described at ¶¶ 12 and 44 of my first Declaration, the agency asserts FOIA Exemption (b)(7)(E), for the reasons cited in the preceding paragraph, for those portions of these documents that were withheld. (See ¶ 13 of the "Second Lambert-Dean Declaration").

15. As I represented in my first Declaration, I am familiar with the segregation requirement of subsection (b) of the FOIA for any nonexempt information contained in responsive agency records. In my review of responsive documents, I attempted to make every reasonably segregable non-exempt portion of every responsive document available to the plaintiff. With respect to the determination as to whether entire pages of documents, especially electronic

mail transmittals, were withheld in their entirety, I looked to the standard of whether any meaningful data would be made available to plaintiff after having determined what of the data was deliberative. When, after looking to redact deliberative data from the documents, I determined that the only data that would not fall within the deliberative process exemption to the FOIA were items such as the "to" and "from" lines in message headings and/or words or sentence fragments that were of no consequence and/or render the document meaningless, I withheld the document in its entirety.

16. With respect to a letter sent to plaintiff by Symeria Rascoe, an employee in the Office of Governmental Liaison and Disclosure (GLD), dated January 13, 2005, and referenced at ¶ 4 of "Mayer, Brown, Rowe & Maw LLP's Statement of Material Facts as to Which There is No Genuine Dispute," any communication between plaintiff and the IRS after the date that plaintiff files litigation is properly channeled through the Department of Justice attorney who represents the agency in the case. Furthermore, within the IRS, after a requester has filed suit with respect to a FOIA request, my office assumes

//////////

//////////

//////////

//////////

//////////

//////////

//////////

jurisdiction for all matters related to that litigation. Therefore, at the time Ms. Rascoe issued this letter, her office was no longer responsible for responding to plaintiffs' FOIA requests and retained no subject matter jurisdiction.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 15, 2006.

[signature]

DEBORAH LAMBERT-DEAN
Office of Chief Counsel
(Disclosure & Privacy Law)
Internal Revenue Service
Washington, D.C. 20224

Department of the Treasury | Internal Revenue Service | Office of Chief Counsel

# Notice

CC-2003-014

May 8, 2003

**Subject:** Following Published Guidance in Advice and Litigation

**Cancellation Date:** Upon Incorporation Into the CCDM

## Purpose

This notice clarifies and supersedes the Chief Counsel Notice (CC-2002-043) dated October 17, 2002, regarding the requirement that Chief Counsel attorneys follow legal positions established by published guidance in papers filed in the Tax Court or in defense or suit letters sent to the Department of Justice. This notice also continues the requirement established in the previous notice that all briefs, trial memoranda and motions to be filed in the Tax Court or letters to the Department of Justice that seek to distinguish a position set forth in published guidance shall be subject to national office review prior to filing in the Tax Court or transmission to the Department of Justice.

## Discussion

### Overview

This topic was recently discussed as part of the mandatory Ethics IVT broadcast nationwide on May 5, 2003. In that IVT, we went over what should now be familiar principles that were derived from the Chief Counsel's Roles memo issued on August 26, 2002. In short, those principles are as follows. Published guidance comes within the province of the Associate Chief Counsel offices. In contrast, litigation primarily falls under the jurisdiction of the Division Counsel. Tax policy should not be made through litigation. Therefore, our litigating positions should be derived from, and consistent with, the Internal Revenue Code and our published guidance. Any disagreement between a Division Counsel office and an Associate Chief Counsel office concerning the legal positions to be pursued in litigation or other resolution of a case, and whether a position proposed to be taken in a particular case conflicts with published guidance, should be resolved through the existing reconciliation procedures.

