# EXHIBIT 4

## V. RISK CONSIDERATIONS

Credit

Credit related risks are nominal. However, the transaction is complicated by limits to the City's obligations and the existing COPS Financing. The City has only limited liability in connection with the COPS Financing, and recourse for payments thereunder is limited to a senior position on the revenues (after operating expenses including Ogden's Management Fee) generated by the property. Similarly, recourse to the City shall be limited to its interest in the Facility with respect to its obligations under this transaction. The City's interest in the Facility is currently valued at approximately $40 million based on the Deloitte and Touche appraisal less outstanding debt under the COPS financing (approximately $110 million).

Credit concerns have been principally mitigated by a very strong collateral package. On the closing date, the Sublessee will enter into a payment undertaking agreement (the "Equity PUA") with AIG Match Funding Corporation, a Delaware Corporation, (the "Equity Payment Undertaker"). Pursuant to the Equity PUA, the Sublessee, by paying a fee to the Equity Payment Undertaker on the closing date, will economically defease its obligation to pay (a) the equity portion of Sublease Base Term Rent, and (b) if the Purchase Option is exercised, the equity portion of the Purchase Option Price. The amounts described in clauses (a) and (b) are referred to as the "Equity Portion of Lease Rent". The obligations of the Equity Payment Undertaker under the Equity PUA will be guaranteed by AIG, Incorporated, which holds the highest ratings from Standard & Poor's and Moody's.

In addition, at financial closing, the Ogden shall arrange for the Equity Investor to receive an irrevocable, unconditional standby letter of credit equal to the highest "Equity Strip Value" in effect during the period the letter of credit is outstanding. The Equity Strip Value represents the difference between the equity portion of the Sublease termination value and the balance of the Equity PUA and any additional collateral (collectively, the "Equity Collateral") at any point in time. The letter of credit will also cover market fluctuations of the Equity Collateral. Furthermore, Ogden shall be further obligated to cover any shortfall that may still exist. It is anticipated that First Union National Bank, which is rated A+ and Aa3 by S&P and Moody's, respectively, will be the provider of the letter of credit supporting the Equity Strip Value. In addition, the Sublessee shall be obligated to replace the letter of credit provider in the event of a downgrade below A or A3 by S&P or Moody's respectively. Furthermore, the debt under the Head Lease has its own security package and is expressly excluded from security provided by the Equity Collateral.

Though the aforementioned obligations can be expected, at any point in time, to economically defease the obligations of the Sublessee to the Sublessor, there is no legal defeasance of the Sublessee's obligations. Limited to its interest in the Facility, the City shall be responsible only for non-payment of rent and City bad acts. With the exception of a guarantee of rent, Ogden will guarantee or be directly responsible for all obligations of the Sublessee including the Equity Strip letter of credit, breakage costs, indemnities, etc. In addition, they will pledge all of their revenues arising from the Facility including those arising from the Management Agreement.

**Residual**

In the Sublease, Bankers Commercial Corporation retains a substantial net book value at the end of the Sublease Base Term. However, the transaction structure and internal assumptions mitigate residual risk. Upon expiration of the Sublease Base Term, the Sublessee may exercise the Purchase Option, causing Bankers Commercial Corporation to realize its booked net after-tax return with no recognizable accounting gain or loss. This is the most attractive option for Bankers Commercial Corporation. However, due to the true lease requirements, the transaction has been carefully structured so as not to economically compel the Sublessee to exercise the Purchase Option. Accordingly, there are no assurances (legal or economic) that the Sublessee will actually exercise the Purchase Option.

In the event that the Sublessee elects not to exercise the Purchase Option, the Sublessor may exercise the Renewal Option or choose from two other options that effectively allow the Sublessor to act as an owner/operator and to assume the relative economic risks and rewards. In the event that the Sublessor elects the Renewal Option, Bankers Commercial Corporation would still realize its after-tax book return. Sublease income during the Sublease Renewal Term would be small relative to the net book value of the investment. Accordingly, this is a much less attractive alternative than the Purchase Option due to the resulting poor accounting returns and the concurrent reduction of average ROA of the investment. The benefit of the Sublease Renewal Option, however, is to protect Bankers Commercial Corporation from any residual losses (economic or accounting) in the event that the Purchase Option is not exercised by the Sublessee.

If the Sublessee elects not to exercise the Purchase Option and the Sublessor elects not to exercise the Renewal Option, Bankers Commercial Corporation's identification of another lessee/operator would yield available returns dependent upon the actual market circumstances at the end of the Sublease Base Term.

**Tax**

Leaseholds represent one of the most attractive tax-advantaged products in the leasing market. The tax deferral represents a substantial portion of the yield from the investment. Though the tax benefit is not essential to a return of the investment, it is essential to obtaining an acceptable return on the investment. The cash yield, without taking into account any of the inherent tax benefits, is slightly less than 3% pre-tax. Overall, given the highly-structured nature of the transaction and the significant tax benefits, the associated tax risks are considered to be on the high end of the spectrum of investments that the Equipment Leasing Division would likely recommend.

