# EXHIBIT 5

H
U.S. v. Nordberg
D.Mass.,1996.

United States District Court, D. Massachusetts.
UNITED STATES of America, Plaintiff,
v.
Paul C. NORDBERG and Debra L. Nordberg, Defendants.
**No. CIV. A. 93-12681-NMG.**

April 08, 1996.

MEMORANDUM AND ORDER

GORTON, District Judge.
***1** There are five motions currently pending before this Court in the above-entitled civil action: 1) defendants' motion for judgment on the pleadings [Docket # 11], 2) plaintiff's motion for partial summary judgment on defendants' counterclaim [# 12], 3) defendants' motion to compel [# 17], 4) plaintiff's motion for a protective order [# 18], and 5) plaintiff's motion for partial summary judgment [# 20]. For the reasons that follow, the defendants' motion to compel will be denied and plaintiff's motion for summary judgment will be allowed; the remaining motions will, therefore, be denied as moot.

I. *Introduction*

On December 9, 1993, the United States government filed this civil action, pursuant to 26 U.S.C. § 7405, to collect what it asserts was an erroneous refund paid to defendants. Section 7405 provides that "[a]ny portion of a tax imposed by this title, refund of which is erroneously made, ... may be recovered by civil action brought in the name of the United States." The dispute arises out of defendants' 1987 tax return, which was the subject of a lengthy IRS audit that lasted until May, 1990. The issue in the case is whether the defendants' treatment of their 1987 securities trading losses on their 1987 tax return was erroneous as a matter of law.

Although an initial "Audit Report" issued by the IRS to the Nordbergs in May, 1990, indicated no deficiency, the agency later alleged a deficiency of $30,665, plus interest. By December 10, 1991, defendants paid, under protest, the entire amount of the alleged deficiency.

In late December, 1991, the IRS issued a check payable to defendants for $45,188.25 as a refund for overpayment of their 1987 taxes. In May, 1992, however, the IRS informed defendants that the refund was erroneous and requested repayment. Defendants, claiming that the refund was owed to them, refused to return the money. Subsequently, the IRS refused to refund the defendants' claimed overpayments on their 1991 and 1992 tax returns but instead applied those amounts ($2,430 and $5,317, respectively) to the claimed outstanding liability.[FN1]

On December 9, 1993, the United States filed the instant suit to recover the amount of the erroneous refund plus statutory interest. The defendants filed an answer and counterclaim on December 29, 1993, seeking return of the money held by the IRS as credits toward repayment of the alleged deficiency.

II. *Defendants' Motion to Compel [Docket # 17]:*

Defendants' motion to compel asserts that the government has repeatedly objected to and declined to answer requests for admissions and interrogatories concerning various aspects of the IRS' audit of their 1987 tax return. The importance of the audit, at least to the defendants, is further evidenced by their expressed desire to depose IRS employees involved during the process, which has led the government to file a motion for a protective order. The government responds that, in light of the sole issue at stake in the underlying action, the defendants' requests for admissions and production of documents fail to satisfy the requirements of Fed.R.Civ.P.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26(b). This Court agrees.

***2** Resolution of the case at bar turns solely on the specific issue of whether the Nordbergs' treatment of their 1987 trading losses was erroneous as a matter of law. Their discovery requests seek to obtain information about the reasoning and processes by which IRS employees involved with the audit of the taxpayers' return decided to assess the tax liabilities with respect to their trading transactions. The discovery does not relate to the facts existing during 1987, upon which the IRS determinations were based. In light of the principle that a challenge to a tax determination results in a trial *de novo* rather than a review by this Court of an existing administrative record, the defendants' discovery requests fail to satisfy the mandate of Fed.R.Civ.P. 26(b) that information sought to be discovered be relevant or "reasonably calculated to lead to the discovery of admissible evidence." *See, e.g., Lewis v. Reynolds,* 284 U.S. 281, 283 (1932); *Ruth v. United States,* 823 F.2d 1091, 1094 (7th Cir.1987) ("courts conduct a *de novo* review of the ... assessment"); *Greenberg's Express, Inc. v. Commissioner,* 62 T.C. 324, 328 (1974) (a court's determination as to a taxpayer's liability "must be based on the merits of the case and not any previous record developed at the administrative level").