### Specific rules

The specific rules regarding the requirement to follow published guidance are as follows:

**(1) Chief Counsel attorneys may not argue contrary to final guidance**

Filing Instructions: Binders________ Master Sets: NO X RO___
NO: Circulate___Distribute X to: All Personnel___Attorneys X In: all divisions
RO: Circulate___Distribute X to: All Personnel___Attorneys X In: all divisions
Other: National FOIA Reading Room
Electronic Filename: CC-2003-014 Original signed copy in:________

Exhibit A

Final guidance consists of final regulations, temporary regulations, revenue rulings, revenue procedures, IRB notices, and announcements. PLRs, TAMs or CCA do not constitute final guidance. Those documents are case specific and are not prepared with the intention of having other taxpayers rely upon them. They are, however, guidance with respect to the taxpayer whose transaction or case was the subject of the ruling or advice. Good judgment dictates, however, that Chief Counsel attorneys should coordinate with the Associate Chief Counsel office with subject matter jurisdiction over the issue if a Chief Counsel attorney proposes to take a position that conflicts with any PLR, TAM or CCA addressing the issue. This potential conflict may suggest an internal disagreement between the Associate Chief Counsel office and Division Counsel office, or between two Associate Chief Counsel offices, that requires reconciliation.

**(a) Final or temporary regulations in force**

If there are final or temporary regulations in force regarding an issue, Chief Counsel attorneys generally should follow the final or temporary regulations, even if the Service has subsequently issued proposed regulations addressing the issue, which might yield a different result if the proposed regulations were actually adopted and in effect. For example, if the application of the proposed regulations would have an adverse effect on the taxpayer by reaching a result that is not achievable under the final or temporary regulations, then the proposed regulations should not be applied in that situation. Proposed regulations do not operate to alter temporary or final regulations until they are finalized and adopted. Hence, where there are final or temporary regulations on an issue, as well as proposed regulations, Chief Counsel attorneys should follow the final or temporary regulations, not the proposed regulations.

**(2) Effect of proposed regulations**

Proposed regulations have no legal effect unless and until they are adopted. This is so, even if there are no final or temporary regulations currently in force pertaining to the matter in question. Prior to adoption, proposed regulations can be withdrawn or modified at any time. Taxpayers generally should not rely on proposed regulations for planning purposes, except where there are no applicable final or temporary regulations in force and there is an express statement in the proposed regulations that taxpayers may rely on them currently. If there are applicable final or temporary regulations in force, taxpayers may only rely on proposed regulations for planning purposes in the limited circumstance where the proposed regulations contain an express statement permitting taxpayers to rely on them currently, notwithstanding the existence of the final or temporary regulations. In contrast, as set forth in rule (3), Chief Counsel attorneys should look to the proposed regulations to determine the office's position on the issue.

**(a) Proposed regulations should not be the subject of PLRs or TAMs**

In light of the fact that proposed regulations have no legal effect, Chief Counsel attorneys should not issue PLRs or TAMs interpreting proposed regulations. Instead, PLRs or TAMs should interpret the statute, taking into account relevant case law and final guidance. Of course, that interpretation should be consistent with, and guided by, the proposed regulations, unless there are final or temporary regulations in force pertaining to the matter, in which case, the final or temporary regulations should be followed as stated in rule (1)(a). Moreover, proposed regulations should not be cited as authority for the positions taken in PLRs or TAMs. Rather, PLRs or TAMs should set forth the reasoning supporting the positions in the proposed

regulations. It is permissible, however, to refer to the proposed regulations for illustrative purposes to show that the office is being consistent in its interpretation of the statute.[1]

**(3) If there are no final or temporary regulations currently in force addressing a particular matter, Chief Counsel attorneys may not take a position that is inconsistent with proposed regulations[2]**

If there are no final or temporary regulations currently in force addressing a particular matter, but there are proposed regulations on point, consistent with the principles set forth in rules (2) and (2)(a), Chief Counsel attorneys should look to the proposed regulations to determine the office's position on the issue. Thus, Chief Counsel attorneys ordinarily should not take any position in litigation or advice that would yield a result that would be harsher to the taxpayer than what the taxpayer would be allowed under the proposed regulations. In this regard, if a taxpayer has not followed the proposed regulations, but takes a position that is nonetheless a reasonable interpretation of the statute, coordination with the Associate Chief Counsel office having subject matter jurisdiction over the issue would be appropriate to determine the best course of action.

**(4) Perceived conflicts between proposed regulations and final guidance or between two or more pieces of nonregulatory final guidance should be coordinated**

If a Chief Counsel attorney believes that a proposed regulation conflicts with a revenue ruling, notice, announcement or other final guidance, the matter should be brought to the attention of the Associate Chief Counsel office with subject matter jurisdiction over the issue. Similarly, notification and reconciliation is appropriate if the perceived conflict is between two or more revenue rulings, notices, announcements or other nonregulatory final guidance. This may occur, for example, where a proposed regulation has been outstanding for a long time but due to more recent events, the office issues a notice stating that a position set forth in the proposed regulation is being reconsidered.