Leaseholds are a relatively recent development in leveraged lease tax structured transactions. As such, there are no published cases or rulings that deal directly with the tax aspects of these transactions. Bankers Commercial Corporation will obtain a tax opinion from Thelen Reid & Priest LLP, serving as outside legal counsel, stating that it should prevail in all material respects if the transaction were to be challenged by the IRS (a "should" opinion). The opinion is expected to cover the timing and character of the deductions of the Head Lease advance and deferred payments, the timing and character of income from the Sublease Base Term and the Sublease

Renewal Term payments, the deduction of interest payments on the nonrecourse debt, and the entitlement of Bankers Commercial Corporation to take into account all items of income, gain, loss, and deductions as owner of the grantor trust.

The following is a brief discussion of critical assumptions which must be upheld for the transaction to be successful:

**The head lease and sublease must be treated as true leases.**
In order to realize the tax benefits from the transaction, the head lease and subleases must be characterized as true leases. Whether an arrangement is a lease for income tax purposes is a factual determination. The IRS has published certain guidelines which, if met, provide a "safe harbor" in characterizing leveraged leases as true leases. There are also a large number of tax cases in which the courts have decided whether a particular arrangement constituted a true lease.

Bankers Commercial Corporation will obtain an appraisal from Deloitte & Touche Valuation Services which will value the equipment in light of IRS true lease guidelines. Among the critical conclusions in the appraisal will be the following:

- The head lease term does not exceed 80 percent of the useful life of the assets.
- The fair market value at the end of the head lease term will be at least 20 percent of the value of the assets at the closing date.
- The purchase option price will exceed the expected market value at the date of that option and, therefore, will not constitute a bargain purchase.

The IRS may take the position that the head lease or the sublease are not true leases. It may disagree with the factual basis for the appraisal conclusions and, therefore, claim that the true lease guidelines are not met. It may take the position, considering the head lease and the sublease together, that there is no business purpose for the transaction other than the creation of tax benefits and, therefore, that it is a sham.

Bankers Commercial Corporation's counsel's legal opinion will state that the head lease and the sublease should each be treated as true leases.

**The head lease advance rent must be deductible in accordance with the allocations specified in the lease.** The tax shelter aspect of the transaction is derived from the allocation of the advance rent to the initial years of the head lease term. In order for such allocation of the rent deductions respected, both the head lease rent payments (the advance rent and the deferred rent) must be considered together and must meet the requirements set forth in proposed regulations under IRC Section 467 (the "90/110 safe harbor"). This transaction has been structured so that the 90/110 safe harbor requirements will be met.

If the IRS were to recharacterize the advance rent as a loan to the lessee, the up-front deductions would be lost. If the deferred rent, which is not due until five years after the termination of the head lease, were to be found not to be fixed and determinable, then the entire head lease would fail to meet the 90/110 safe harbor and the deductions would be lost. The IRS may also argue that the rental deductions do not result in a "clear reflection" of income, when taken together

with the recognition of rental income.

Bankers Commercial Corporation's legal counsel's opinion will state that the head lease advance rent should be deductible in accordance with the allocations specified in the lease.

**The head lease deferred rent must be deductible under the present value and interest concepts set forth in the proposed regulations under IRC Section 467.** The timing of deductions for the deferred rent payment is subject to the same risks described above. Bankers Commercial Corporation's legal counsel's opinion will state that the head lease deferred rent should be deductible in accordance with the present value and interest concepts of IRC Section 467 regulations.

**Rental income from the lease must be includible in gross income in each year as allocated in the lease agreement.** Similar to the pattern of deductions for the head lease rent, allocation of rental income from the sublease, according to the sublease agreement, will be respected if the 90/110 safe harbor is met. In order to meet the safe harbor test, it is essential that the sublease base term and the sublease renewal terms are not aggregated. The appraisal will conclude that the Renewal Option is below market value at the Renewal Option Date and is, therefore, not expected to be exercised.

If the sublease does not meet the safe harbor, the recognition of rental income would be substantially accelerated. The IRS may argue that the factual basis of the appraisal is incorrect and that the base term and the renewal term should be aggregated. The IRS may also argue that the defeasance arrangements with respect to the sublease rent are actual payments of rent rather than security for payments of rent.

Bankers Commercial Corporation's legal counsel's opinion will state that the sublease income should be includible in income each year as allocated in the sublease agreement.

**Interest expense on the nonrecourse loan must be deductible as paid or accrued.** Debt service on the nonrecourse loan is dependent on the Debt Payment Undertaking Agreement, which collateralizes the City's obligations under the Sublease. The IRS may argue that a right of offset exists and, therefore, that the nonrecourse loan is not true debt.

Bankers Commercial Corporation's legal counsel's opinion will state that the nonrecourse loan should be treated as true debt and that deductions are appropriate for interest paid or accrued.

**Other**
The Sublessee will indemnify Bankers Commercial Corporation, as Sublessor, for tax risks not associated with U.S. Federal and State income taxes. Accordingly, tax risks such as withholding, possessory, sales, etc. will not be a risk for Bankers Commercial Corporation.