The information sought by defendants which forms the basis for the motion to compel is, therefore, evidence which would not be relevant to determining their 1987 tax liability. Information about people who participated in the audit is not relevant, nor are notes made by IRS employees during the audit. Indeed, the audit of the Nordbergs' 1987 tax return took place well after the tax year at issue. In short, the information requested by defendants has no bearing on the sole issue in the case at bar because the Nordbergs' ultimate tax liability is not influenced by the IRS' conduct or findings during the audit. In rejecting a similar argument, one District Court denied a motion to compel upon observing that:

> the opinions, impressions, conclusions and reasoning of IRS agents are irrelevant to the validity of the assessment against [the taxpayer].... Resolution of the[ ] issues depends solely on application of the pertinent law to the facts of [the] case.... [T]he opinions of individual IRS agents regarding their propriety are immaterial.

*Garity v. United States,* 81-2 U.S.T.C. (CCH) P 9599, 1980 WL 1765, at *2 (E.D.Mich. May 20, 1980). Similarly, the Southern District of New York has recognized that:

> [t]he subjective analysis of the agent and technical advisor based upon the information derived from [taxpayer's] records and their respective opinions as to the proper method to be applied in determining whether taxes are due form no part of the [taxpayer's] case. While no doubt disclosure of such information would be of interest to [taxpayer], it is not essential nor required for proper preparation.

*Detroit Screwmatic Co. v. United States,* 49 F.R.D. 77, 79 (S.D.N.Y.1970).

***3** Furthermore, if the Nordbergs' treatment of the trading losses on their 1987 tax return was erroneous as a matter of law, they are liable regardless of what an IRS agent, at any time, might have thought. *See United States v. Tuthill,* 55 F.2d 415, 416 (7th Cir.1931); *United States v. Ellis,* 154 F.Supp. 32, 38 (S.D.N.Y.1957), *aff'd,*264 F.2d 325 (2d Cir.1959); *see also Flamingo Fishing Corp. v. United States,* 31 Fed.Cl. 655, 658 (1994) (where the Court of Claims allowed the government's motion for protective order precluding taxpayer from deposing IRS agents because agents' opinions and conclusions regarding the applicable Code provisions were irrelevant to the determination of the case). Accordingly, defendants' motion to compel will be DENIED.

III. *Plaintiff's Motion for Partial Summary Judgment [Docket # 20]:*

The government has also filed a motion for "partial

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

summary judgment on the issue of the nature of the defendants' losses from trading in 1987." In the memorandum in support of its motion, the government enumerates the "questions presented" to the Court as: 1) whether Paul Nordberg was a trader or a dealer with respect to the options he traded in 1987, and, accordingly, 2) whether the losses from the trading activity are properly capital or ordinary. The Nordbergs vigorously contest the government's assertion that there is no genuine issue of any material fact with respect to the nature of the losses, and, therefore, it is important for this Court to identify precisely the material facts upon which plaintiff bases its motion.

A. *The Summary Judgment Standard*

Summary judgment shall be rendered where the pleadings, discovery on file and affidavits, if any, show "there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must view the entire record in the light most favorable to the plaintiffs and indulge all reasonable inferences in their favor. *O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir.1993).

With respect to a motion for summary judgment, the burden is on the moving party to show that "there is an absence of evidence to support the non-moving party's case." *FDIC v. Municipality of Ponce,* 904 F.2d 740, 742 (1st Cir.1990) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)). If the movant satisfies that burden, it shifts to the non-moving party to establish the existence of a genuine material issue. *Id.* In deciding whether a factual dispute is genuine, this Court must determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The nonmovant's assertion of mere allegation or denial of the pleadings is insufficient on its own to establish a genuine issue of material fact. Fed.R.Civ.P. 56(e).

B. *Material Facts*

On their joint income tax return for 1987, the Nordbergs reported, on Schedule C (entitled "Profit or (Loss) From Business or Profession"), losses of $86,821.86. According to a letter written by Paul Nordberg to the Internal Revenue Service, those losses resulted from his trading of securities called "OEX options," which are "puts" and "calls" indexed to a basket of stocks in the Standard & Poors 100. In response to the United States' Requests for Admissions, Paul Nordberg admitted that his trading of securities in 1987 was done "exclusively for an account" in the Nordbergs' name at Shearson, Lehman Brothers. Government Exhibit 9 at p. 4.