**(5) Case law invalidating or disagreeing with the Service's published guidance does not alter rule 1 or 3**

Chief Counsel attorneys may <u>not</u> rely on case law to take a position that is less favorable to the taxpayer in a particular case than the position set forth in published guidance. This means that in circumstances where Chief Counsel attorneys must follow published guidance under the rules set forth above, it is irrelevant that the result under the case law would be more advantageous to the Service than under the Service's published guidance. Under those circumstances, Chief Counsel attorneys must follow the position in the published guidance and give the taxpayer the more beneficial treatment, notwithstanding that the treatment is inconsistent with the case law. For example, if a revenue ruling provides that a particular expense may be currently deducted, Chief Counsel attorneys should not challenge the deduction even though under the applicable case law, the expense might be capitalized.

---

[1] The principles stated herein are also applicable to briefs, other court filings, and letters to the Department of Justice.

[2] But see rule (4) regarding circumstances where subsequently issued published guidance calls into question the continuing vitality of the proposed regulations.

**(6) The government's authority to resolve cases through settlement or other dispute resolution mechanisms remains unchanged, so long as the rules set forth above are not violated**

The requirement to follow published guidance means that Chief Counsel attorneys are prohibited from taking positions in litigation or advice that is inconsistent with published guidance. That does not mean, however, that every case presenting an issue that is the subject of published guidance must be litigated if the taxpayer does not concede the issue in full. In other words, this requirement is not intended to foreclose the possibility of recommending settlement or concession of an issue in a particular case based on litigating hazards. For example, if there is an adverse circuit court opinion on an issue governed by published guidance, it may be appropriate in a TAM, CCA or other legal advice to recommend settlement or concession of the issue in light of Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971), since the Tax Court ordinarily would follow the adverse circuit court precedent. The exception would be if the Service is seeking a vehicle to request the circuit court to reconsider the issue or the Service is continuing to litigate the issue in other circuits in an effort to create a conflict among the circuits for the purpose of seeking Supreme Court review of the issue. A relevant consideration in giving advice in this situation is whether the Service issued an AOD stating what action should be taken in cases appealable to the adverse circuit. Since this is likely to be a fluid situation, the matter should be coordinated with the Associate Chief Counsel office with subject matter jurisdiction over the issue.

**Distinguishing published guidance**

Reasonable minds can sometimes differ over whether a proposed position in a current case can be effectively distinguished from an existing published position. Likewise, Chief Counsel attorneys may encounter rulings that appear outdated or inconsistent with well-established case law. In those situations, Chief Counsel attorneys should bring the ruling or other published guidance to the attention of the Associate Chief Counsel office with subject matter jurisdiction over the issue so that the Associate Chief Counsel office can consider whether to revoke or modify the published guidance or determine whether the published guidance can be distinguished in a particular case. Accordingly, all briefs, motions, trial memoranda and letters that seek to distinguish a litigation position from a published guidance position must be reviewed by the national office prior to filing with the Tax Court or transmission to the Department of Justice, regardless of the issue or amount involved.

**Conclusion**

Our litigating positions should be derived from, and consistent with, the Internal Revenue Code and our published guidance. A reading of the Roles Memo and the Tax Court opinions where the court has found that respondent argued contrary to published guidance should make us sensitive to that principle. See Rauenhorst v. Commissioner, 119 T.C. 157 (2002); Walker v. Commissioner, 101 T.C. 537 (1993); Phillips v. Commissioner, 88 T.C. 529 (1987). See also Byrne v. Commissioner, T.C. Memo. 2002-319.

**Effect on other documents**

Chief Counsel Notice CC-2002-043 is clarified, modified and superseded.

Any questions regarding the matters contained herein should be directed to George Bowden or Henry Schneiderman of the Office of the Associate Chief Counsel (Procedure and Administration) at (202) 622-3400.

/s/
DEBORAH A. BUTLER
Associate Chief Counsel
(Procedure and Administration)