*4 Moreover, Mr. Nordberg admitted that he was aware of no facts or evidence that in 1987 he ever traded securities except through a "securities exchange," assuming that that term encompasses the Chicago Board of Exchange. *Id.* at pp. 5-6. By reporting the losses on a Schedule C form, the Nordbergs claimed the entire trading loss as an ordinary business loss. An audit by the IRS followed, with which the defendants cooperated fully.

At the conclusion of the exhaustive audit, the only unresolved substantive issue was whether Paul Nordberg's trading losses for the 1987 tax year were capital or ordinary. Indeed, in a letter to the IRS dated May 8, 1989, Mr. Nordberg wrote that:

> [T]he only material, unresolved matter is the proper treatment ... of Nordberg's trading of securities.... The issue to be determined is whether Nordberg is limited to a maximum "Capital Loss" deduction of $3,000 (for 1987) or is entitled to treat the entire net trading loss in 1987 as the loss incurred in a "business" or "trade", and therefor [sic] deductible in its entirety in 1987.

Government Exhibit 2, p. 2.

According to an "Income Tax Examination Changes" form dated July 11, 1990, the IRS changed the characterization of the Nordbergs'

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1987 loss to a capital loss. Government Exhibit 3. Consequently, the IRS proposed a deficiency of $30,665, plus interest, for a total of $44,015.70. In November and December of 1991, the defendants made payments by check in the amount equal to the total amount of the assessment, plus interest.

By what the IRS admits was mistake, it issued a refund check to the Nordbergs on December 20, 1991, for $45,188.25, representing the payments made by defendants plus $388.25 in interest. Government Exhibits 4, 6. In early 1992, the IRS sent the defendants a notice that 1) informed them that the refund check had been issued erroneously, and 2) requested repayment. Government Exhibit 7. By letter dated February 14, 1992 to the IRS Center Director, the Nordbergs informed the Service that they would not return the money. The government then commenced the pending lawsuit.

C. *Legal Analysis*

Sections 165(a) and (c) of the Internal Revenue Code permit individuals to deduct losses incurred in a trade or business or in a transaction entered into for profit. 26 U.S.C. § 165(a), (c). Section 165(f) provides, however, that capital losses are deductible only to the extent allowed by sections 1211 and 1212. Under section 1211, an individual's capital losses are deductible only to the extent of capital gains, plus $3,000 of ordinary income.

Section 1221 of the Code broadly defines the term "capital asset" as "property held by the taxpayer (whether or not connected with his trade or business)," and then narrows that definition by enumerating various exceptions. The relevant provision in the case at bar is section 1221(1), which excludes from the definition of capital assets:

> stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business[.]

***5** 26 U.S.C. § 1221(1).

In the case at bar, the government maintains that 1) Paul Nordberg was a trader in securities (as opposed to a dealer) who engaged in securities transactions entirely on his own account and lacked "customers," and 2) he cannot, therefore, invoke the exception to the definition of capital asset provided by § 1221(1). The government asserts that the Nordbergs' 1987 losses were therefore capital in nature and, accordingly, they must repay to the United States "the portion of the refund attributable to the disallowance of the Nordbergs' ordinary loss claim." Government Memorandum at 14.

To determine whether securities constitute "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business," see § 1221(1), courts have identified three classifications of purchasers of securities: dealers, traders and investors. *E.g., United States v. Wood,* 943 F.2d 1048, 1051 (9th Cir.1991); *King v. Commissioner,* 89 T.C. 445, 457-58 (1987). Of those three classifications, only the first two are relevant to the case at bar. "The tax liability of a seller of securities depends upon which classification best identifies the seller; dealers may qualify for [the § 1221(1) exception], while traders and investors do not." *Wood,* 943 F.2d at 1051.

The critical issue in distinguishing between dealers and traders is whether the taxpayer has "customers." *Wood,* 943 F.2d at 1050-53. The United States Tax Court explained that a "dealer" is a person who purchases securities or commodities with the expectation of realizing a profit,

> not because of a rise in value during the interval of time between purchase and resale, but merely because they have or hope to find a market of buyers who will purchase from them at a price in excess of their cost. This excess or mark-up represents remuneration for their labors as a middle man bringing together buyer and seller, and per-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

forming the usual services of retailer or wholesaler of goods.

*Kemon v. Commissioner,* 16 T.C. 1026, 1032-33 (1951). The *Kemon* Court thus employed a "merchant" analogy to determine whether a seller of securities is a dealer who sells to "customers" for purposes of section 1221. *See id.; see also Wood,* 943 F.2d at 1051; *United States v. Diamond,* 788 F.2d 1025, 1029 (4th Cir.1986).

"Traders," on the other hand, are sellers of securities or commodities who "depend upon such circumstances as a rise in value or an advantageous purchase to enable them to sell at a price in excess of cost." *Kemon,* 16 T.C. at 1033. In contrast to dealers, traders "perform[ ] no merchandising functions nor any other service which warrants compensation by a price mark-up of the securities he or she sells." *Id.* at 1032-33; *Diamond,* 788 F.2d at 1029. A trader will be deemed to be engaged in a "trade or business" if his or her trading is frequent and substantial. *King,* 89 T.C. at 458. As the *Wood* Court observed, however, although "[g]enerally both dealers and traders will be engaged in a trade or business[,] only a dealer ... has customers." 943 F.2d at 1052. In short, unlike a trader, a dealer in securities or commodity futures can take advantage of the section 1221(1) exception to capital asset tax treatment because the latter deals in property held "primarily for sale to customers in the ordinary course" of business. *Id.; see also*26 U.S.C. § 1221(1).

***6** The foregoing cases illustrate that, even when a taxpayer is engaged in the trade or business of selling securities, the gains or losses derived from that activity are nonetheless capital in nature if the taxpayer has no customers. *See Diamond,* 788 F.2d at 1028; *King,* 89 T.C. at 458. In *Diamond,* for example, the Court of Appeals observed that the taxpayer's emphasis upon the significant financial and hourly commitment to securities trading "misses the crucial point that, whether or not his 1980 transactions amounted to a trade or business, he was not selling 'to customers' for purposes of § 1221(1)." FN2 788 F.2d at 1028. In the case at bar, then, even assuming that Paul Nordberg was engaged in the "trade or business" of trading securities, this Court's focus properly turns to the issue of whether or not he had "customers" within the meaning of § 1221(1).

Numerous cases demonstrate that a taxpayer who trades solely on his own account through a broker has no customers with respect to the securities so traded. *Diamond,* 788 F.2d at 1028 ("courts have clearly and consistently held that a taxpayer who trades securities for his own account does not sell 'to customers' within the meaning of § 1221(1)"); *Van Suetendael v. Commissioner,* 152 F.2d 654 (2d Cir.1945) (per curiam). In the instant case, the Nordbergs admit both that their trading of securities in 1987 was exclusively for an account in their name at Shearson, Lehman Brothers and that they are aware of no facts or evidence that in 1987 they ever traded securities other than through a securities exchange. Government Exhibit 9 at p. 4.

Defendants attempt to avert summary judgment merely by reciting that "a significant factual issue in dispute in this case is whether [defendants] had 'customers,' " and citing a dictionary definition of the term "customer" (i.e., "one that purchases a commodity or service"). Opposition at 9. Defendants further reason that:

> by that straightforward meaning of the term, there could not have been sales (which there undisputedly were) in the absence of the "seller" (Paul Nordberg) having "customers." A "customer" is always needed for a sale to occur.

*Id.*

Several courts have, however, considered and rejected the argument that securities sold by taxpayers through a broker *eventually* reach customers. *See, e.g., George E. Warren Co. v. United States,* 53 F.Supp. 578, 581 (D.Mass.1944) ("[w]hile it may be contended that each time [the taxpayer corporation which was not a dealer in securities] sold the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

securities it dealt with a customer, such is not true within a fair reading of the taxing statute"); *Mirro-Dynamics,* 374 F.2d at 16 (rejecting taxpayer's argument that securities it sold eventually reached customers); *Seeley v. Helvering,* 77 F.2d 323, 324 (2d Cir.1935) ("So far as [the taxpayer] traded in securities on his own account, his sales were on the exchange to persons whom he did not even know; these were not his customers....").

***7** In *Swartz v. Commissioner,* for example, the Tax Court dismissed the taxpayer's argument that his commodity contract trades, all of which were made through Merrill Lynch or Prudential-Bache, were made to "customers." Rather, the Court observed that those brokerage houses "were not [taxpayer's] customers, but ... [he] was one of their customers," and the court declined to regard as taxpayer's customers "the nameless members of the commodity markets who ultimately purchased the commodity contracts [taxpayer] sold and sold the commodity contracts [he] purchased." T.C.Memo. 1987-582, *aff'd,*876 F.2d 657 (8th Cir.1989), *cert. denied,*494 U.S. 1006 (1990).

In short, if a taxpayer transacting in securities has no customers, then that taxpayer cannot, within the meaning of the second clause of § 1221(1), hold securities "primarily for sale to customers in the ordinary course of his trade or business." As the Fourth Circuit Court of Appeals noted in *Diamond,*

> [t]he government's position ... merely reflects the well-settled rule that a trader buying and selling securities exclusively for his own account does not sell 'to customers,' whatever the character of his transactions.

788 F.2d at 1030.

A taxpayer without customers likewise cannot satisfy the first clause of § 1221(1), to wit, hold the securities as "stock in trade ... which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year." The general rules governing inventories are enumerated in section 471 of the Internal Revenue Code. *See*26 U.S.C. § 471. Tellingly, regulation 1.471-5, promulgated under that Code section, applies to taxpayers who are "dealers" in securities, and states that:

> For the purposes of this section, a dealer in securities is a merchant of securities ..., with an established place of business, regularly engaged in the purchase of securities and their resale to customers; that is, one who as a merchant buys securities and sells them to customers with a view to the gains and profits that may be derived therefrom.... Taxpayers who buy and sell or hold securities for investment or speculation, irrespective of whether such buying or selling constitutes the carrying on of a trade or business, ... are *not* dealers in securities within the meaning of this section.

Treas.Reg. 1.471-5 (emphasis added); *see also Mirro-Dynamics,* 374 F.2d at 16; *Swartz v. Commissioner,* 876 F.2d 657, 659 (8th Cir.1989) (rejecting taxpayer's argument that his commodity futures contracts were property he included in inventory at the end of each tax year, explaining that "[c]ommodity futures contracts are capital assets in the hands of a trader"), *cert. denied,*494 U.S. 1006 (1990).

This Court concludes, therefore, that the securities that Mr. Nordberg purchased and sold for his own account at Shearson, Lehman Brothers were capital assets in his hands, and the losses from such trading were capital in nature.

ORDER

***8** For the foregoing reasons:

1) The defendants' motion to compel [Docket # 17] is DENIED;

2) The plaintiff's motion for summary judgment [Docket # 20] is ALLOWED; and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3) The defendants' motion for judgment on the pleadings [Docket # 11], the plaintiff's motion for partial summary judgment on defendants' counterclaim [Docket # 12] and the plaintiff's motion for a protective order [Docket # 18] are DENIED AS MOOT.

So ordered.

FN1. The IRS withheld the later refunds pursuant to 26 U.S.C. § 6402(a), which provides that "[i]n the case of any overpayment, the Secretary, within the applicable period of limitations, may credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax on the part of the person who made the overpayment...."

FN2. It is worth noting that the phrase "to customers" was added to the predecessor of § 1221(1) to exclude from the definition of capital assets only those securities bought and sold by dealers, and not those traded by investors on their own account. *See Mirro-Dynamics Corp. v. United States,* 374 F.2d 14, 16 (9th Cir.1967) (citing legislative history); *see also MacAdam v. Commissioner,* 62 T.C.Memo. 1991-410, 1991 WL 157917 (1991).

D.Mass.,1996.
U.S. v. Nordberg
Not Reported in F.Supp., 1996 WL 170119 (D.Mass.), 77 A.F.T.R.2d 96-2158, 96-1 USTC P 50,295

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.