# In the United States Court of Federal Claims

No. 06-587T

(Filed Under Seal:  October 4, 2013)

Reissued:  October 23, 2013[1]

_____

| | |
|---|---|
| UNIONBANCAL CORPORATION & SUBSIDIARIES,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Tax refund suit; Trial; Lease-in/lease out (LILO) transaction involving public arena; Substance-over-form doctrine; *Consolidated Edison* and *Wells Fargo* examined; "Rent" payments not deductible under section 162(a)(3) of the Code; Purchase option likely to be exercised; "Interest" payments not deductible under section 163 of the Code; Circular obligations yielded no genuine indebtedness. |

_____

## OPINION

_____

*David Farrington Abbott,* Mayer, Brown, Rowe, & Maw, LLP, New York, NY, for plaintiff.

*Joseph Andrew Sergi*, Tax Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Kathryn M. Keneally*, for defendant.

> *"When does a taxpayer cross the fault line between the cheering fields of tax planning and the forbidding elevations of form over substance, far enough, at least, to require a transaction to be recharacterized for tax purposes?  No map – statutory, regulatory or otherwise – precisely reveals this point of no return. Rather, . . . the judicial traveler [is] guided only by multi-factored analyses, balancing tests and other forms of* ad hocery*, which, if properly employed, serve hope that the terrain's true character will be revealed."*[2]

---

[1]  An unredacted version of this opinion was issued under seal on October 4, 2013.  The parties were given an opportunity to propose redactions, but no such proposals were made. Nevertheless, the court has incorporated some minor changes into this opinion.

[2]  *Principal Life Ins. Co. v. United States*, 70 Fed. Cl. 144, 145 (2006).

**ALLEGRA, Judge:**

This case is about LILOs and, relatedly, SILOs.  No, not the Disney character, mind you, nor anything remotely agricultural or martial.  Rather, the LILOs and SILOs at play here are acronyms, given to so-called "lease in/lease out" and "sale in/lease out" transactions, respectively.  In the world of Federal taxation, LILOs and SILOs are labyrinthine, leveraged-lease transactions in which United States taxpayers seek the tax benefits associated with the ownership of properties that the actual owners – owing to their tax-exempt status – cannot enjoy. Before such transactions were banned by Congress, a variety of prodigious assets owned by foreign corporations and government agencies were so leased – rail cars, hydroelectric plants, locomotives, public transit lines, cellular telecommunications equipment, sewer systems, to name a few – all with the same objective, namely, to take advantage of deductions that would otherwise be "wasted."

This case is before the court following a trial in Washington, D.C.  It involves the tax treatment of the Pond Transaction – a leveraged lease between a subsidiary of UnionBanCal Corporation (UBC) and the City of Anaheim, California (Anaheim or the City).  Anaheim is a so-called "tax indifferent" entity because it is not subject to Federal income taxation.  The Pond Transaction centers around the lease and simultaneous sublease of a sports and entertainment facility located in Anaheim, California, previously known as the Arrowhead Pond of Anaheim (the Pond).[3]  Anaheim controlled the operation of the Pond before and after the transaction. Notwithstanding this, at issue is whether, via this LILO, UBC obtained what Anaheim could not have enjoyed – the tax benefits of ownership and indebtedness, reflected in various deductions UBC claimed under the Internal Revenue Code of 1986[4] for its 1999 through 2002 tax years. First, the facts.

## I.

Based on the record, including the parties' stipulations, the court finds as follows:

UBC is a financial services company, headquartered in San Francisco, California. Though its subsidiaries, UBC offers a variety of banking and financial services to a broad spectrum of domestic and international customers.  At the time of the Pond Transaction, Bankers Commercial Corporation (BCC), UNBC Leasing Inc., and UnionBanCal Leasing Corporation were all subsidiaries of UBC engaged in equipment leasing and other lease-related financing. UBC entered into direct financing and leveraged leases through its Equipment Leasing Division (the ELD), which managed the operations of BCC, UNBC Leasing, Inc., and UnionBanCal

---

[3]  At some point in 2006, the Pond was renamed the Honda Center.

[4]  All references herein are to the Internal Revenue Code of 1986 (26 U.S.C.), as amended and in force during the years in question.

Leasing Corporation.[5]  Prior to the years in question, very few of the leases ELD entered into involved property in California; most had been with Japanese corporations and involved foreign-based property.

Prior to April 1996, The Bank of Tokyo, Ltd. was the parent company of Union Bank and The Mitsubishi Bank Ltd. was the parent company of the Bank of California.  In April 1996, The Bank of Tokyo, Ltd., and The Mitsubishi Bank Ltd. merged to form The Bank of Tokyo-Mitsubishi, Ltd. (BTM).  As part of the merger, the Bank of California and Union Bank consolidated into UBC, with its primary operating subsidiary being Union Bank of California, N.A.  As of August 10, 1998, BTM owned 82 percent of UBC.  As of March 3, 1999, BTM owned 64 percent of UBC, following a secondary offering of UBC stock and a stock repurchase.  On January 1, 2006, BTM and UFJ Bank Ltd. combined to form the Bank of Tokyo-Mitsubishi UFJ, Ltd. (BTMU).  On November 4, 2008, BTMU acquired the remainder of the outstanding stock of UBC, leaving UBC as a wholly-owned subsidiary of BTMU.

As of late 1998, Anaheim owned the Pond, an arena located in Anaheim, Orange County, California, about 28 miles southeast of downtown Los Angeles.  On June 26, 1990, Anaheim and Ogden Facility Management Corporation of Anaheim (Ogden), a subsidiary of Ogden Corporation, entered into an agreement pursuant to which Anaheim agreed to construct and Ogden agreed to manage and operate the Pond.  Construction of the Pond commenced in 1991.  To finance that construction Anaheim issued Certificates of Participation (1990 COPS) in the amount of $103.6 million.[6]  By letter dated February 24, 1993, Disney Sports Enterprises, Inc. and Ogden reached an agreement whereby the Anaheim Mighty Ducks, a National Hockey League (NHL) franchise, agreed to play all of its regular season and playoff games at the Pond (the Mighty Ducks Agreement).  The Mighty Ducks Agreement expires on February 23, 2023, unless terminated earlier.  The grand opening of the Pond occurred on June 18, 1993.  In November 1993, Anaheim issued $126.5 million in Certificates of Participation (COPS) in order to refinance its obligations with respect to the 1990 COPS, as well as to provide additional financing for improvements required by the Mighty Ducks Agreement, on-site and off-site parking improvements, and various administrative office and club improvements.

---

[5]  UBC's lease portfolio includes what are commonly referred to as "leveraged leases."  A leveraged lease is a three-party transaction under which a lessor (the equity investor) acquires an asset using a combination of its own funds and funds borrowed from a lender on a non-recourse basis, then leases the asset to a lessee in exchange for rental payments providing cash flow that, *inter alia*, repays the non-recourse loan.  Lessors sometimes expect to earn additional profits from the asset during the period after the initial lease ends, which is often called the residual value period or the "shirttail" period.  The availability of tax benefits often plays an important, if not controlling, role in a lessor's decision to enter into a leveraged lease.

[6]  To simplify the findings somewhat, and because it does not impact the conclusions herein, the court will round off the sizeable numbers associated with this transaction.

On December 1, 1993, the management agreement between Anaheim and Ogden was amended and restated in a Second Amended and Restated Management Agreement (the Management Agreement).  The Management Agreement was for a term of thirty years, commencing on June 15, 1993, and ending on June 14, 2023.  Pursuant to the Management Agreement, Anaheim granted Ogden the exclusive right to occupy, use, manage, operate, market, and promote the Pond, or to arrange for the use, management, operation, marketing, or promotion of the Pond.  Ogden assumed responsibility for paying the Pond's operating expenses, including all interest principal, premium, fees, amounts, costs, and expenses required on the COPS.  Neither the full faith and credit nor the taxing power of the City was pledged to the payment of the debt related to the COPS.[7]

In late 1998, Babcock & Brown, acting on behalf of Anaheim and Ogden Corporation, advanced the prospect of UBC doing the Pond Transaction with Lance Markowitz, Senior Vice President and head of the ELD.[8]  Babcock & Brown was the financial and leasing advisor both to Anaheim and Ogden, and advised those parties on how to structure and negotiate the terms of the Pond Transaction.[9]  For its part, UBC engaged BTM Capital Corporation (BTM), a sister corporation, as its leasing and financial advisor in reviewing and closing the Pond Transaction.  Under Markowitz's direction, the ELD prepared a Credit Recommendation Summary and attached memorandum urging UBC's Senior Loan Committee to approve a proposal under which UBC would acquire an "equity portion of a leasehold interest" in the Pond.  The Credit Recommendation Summary was signed "Recommended" by Markowitz and Joni LeSage of the ELD on December 22, 1998.  The memorandum touted that the Pond Transaction was designed

---

[7]  The Management Agreement provided that if the Pond revenues were insufficient to cover the operating expenses and payments required on the COPS, Ogden must make an advance to cover the shortfall; Ogden was entitled to recover that advance from future surpluses. However, Anaheim was required to fund the first $1.5 million of any such shortfalls for the fiscal years ending June 30, 1997 through 2001.  The potential $7.5 million shortfall funding for the fiscal years ending June 30, 1997 through 2001 was a contingent liability payable from Anaheim's general fund.  Prior to the Pond Transaction, Anaheim made $1.5 million payments for each of the fiscal years ended June 30, 1997 and 1998, reducing Anaheim's maximum contingent liability to $4.5 million.  One of Anaheim's stated reasons for entering into the Pond Transaction was to offset a portion of this $4.5 million contingent liability.

[8]  Markowitz was named head of the ELD in November 1997.  He first joined UBC in 1982; from 1990 to 1997, he worked in the Project Finance Department of UBC's Energy Capital Services Division.

[9]  It was in July of 1997 that BTM first proposed that UBC enter into a LILO transaction. While UBC declined this opportunity, in mid-1998, it was presented with the Misoxer Transaction, involving hydroelectric facilities in Switzerland.  In September of 1998, UBC received internal approval to participate in this transaction.  Shortly after the Misoxer Transaction closed, UBC turned its attention to the Pond Transaction.

to protect UBC's investment from risk of loss.[10]  On December 24, 1998, UBC's Senior Loan Committee approved UBC's participation in the Pond Transaction.

The memorandum attached to the Credit Recommendation Summary strongly suggests that UBC's main purpose in entering into the LILO transaction was to achieve the tax benefits associated with rent and interest deductions.  It stated that "[t]hough the tax benefit is not essential to a return of the investment, it is essential to obtaining an acceptable return on the investment."  The memorandum noted that while the cash yield on the proposed investment was only approximately 3.0 percent pre-tax, "[t]he net after-tax yield of the proposed investment is approximately 10.0%," a "yield [that] compares very favorably to those available in other leverage lease transactions."  (By comparison, at the time of the Pond Transaction, Treasury bonds and municipal bonds were yielding, on average, 4.5 percent and 3.47 percent, respectively.)  Other UBC internal documents revealed that the tax benefits drove the transaction.  A memorandum from UBC's files, for example, explained that "[f]rom the investor's perspective, the leasehold allows for very large write-offs in the first few years of the transaction."  And at trial, Markowitz agreed that "[t]he tax benefits were essential to obtaining an acceptable return for BCC," adding that UBC "would not have pursued the transaction without the tax attributes."[11]

While UBC was working its way through the approval process, so was Anaheim.  In a January 22, 1999, memorandum to the City Manager and City Council of Anaheim, William Sweeney, then the Finance Director, recommended that the City Council approve the Pond Transaction.  In this memorandum, he stated that "in terms of allocation of net proceeds, the agreement with [Ogden] provides for [Anaheim] to retain $4 million, net of all expenses, and to pay [Ogden] the balance (projected at approximately $7 to $8 million)." He explained that "Ogden Corporation receives a greater portion of this amount in recognition of their assumption of certain risks associated with the transaction that [Anaheim] was unwilling to assume."

UBC invested in the Pond Transaction through a trust (the Pond Trust). BCC was the sole beneficiary of the Pond Trust, and all tax benefits of ownership, if applicable, were to flow

---

[10]  The memorandum made several interesting observations.  In a segment entitled "Risk Considerations," it indicated that "[c]redit related risks are nominal," noting that any concerns in that regard "have been principally mitigated by a very strong collateral package."  After explaining the various offsetting obligations created under the transaction, the memorandum stated that "the aforementioned obligations can be expected, at any point in time, to economically defease the obligations of the Sublessee to the Sublessor."  The memorandum indicated that "the transaction structure and internal assumptions mitigate residual risk," as well.

[11]  While plaintiff claims it participated in the Pond Transaction for other business reasons – for example, so it could make an investment in its home state of California and to build UBC's lease portfolio in a "favorable strategic direction" – these claims all have a somewhat hollow ring in the face of overwhelming proof that UBC would not have participated in the transaction but for the tax benefits it expected to receive from Anaheim.

through to BCC, to be reflected on UBC's consolidated tax returns.[12]  On or about January 6, 1999, UBC entered into a trust agreement with State Street Bank and Trust Co. (State Street), under which the latter agreed to act as trustee of the Pond Trust.

On January 26, 1999 (the Pond Closing Date), the Pond Transaction closed.  Effectuating their deal, UBC and Anaheim executed a series of interrelated agreements, primarily among them, an umbrella agreement that sets forth various terms of the transaction (the Participation Agreement), and two leases pertaining to the Pond:  a Head Lease Agreement (the Head Lease) and Sublease Agreement (the Sublease).[13]  Pursuant to the Head Lease, UBC leased an undivided interest in the Pond from Anaheim until April 1, 2038, or for approximately 39 years (the Head Lease Term).  Simultaneously, via the Sublease, UBC conveyed its interest in the Pond back to Anaheim until January 2, 2019, or approximately 19.93 years (the Basic Sublease Term), with an option to renew through May 29, 2030 (the Sublease Renewal Term).  The Head Lease and Sublease were integrated parts of the same transaction – that is to say, one would not have been executed without the other.

The Head Lease obligated UBC to make two rent payments to Anaheim:  (i) an Advance Rent Payment of $132.3 million, due on the Pond Closing Date, and (ii) a Deferred Rent Payment of $975.8 million, due on April 1, 2043, the fifth anniversary of the last day of the Head Lease Term.[14]  UBC satisfied its Advance Rent Payment obligation by making an initial equity payment of $39.2 million, and borrowing the remaining $93.1 million via a non-recourse loan (the AIG-FP Loan) from AIG-FP Funding (Cayman) Limited (AIG-FP Funding).[15]  UBC placed its equity investment of $39.2 million in an account (the Equity Account) at State Street.  UBC placed the proceeds of the loan in the amount of $93.1 million in an account (the Debt Account) at UBS AG, Stamford.  UBC assigned its rights with respect to the Equity Account and the Debt Account to the Pond Trust, thereby satisfying its obligation under the Head Lease.

Under the Sublease, Anaheim agreed to make annual rental payments to UBC, in amounts determined as of the Pond Closing Date.  Under the Sublease, in the event of a default,

---

[12]  Because of this, to simplify the findings herein (a daunting task, admittedly), this opinion is generally written as if UBC was the direct party in interest, *i.e.*, as if the Pond Transaction had taken place between UBC and Anaheim.

[13]  Attached to this opinion is a schematic, taken from one of defendant's expert reports, of the entire transaction, including the associated debt and defeasance arrangements.

[14]  For tax purposes, the $132.3 million Advance Rent Payment was allocated to the first four years of the Head Lease Term (plus a portion of 2004), and the $975.8 million Deferred Rent Payment was allocated to the remaining years of the Head Lease on an undiscounted basis.

[15]  AIG-FP Funding received the funds to make this non-recourse loan from its affiliate AIG-FP Investment Company (Bermuda) Ltd.

UBC could require Anaheim to pay varying levels of liquidated damages, otherwise referred to in the agreement as the "Termination Value."[16]

Under the Participation Agreement, Anaheim had to use a portion of UBC's equity investment to obtain letters of credit for the benefit of UBC.  On January 26, 1999, Anaheim paid $3.8 million from the proceeds of the Equity Account for an irrevocable standby letter of credit for the benefit of BCC.  In addition, as part of the transaction, Anaheim paid fees to AIG Matched Funding Corp. (AIG MFC) and AIG-FP Special Finance in return for their agreement to make certain payments on Anaheim's behalf, including sublease rent; these agreements became collateral for Anaheim's Sublease obligations.  Under an Equity Payment Agreement (EPA), Anaheim agreed to pay an equity undertaking fee of $23.6 million to AIG MFC in consideration for the latter's agreement to make certain payments as required by the EPA.  Anaheim paid this fee by transferring funds in the State Street account.  After it received this fee on the Pond Closing Date, AIG MFC then paid Anaheim $4 million, via wire transfer, and paid Babcock & Brown, Inc. $11.6 million, via wire transfer, as payment agent for the further distribution of certain transaction fees and expenses.[17]  In addition, $9.7 million was paid to Ogden under the agreements, $5.7 million of which was for its guarantees of Anaheim's obligations, liabilities, and duties under the Pond Transaction.

Pursuant to the EPA, AIG MFC was required to deliver collateral (cash and securities) to State Street as custodian (not in its capacity as trustee of the Pond Trust), as security for AIG MFC's obligations under the EPA.  AIG MFC granted UBC a first security interest in the collateral.  In addition, Ogden agreed to arrange a letter of credit from First Union National Bank, which then issued UBC an irrevocable standby letter of credit (the Equity Letter of Credit) in the maximum amount of $26 million.  This arrangement was intended to secure a portion of the difference between the equity portion of the Termination Value and the balance of the collateral.

UBC paid $3.4 million in transaction expenses (including transaction costs of $2.6 million and a fee paid to BTM of $745,000) in connection with the Pond Transaction.  Under a loan and security agreement (the Loan and Security Agreement), AIG-FP Funding agreed to provide a nonrecourse loan in the amount of $93.1 million to the Pond Trust.  AIG-FP Funding

---

[16]  Under the agreements, the Termination Value is the amount payable by Anaheim to UBC upon the occurrence of specified events, including default and physical/governmental acts which would reduce or eliminate the value of the Pond.  (This value should be distinguished from the Early Termination Amount, which is paid by AIG-FP Special Finance to UBC or to AIG-FP Finance upon the occurrence of various events, including the termination of the Sublease and the refinancing of the Loan Certificates).

[17]  This $4 million was essentially the amount that Anaheim received for participating in the Pond LILO.  Anaheim did not reflect either its rental obligations, or the scheduled payments from the defeasance arrangements, on its books because it viewed the latter as cancelling out the former.

did, in fact, make this loan.  AIG-FP Special Finance acted as the debt payment undertaker under a debt payment undertaking agreement (the Debt PUA) in connection with the Pond Transaction. Pursuant to the Debt PUA, Anaheim agreed to pay to AIG-FP Special Finance a fee (the Debt Undertaking Fee) in the amount of $93.1 million in consideration for AIG-FP Special Finance's agreement to make payments in the amount, and at the times, set forth in the schedules to the Debt PUA.  The Debt Undertaking Fee equaled the amount of the AIG-FP Loan ($93.1 million).[18]

Section 3(b) of the Sublease requires Anaheim to pay rent in the amount, and at the times, set forth in an annex to the Sublease.  Annex A to the Loan Certificate (evidencing the nonrecourse loan by AIG-FP Funding to the Pond Trust) sets forth the principal due, accrued interest, interest payable, net amount payable, and additions to principal on the respective payment dates of January 26, 1999, and every January 2nd for the years 2000 through 2030, and on May 29, 2030.  UBC assigned its right to receive payments from the Debt PUA to AIG-FP Funding as security for UBC's obligations under the Loan and Security Agreement, so long as the lien underlying that agreement remains in effect.  Anaheim's scheduled rent payments to UBC under the Sublease equal, both in timing and amount, UBC's scheduled debt payments to AIG-FP Funding (except for one rent payment that Anaheim must make from the Equity Account).[19]

AIG issued a guaranty in favor of UBC and Anaheim, guaranteeing the obligations of AIG-FP Special Finance under the Debt PUA.  Various transactional documents require AIG-FP Special Finance and AIG to maintain minimum credit ratings of at least BBB- by Standard & Poors (S&P) and Baa3 by Moody's.  If their ratings drop below these targets, Anaheim is obligated to replace the Debt PUA with other collateral within a specified time.  If Anaheim fails to discharge this responsibility, it will be in default under the Sublease.  AIG also issued a guaranty in favor of UBC and Anaheim, guaranteeing the obligations of AIG MFC under the EPA.  Other provisions required AIG MFC and AIG to maintain minimum credit ratings of at least BBB- by Standard & Poors and Baa3 by Moody's.  As with the Debt PUA, if the ratings of the AIG companies drop below these targets, Anaheim is obligated to replace the EPA with other

---

[18]  The record reflects that AIG Financial Products, parent of AIG-FP Funding and AIG-FP Special Finance, consolidated the loan and defeasance on its books at the AIG Financial Products level, thereby cancelling out those obligations in its books.

[19]  AIG recognized that it faced no real risk from the loan due to this circular payment structure.  Consistent with this view, an AIG credit review stated that "[a]lthough AIG-FP was involved in a lease of the Pond, roles were limited to defeased debt and [the Guaranteed Investment Contract] GIC provider, with no exposure.  The transaction has since been restructured with AIG-FP continuing in the same roles . . . ."  A GIC is a contract that guarantees repayment of principal, with interest, for a predetermined time period.  Here, the GIC was purchased with $23.6 million from the Equity Account.  UBC was granted a first priority security interest in the securities supporting the payment obligations under the GIC.

collateral within a specified time.  If Anaheim fails to discharge this responsibility, it will be in default under the Sublease.

Importantly, the Sublease included a fixed price purchase option (Purchase Option) by which Anaheim could purchase UBC's remaining Head Lease interests in the Pond at the end of the Basic Sublease Term (which was 19.93 years).  If various conditions are satisfied, Anaheim can exercise the Purchase Option for the agreed purchase option price, plus its assumption of UBC's obligations under the Head Lease, including the obligation to make the deferred rent payment at the expiration of the Basic Sublease Term.  The equity defeasance arrangements in the transactions are designed to provide Anaheim with the funds needed to exercise this option.[20] UBC's obligation to make the $975.8 million payment in 2043 arises only if Anaheim fails to elect this pre-funded Purchase Option.[21]  If Anaheim does not exercise this option, then, under the Sublease, UBC may:  (i) require Anaheim to renew the Sublease for the Sublease Renewal Term lasting until May 29, 2030 (the Sublease Renewal Option); (ii) cause a Successor Sublessee to enter into a Successor Sublease with respect to the Pond Trust's interest in the Pond (Successor Sublease Option); or (iii) cause Anaheim to surrender its interest in the Pond to UBC for the remainder of the Head Lease Term on the date the Basic Sublease Term expired (the Return Option).[22]

Depending upon which of these options is elected, a welter of provisions kicks in.  For example, the loan by AIG-FP Funding to the Pond Trust must be prepaid in full under any of the

---

[20]  Testimony at trial confirmed not only that this was the substance of the agreements, but also that Anaheim participated in the transaction based on the assumption that the transaction's equity and debt obligations, as well as the Purchase Option, were all fully defeased. Anaheim's former manager testified that, because the City's obligations under the Pond Transaction were all defeased, the related liabilities were excluded from the City's financial statements.

[21]  As part of the transaction, Anaheim signed a tax indemnification agreement which prohibited it from taking any official position with respect to whether it would exercise the Purchase Option.  The agreement obliged Anaheim to pay for any negative tax consequences to UBC if it took an official position on exercising the option.  One can readily surmise the purpose of this agreement from looking at the earlier Misoxer Transaction.  In that early deal, UBC's lawyers were forced to demand that Misoxer recant statements made in various materials to the effect that "[i]t is certain as a practical matter that the fixed purchase option (the 'FPO') will be exercised."

[22]  Commenting on this part of the transaction, the memorandum attached to the Credit Recommendation Summary that UBC used in internally approving the Pond Transaction (discussed above) indicated that "the transaction has been carefully structured so as not to economically compel [Anaheim] to exercise the Purchase Option."  The memorandum, nevertheless, admitted that UBC was essentially protected from any residual losses whether or not the Purchase Option is exercised.

following circumstances: (i) Anaheim elects to exercise the Purchase Option; (ii) UBC elects to exercise the Return Option; (iii) UBC elects to exercise the Successor Sublease Option but has been unable to arrange for a loan extension; (iv) upon an early termination event; and (v) the loan is refinanced.  UBC will be deemed to have elected the Sublease Renewal Option unless it affirmatively elects either the Successor Sublease Option or Return Option by the 135th day prior to the end of the Basic Sublease Term.  If UBC elects the Successor Sublease Option, but does not arrange for a successor sublessee on or before thirty days prior to the expiration of the Basic Sublease Term, it shall be deemed to have elected the Sublease Renewal Option, unless UBC previously notified Anaheim that it has chosen to convert the Successor Sublease Option to the Return Option.  If UBC has elected the Return Option and has not arranged for the payment or prepayment in full of the AIG-FP Funding loan on or before thirty days prior to the expiration of the Basic Sublease Term, UBC shall be deemed to have elected the Sublease Renewal Option.  The Sublease Renewal Term, if elected by UBC, runs from January 3, 2019, through May 29, 2030.  The Sublease rent amounts due from Anaheim during the Sublease Renewal Term, if elected, were determined at the closing of the Pond Transaction and set forth in an exhibit to the Sublease.  Those rents were $21 million per year on each January 2 from 2020 through 2030, and one payment of $8.6 million on May 29, 2030.

The Participation Agreement provides that if UBC elects the Sublease Renewal Option, Anaheim must provide or cause to be provided collateral arrangements to secure the equity portion of the Sublease payments during the Sublease Renewal Term, in substantially the same manner as provided with respect to the EPA during the Basic Sublease Term.  It also provides that if UBC elects the Sublease Renewal Option, Anaheim must provide debt defeasance arrangements to secure the debt portion of the sublease payments during the Sublease Renewal Term, in substantially the same manner as required under the Debt PUA during the Basic Sublease Term.

Under the Sublease, when the Basic Sublease Term expires, UBC can elect the Successor Sublease Option if Anaheim elects not to exercise the Purchase Option.  If UBC elects the Successor Sublease Option, Anaheim must cooperate in good faith with UBC to effect the negotiation, execution, and delivery of a Successor Sublease.  If UBC elects the Successor Sublease Option, Anaheim must surrender the Pond Facility to the Successor Sublessee when the Basic Sublease Term expires and must pay:  (i) any Sublease Rent that was due and payable on or prior to that expiration, together with interest; and (ii) all Supplemental Rent due and owing on or prior to that expiration by Anaheim to UBC, AIG-FP Funding, or any other person owed funds under the documents governing the Pond Transaction.

Under the Successor Sublease Option or the Return Option, Anaheim is not required to provide collateral arrangements because it has no obligation to pay Sublease rent to UBC under these options.  If UBC elects the Successor Sublease Option or the Return Option, Anaheim is required to pay any unpaid Sublease rent plus all Supplemental Rent[23] due and owing on or

---

[23]  Supplemental Rent was defined as payments of, *inter alia*, the Termination Value and indemnity payments owing under the documents governing the Pond Transaction.

before the Basic Sublease Term expiration date.  The Sublease specifically provides, in part, that if UBC shall have elected or have been deemed to elect the Sublease Renewal Option Anaheim shall:

> Arrange for a Loan Extension and in order to satisfy such obligations [Anaheim] shall purchase up to 49% of the principal amount of the Loan Certificates then outstanding under the Loan [and Security] Agreement from [AIG-FP Funding . . . ] if third party lenders cannot be arranged for 100% of the principal amount of the Loan Certificates then outstanding under the Loan [and Security] Agreement; *provided* that [Anaheim] shall exercise reasonable efforts to arrange such Loan Extension from third parties and such Loan Certificates purchased by [Anaheim] must be secured on a pari passu basis with all other outstanding Loan Certificates and the third party lenders shall have exclusive control of the exercise of remedies under the Loan Agreement.

(Emphasis in original).  Pursuant to the Debt PUA, AIG-FP Special Finance (the debt payment undertaker) must pay to UBC (or AIG-FP Funding, if the Debt PUA is pledged to it under the loan agreement) a specified termination amount[24] if UBC elects to exercise its Sublease Renewal Option and the conditions to do so are satisfied.  Under the options other than the Sublease Renewal Option, if UBC chooses to repay or refinance the remaining amounts due on the AIG-FP Funding loan at the end of the Basic Sublease Term (which it must do in order to exercise the Return Option), Anaheim will receive the final payment due under the Debt PUA.

As noted, the Head Lease provides that UBC is to make the Deferred Rent Payment to Anaheim in the amount of $975.8 million on April 1, 2043.  To support the payment of the Deferred Rent Payment, following the expiration date of the Basic Sublease Term, Anaheim has recourse against UBC to the extent UBC receives Sublease Rent under the Sublease Renewal Option or Successor Sublease Option, or to the extent UBC receives revenues from its use of the Pond under the Return Option.

If either Anaheim or Ogden fail to perform or observe its covenants, obligations, or agreements, or if any of their representations or warranties is discovered to be untrue, inaccurate, or misleading and remains uncured, then Anaheim and Ogden will be in default.  Specifically, the Sublease contains provisions defining the following Sublessee events of default:  (i) Anaheim fails to pay rent or other payments when due; (ii) any representation or warranty of Anaheim or Ogden is discovered to be untrue, inaccurate, or misleading; (iii) Anaheim fails to maintain insurance as required by the Sublease Agreement; (iv) Anaheim or Ogden fails to perform or observe any covenant, obligation, or agreement under the Head Lease or under any other document involving the Pond Transaction; and (v) Anaheim or Ogden files a voluntary petition in bankruptcy.  At all times during the term of the Sublease, upon the occurrence of any these events of default, UBC has the right to declare Anaheim and/or Ogden in default and exercise

---

[24]  This amount varies depending upon the nature of the event that triggers the payment (*e.g.*, the termination of the Sublease, the refinancing of the Loan Certificates).

various remedies available to UBC, including the right to:  (i) demand that Anaheim return the Pond to UBC for the remainder of the Sublease; (ii) require Anaheim to pay the Termination Value; or (iii) sell, assign or convey UBC's Head Lease rights in a commercially reasonable manner and hold Anaheim liable for any unpaid rent.  In addition, UBC has the right to require that Anaheim pay the Termination Value in the event of any premature termination of the Pond Transaction.

Effective March 14, 2001, Ogden changed its corporate name to Covanta Energy Corporation (Covanta).  Covanta was downgraded by S&P from BBB to B in January 2002, and from B to D on March 1, 2002.  Pursuant to the terms of the Pond Transaction, Covanta was thus required to post an additional letter of credit (the Ogden Letter of Credit) in the maximum amount of $4 million for the benefit of UBC.  Covanta failed to do this, which was an event of default under the Sublease.

On April 1, 2002, Covanta filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  Covanta failed to increase the Equity Letter of Credit from the initial amount of $26 million to the required amount of $32.5 million (as of April 2002).  This also constituted an event of default.  On April 4, 2002, AIG-FP Funding sent a notice to Anaheim and UBC in which it noted the defaults and advised that it intended to exercise its remedies under the Loan and Security Agreement.  On or about April 18, 2002, Anaheim received a similar notice of default from State Street.  Eventually, UBC agreed not to enforce any of its remedies available under the Sublease and, after negotiations between UBC and Anaheim, agreed instead to restructure the Pond Transaction.  UBC agreed to remove the requirements for the Equity Letter of Credit and the Ogden Letter of Credit.  Covanta was released from its obligations under the Pond Transaction and replaced, with UBC's consent, with a new manager for the Pond, Anaheim Arena Management (AAM).  In consideration for these concessions, UBC received $1.4 million and a percentage of future net revenues from the Pond if that revenue exceeded a specified threshold.  UBC was also reimbursed for legal fees concerning the restructuring.

The Participation Agreement was amended and restated on December 16, 2003, to reflect the aforementioned changes, and corresponding agreements were substituted for the Management Agreement and associated pledge agreements.  Anaheim's obligations under the operative documents governing the Pond Transaction remained limited, as before.  The Facility Management Agreement (FMA) between Anaheim and AAM allows for the latter to operate exclusively the Pond in order to create, produce co-promote, and stage all acts and events at the Pond.  The FMA requires AAM to manage and operate all aspects of the Pond.

On its 1999 through 2002 tax returns, UBC reported rental income with respect to the Pond Transaction and claimed deductions for rental expense, amortization of transaction

expenses, and interest expense in connection with the Pond Transaction.[25]  During an audit of UBC's tax returns for the 1998 through 2002 taxable years, the IRS disregarded the income and disallowed the deductions reported by UBC in connection with the Pond Transaction.  The IRS' proposed adjustments in connection with the Pond Transaction and a second lease transaction, the Misoxer Transaction[26] resulted in the following increases in UBC's taxable income and corresponding deficiencies:

| Year | Increase in Taxable Income | Deficiency |
|------|---------------------------|------------|
| 1998 | $9,434,080 | $2,965,331 |
| 1999 | $63,166,481 | $19,200,319 |
| 2000 | $65,661,544 | $22,293,179 |
| 2001 | $65,556,447 | $24,428,897 |
| 2002 | $55,743,866 | $11,131,710 |

UBC paid these deficiencies in two installments, on or about July 2, 2003, and December 5, 2005.  UBC filed a claim for refund (Form 1120X) with the IRS on or about January 4, 2006, requesting a refund of Federal income taxes for the 1998 through 2002 taxable years in the amount of $90,846,856.

On August 14, 2006, UBC filed this refund suit against the United States for recovery of income tax payments relating to the Pond Transaction and the Misoxer Transaction.  Following discovery and various motions, on February 22, 2012, the court allowed plaintiff to dismiss its

---

[25]  First, pursuant to section 162(a)(3) of the Code, UBC deducted rental expenses for the acquisition of UBC's Head Lease rights.  Second, pursuant to section 163 of the Code, UBC deducted interest expense for the non-recourse debt incurred to pay part of the cost of UBC's Head Lease rights.  Third, pursuant to section 167 of the Code, UBC deducted an amortized portion of the transaction costs associated with the Pond Transaction.  In total, these deductions equaled $34,166,666 for 1999; $37,019,723 for 2000; $37,363,479 for 2001; and $37,727,628 for 2002.  UBC also reported rental income attributable to Sublease rent paid by Anaheim of $3,151,164 for 1999; $3,760,420 for 2000; $4,180,980 for 2001; and $4,647,943 for 2002.  For reasons unexplained, plaintiff does not appear to be contesting the disallowance of the third category of deduction discussed – that relating to the transaction costs.

[26]  In the Misoxer LILO, UBC became the titular owner of a leasehold interest in a hydroelectric facility located in Switzerland.  As in the Pond Transaction, the owner of this facility purported to pay rent to UBC for the property that the owner continued to operate and maintain.  As with respect to the Pond, UBC claimed rent deductions for the facilities, as well as interest deductions on the purported financing and deductions for transaction costs.  As trial approached, UBC sought to amend its complaint in this case to jettison its challenge to the Misoxer Transaction.  This court denied that motion, but subsequently allowed UBC to dismiss its Misoxer-related claims with prejudice, contingent on UBC conceding all other years relating to the Misoxer Transaction not at issue in the current case and entering into a closing agreement with the IRS to that effect.

refund claims related to the Misoxer Transaction.  Trial was held in this case from March 12, 2012, until March 21, 2012.  The court heard the testimony of twelve witnesses, including several experts for each side.  Plaintiff's expert witnesses were Dr. David Ellis, who testified about the economic characteristics of leveraged leases; Mark Zmijewski, who testified about accounting principles as they apply to leveraged leases; and James Bailey, who testified about the financial and other considerations attendant to sports facility investment.  Defendant's expert witnesses were Shawn Halladay, a consultant to the equipment and finance industry who testified about the Federal tax treatment of LILO transactions; Paul Bent, who testified about the overall structure and mechanics of equipment leasing transactions; and Dr. David LaRue, who testified about the economics of the Pond Transaction.  Closing arguments were heard on December 14, 2012.[27]  Supplemental briefs were filed thereafter.

## II.

This case involves a lease-in/lease-out transaction, more commonly known as a LILO, designed to transfer tax benefits from an entity not subject to U.S. income taxation (a tax-indifferent entity) to an entity that is subject to U.S. income taxation.  *See Consolidated Edison Co. of N.Y. v. United States*, 703 F.3d 1367, 1372 (Fed. Cir. 2013); *see also* Maxim Shvedov, Congressional Research Service, Report for Congress:  Tax Implications of SILOs, QTEs, and Other Leasing Transactions with Tax Exempt Entities, CRS-2 (Nov. 30, 2004) (hereinafter "Shvedov"); Robert W. Wood and Steven E. Hollingworth, "SILOs and LILOs Demystified," 129 Tax Notes 195 (2010).  In the typical LILO, a U.S. taxpayer purports to lease property from a tax-indifferent owner under a "head lease," and then simultaneously leases that property back to the owner under a sublease.[28]  Before and after the transaction, the tax-indifferent entity

---

[27]  On March 22, 2012, the court issued an order allowing the parties to propose withdrawing certain exhibits that had been admitted at trial, but that were viewed as unnecessary to the rendering of a decision in this matter.  In accordance with that order, the parties submitted lists of exhibits that they jointly believed could be withdrawn.  Even though the understanding of the parties was that these exhibits would actually be withdrawn, the court has yet to order so.  Accordingly, it does so now.

[28]  In a LILO, the head lease is shorter than the property's useful life, and the taxpayer claims rent deductions associated with the head lease.  In a SILO, the length of the head lease is longer than the property's remaining economic useful life, and the taxpayer claims depreciation deductions associated with the head lease.  *See Wells Fargo & Co. v. United States*, 641 F.3d 1319, 1322-23 (Fed. Cir. 2011) (comparing LILOs and SILOs).  Like SILOs, LILOs "evolved in response to a long running battle among Congress, the IRS, and enterprising taxpayers regarding the boundaries of permissible leasing of tax-exempt property to generate tax benefits."  *Id.*  The beginning of the end of the LILO market began in 1999, when the Treasury Department issued new regulations requiring that the prepayment of the head lease rent be treated as a loan for tax purposes.  *See* Treas. Reg. § 1.467-1.  Further limitations on the use of such transactions were imposed by Treasury in 2002.  *See* Rev. Rul. 2002-69, 2002-2 C.B. 760; *see also*  Rev. Rul. 99-14, 1991-1 C.B. 835.  Finally, in 2004, Congress eliminated the tax benefits associated with

continues to operate the property.  Nevertheless, the taxpayer claims deductions predicated upon the head lease.  *See Wells Fargo*, 641 F.3d at 1322-23; 1 John Merten, Mertens Law of Federal Income Tax'n § 6A:39 (2013); Lawrence M. Hill, The Increasingly Vital Role of International Tax Law, Aspatore, 2008 WL 5689074, at *3 (2008).  The tax-indifferent party receives a fee for agreeing, in effect, to transfer its "wasted" tax deductions to a tax-paying entity that can use them.  Shvedov, *supra*, at CRS-2-3.

The property that was leased/subleased in the LILO in question was the Pond, an arena owned by Anaheim (the tax-indifferent entity).  UBC deducted the rent payments it made under this transaction under section 162(a)(3) of the Code, which permits a deduction for "rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business of property."  26 U.S.C. § 162(a)(3).  And it deducted the interest it paid on the loans used to discharge its rent obligations under section 163(a) of the Code, which provides a deduction for "interest paid or accrued within the taxable year on indebtedness."  26 U.S.C. § 163(a).

Defendant, for its part, assails the LILO on several grounds.  It charges, *inter alia*, that UBC did not acquire a genuine leasehold interest in Anaheim's property and thus was not entitled to deduct its purported rent payments under section 162(a)(3) of the Code.  It further argues that the loan nominally used to pay UBC's rent was not genuine debt and that UBC, therefore, was not entitled to deduct its purported interest payments thereon under section 163(a) of the Code.  In each of these instances, defendant's argument is essentially the same:  the transactions in question were designed to preserve Anaheim's control of the property and UBC's original investment and thus accomplished nothing, in substance, for tax purposes.

UBC bears the burden of proving its entitlement to these deductions.  *See Helvering v. Taylor*, 293 U.S. 507, 515 (1935) ("[u]nquestionably the burden of proof is on the taxpayer"); *Lewis v. Reynolds*, 284 U.S. 281 (1932); *Cinergy Corp. v. United States*, 55 Fed. Cl. 489, 500 (2003).  More specifically, in a case such as this, "it is the taxpayer's burden to demonstrate that the form of its transaction accords with its substance."  *Principal Life Ins. Co. v. United States*, 70 Fed. Cl. 144, 160 (2006); *see also Goldberg v. United States*, 789 F.2d 1341, 1343 (9th Cir.1986) ("The burden is therefore on the taxpayer to show that the form of the transactions reflects their substance."); *Long Term Capital Holdings v. United States*, 330 F. Supp.2d 122, 165-66 (D. Conn. 2004), *aff'd*, 150 Fed. Appx. 40 (2d Cir. 2005) (unpublished) (same); *Am. Elec. Power, Inc. v. United States*, 136 F. Supp. 2d 762, 778-79 (S.D. Ohio 2001), *aff'd*, 326 F.3d 737 (6th Cir. 2003), *cert. denied*, 540 U.S. 1104 (2004) (same); *see also United States v. Janis*, 428 U.S. 433, 440 (1976).  This qualification cabins a taxpayer's otherwise admitted right to arrange its affairs to minimize its taxes.  *See Helvering v. Gregory*, 69 F.2d 809 (2d Cir. 1935)

---

LILO and SILO transactions by amending the Code.  *See* American Jobs Creation Act, Pub. L. No. 108-357, §847, 118 Stat. 1418 (2004) (enacting, *inter alia*, section 470 of the Code); *see also Wells Fargo*, 641 F.3d at 1322-23.  While the amendments were prospective, Congress made clear that they were not designed to alter the preexisting principles governing the legitimacy of leasing transactions.  *See* H.R. Conf. Rep. No. 108-755, at 660 (2004).

*aff'd*, 293 U.S. 465 (1935) (Hand, J.) ("Any one may so arrange his affairs that his taxes shall be as low as possible . . . .").

## A.

"[J]udicial anti-abuse doctrines," the Federal Circuit recently observed, "'prevent taxpayers from subverting the legislative purpose of the tax code.'"   *Consol. Edison Co. of New York, Inc. v. United States*, 703 F.3d 1367, 1374 (Fed. Cir. 2013) (quoting *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1354 (Fed. Cir. 2006)); *see also Wells Fargo & Co. v. United States*, 641 F.3d 1319, 1325 (Fed. Cir. 2011).  Among these doctrines is that of "substance-over-form," which "provides that the tax consequences of a transaction are determined based on the underlying substance of the transaction rather than its legal form."   *Wells Fargo*, 641 F.3d at 1325; *see also Griffiths v. Helvering*, 308 U.S. 355, 357 (1939) (looking to "the crux" of transaction by imagining it in its simplest form); *Minn. Tea Co. v. Helvering*, 302 U.S. 609, 613 (1938) ("A given result at the end of a straight path is not made a different result because reached following a devious path."); *Gregory v. Helvering*, 293 U.S. 465, 469-70 (1935).[29]  "Tax law deals in economic realities, not legal abstractions."   *PPL Corp. v. Comm'r of Internal Revenue*, 133 S. Ct. 1897, 1905 (2013) (quoting *Comm'r of Internal Revenue v. Southwest Exploration Co.*, 350 U.S. 308, 315 (1956)).  To permit otherwise, the Supreme Court has held, "would seriously impair the effective administration of the tax policies of Congress."   *Comm'r of Internal Revenue v. Court Holding Co.*, 324 U.S. 331, 334 (1945); *see also H.J. Heinz Co. & Subs. v. United States*, 76 Fed. Cl. 570, 580 (2007).

---

[29]  There are several different anti-abuse doctrines.  While joined by a common purpose, these doctrines each have a distinct focus.  One of these doctrines is the economic substance doctrine (sometimes also called the "sham transaction doctrine"), "which disregards for tax purposes transactions that comply with the literal terms of the tax code but lack economic reality in order to prevent taxpayers from subverting the legislative purpose of the Code."   *Bartels Trust for Benefit of Cornell Univ. v. United States*, 617 F.3d 1357, 1362-63 (Fed. Cir. 2010); *see also Frank Lyon Co. v. United States*, 435 U.S. 561, 572-73 (1978); *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1352 (Fed. Cir. 2006).  This doctrine is separate and distinct from the substance-over-form doctrine, discussed herein.  *See Rogers v. United States*, 281 F.3d 1008, 114-18 (10th Cir. 2002).  Then there is the "step transaction doctrine," which is actually a subset of the "substance-over-form doctrine."  Under this doctrine, "interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction*."   Comm'r of Internal Revenue v. Clark*, 489 U.S. 726, 738 (1989); *see also Minn. Tea Co*., 302 U.S. at 613; *H.J. Heinz Co. & Subs. v. United States*, 76 Fed. Cl. 570, 588 (2007).  It is important to observe the distinctions between these doctrines lest opinions involving one be inappropriately relied upon as a basis for applying another.  Observing these distinctions is also important because a transaction that is found to pass one of these tests may yet be determined to have transgressed another.  *See, e.g.*, *John Hancock Life Ins. Co. v. Comm'r of Internal Revenue*, 141 T.C. 1, 53 (2013); *see also Altria Group*, 658 F.3d at 291.

The rent deductions taken here presuppose that UBC, via the Head Lease, possessed an ownership interest in the Pond. But is this so? To be sure, "[t]here is no simple device available to peel away the form of this transaction and to reveal its substance." *Frank Lyon*, 435 U.S. at 576. On the other hand, as Burke once said, "[t]hough no man can draw a stroke between the confines of night and day still light and darkness are on the whole tolerably distinguishable." And this is neither a hard case nor one of first impression.

Indeed, in a phalanx of recent cases, courts considering analogous LILO/SILO transactions  have readily concluded that, despite the form of those transactions, the taxpayers, in substance, never obtained the benefits and burden of ownership – that viewed in their totality, the circumstances of the lease/sublease transactions did not permit the taxpayers to be viewed, for tax purposes, as possessing an interest in the property upon which their deductions hinged. *See Consolidated Edison*, 703 F.3d at 1381-82 (finding that the LILO was not a genuine lease and sublease); *Altria Grp., Inc. v. United States*, 658 F.3d 276 (2d Cir. 2011) (affirming jury finding that a series of LILO and other transactions did not withstand the substance-over-form inquiry); *Wells Fargo*, 641 F.3d 1319 (Fed. Cir. 2011) (same as to SILO transaction involving public transit vehicles); *BB & T Corp. v. United States*, 523 F.3d 461, 464 (4th Cir. 2008) (affirming district court's conclusion that "although the form involved a lease financed by a loan, BB&T did not actually acquire a genuine leasehold interest"); *AWG Leasing Trust v. United States*, 592 F. Supp. 2d 953, 981-82 (N.D. Ohio 2008) (finding that in SILO transaction, taxpayer never obtained ownership interest in German waste-to-energy disposal treatment plant to support deductions); *John Hancock Life Ins.*, 141 T.C. at 54-55 (2013) (holding that the substance of LILO transactions were not consistent with their legal form, precluding various deductions).[30]  In each of these cases, the court found that the structure of the LILO/SILO prevented the taxpayer from obtaining a genuine ownership interest in the property. And in each instance, the key inquiry was the same – whether the taxpayer involved bore the benefits and burdens associated with the leased asset.

While these cases cite a variety of considerations, the central question in each case came down to whether the original property holder – the "tax indifferent" entity – could be expected to exercise its purchase option at the end of the sublease.[31]  That issue proved determinative

---

[30]  *See also Hoosier Energy Rural Elec. Cooperative, Inc. v. John Hancock Life Ins. Co.*, 588 F. Supp. 2d 919, 921, 928 (S.D. Ind. 2008), *aff'd*, 582 F.3d 721 (7th Cir. 2009) (describing a SILO transaction as a "blatantly abusive tax shelter" that is "rotten to the core.").

[31]  *See Consol. Edison Co. of New York*, 703 F.3d at 1376 ("In our view, and consistent with *Wells Fargo,* therefore, the 'critical inquiry' is whether ConEd 'could have reasonably expected that the tax-[indifferent] entit[y] would exercise [its] repurchase option[ ].'") (quoting *Wells Fargo*, 641 F.3d at 1327); *Wells Fargo*, 641 F.3d at 1327 ("[T]he critical inquiry is whether Wells Fargo could have reasonably expected that the tax-exempt entities would exercise their repurchase options. . . ."); *AWG Leasing Trust*, 592 F. Supp. 2d at 981-82 ("[M]ost importantly, it is nearly certain that AWG [the tax-indifferent entity] will exercise the Fixed Purchase Option . . . ."); *see also Altria Grp.*, 658 F.3d at 288 (affirming instruction to jury to

- 17 -

because if that option was to be exercised, the transactions would become off-setting leases, leaving the property essentially in the hands of the original owner, at least for tax purposes.[32] This was especially so because, under each of the transactions, the tax indifferent entity was to maintain uninterrupted use of the subject property without any involvement of the taxpayer.[33] Moreover, via the offsetting nature of the obligations established in the transaction, the taxpayer was insulated from meaningful economic risk of loss or potential gain, and thus obtained none of the benefits or burdens associated with its leasehold interest.[34]

_____

consider "the likelihood that the tax-indifferent entity would exercise its fully-funded purchase option"); *BB&T Corp.*, 523 F.3d at 468-70; *John Hancock Life Ins.*, 141 T.C. at 57 n. 40 ("The purchase option decision is a critical issue in determining risk of loss.").

[32]   *See Consol. Edison Co. of New York*, 703 F.3d at 1376 ("If the Sublease Purchase Option were exercised, the transaction would merely become a transaction in which ConEd leased the RoCa3 Plant from EZH and leased it back for the same identical period."); *Wells Fargo*, 641 F.3d at 1330 ("Because . . . tax-exempt entities are virtually certain to exercise their repurchase options, we are left with purely circular transactions . . . . From the tax-exempt entity's point of view, the transaction effectively ended as soon as it began."); *see also BB&T Corp.*, 523 F.3d at 470 (affirming the trial court's view that "the various obligations in the transaction were offsetting . . . .").

[33]   *See Consol. Edison Co. of New York*, 703 F.3d at 1376 ("If the Sublease Purchase Option were exercised . . . EZH would maintain uninterrupted use of the RoCa3 Plant without any involvement on ConEd's part . . . ."); *Altria Grp.*, 658 F.3d at 280 ("the tax-indifferent entity was able to continue free, uninterrupted use of its facility . . . ."); *Wells Fargo*, 641 F.3d at 1324 (affirming the trial court's finding that "[T]he SILO transactions had no effect on the tax-exempt entities' use of the assets . . . ."); *BB&T Corp.*, 523 F.3d at 466 ("Sodra therefore continues to use and possess the Equipment as it did prior to the transaction."); *AWG Leasing Trust*, 592 F. Supp. 2d at 990 ("AWG, meanwhile, continues to have undisturbed and uninterrupted possession and control of the Facility . . . ."); *John Hancock Life Ins.*, 141 T.C. at 55 ("OBB continued to use the VK marshaling yard just as it had before entering into the LILO transaction without making any payments to John Hancock . . . .").

[34]   *See Consol. Edison Co. of New York*, 703 F.3d at 1381 ("ConEd has failed to show that the substance of the transaction included a genuine leasehold interest in which ConEd would bear the benefits and burdens of a lease transaction."); *BB&T Corp.*, 523 F.3d at 473 ("[T]he transaction does not allocate BB&T and Sodra's rights, obligations, and risks in a manner that resembles a traditional lease relationship."); *AWG Leasing Trust*, 592 F. Supp. 2d at 982 ("The Plaintiffs have failed to show that they enjoy the benefits or carry the burdens of owning a depreciable interest in the Facility."); *see also Altria Grp., Inc.*, 658 F.3d at 290 ("A reasonable jury could find that Altria did not retain assets of value at the end of the sublease terms; did not retain either the upside potential for economic gain or the downside risk of economic loss; and did not retain significant control over the facilities."); *see also Wells Fargo & Co.*, 641 F.3d at 1330.

Hotly-debated in these cases was how to evaluate the purchase options in terms of their impact on who, in substance, should be viewed as owning the subject properties.  The taxpayers in all these case argued – as UBC originally did here – that the purchase option factored into the substance-over-form calculus only if it was "certain" to be exercised.[35]  Each of the courts made short shrift of that assertion, finding instead that the relevant standard was whether a prudent investor in the taxpayer's position would have "reasonably expected" that the tax indifferent entity would exercise the purchase option.[36]  As the Federal Circuit well-explained in *Wells Fargo* –

> We have never held that the likelihood of a particular outcome in a business transaction must be absolutely certain before determining whether the transaction constitutes an abuse of the tax system.  The appropriate inquiry is whether a prudent investor in the taxpayer's position would have reasonably expected that outcome.  Characterization of a tax transaction based on a highly probable outcome may be appropriate, particularly where the structure of the transaction is designed to strongly discourage alternative outcomes.

---

[35]  *See Consol. Edison Co. of New York*, 703 F.3d at 1376 ("ConEd mistakenly argues that, under *Wells Fargo*, the purchase option is significant only if it is 'certain' to be exercised."); *Altria Grp.*, 658 F.3d at 287 ("Altria argues that 'a purchase option may negate the residual value factors of ownership in only two circumstances: when a purchase option is *certain* or *virtually certain* to be exercised, as of the closing date of the transaction; or when the purchase price is set at a nominal or bargain level below fair market value.'"); *see also Wells Fargo*, 641 F.3d at 1329 ("Wells Fargo highlights statements of expert witnesses that Belgacom's exercise of the repurchase option was not completely assured at the outset of the transaction."); *BB&T Corp.*, 523 F.3d at 469 ("Sodra has professed uncertainty as to whether it will exercise its purchase option, and BB & T maintains that as a result, any of the options made possible by the transaction *could* become a reality at the close of the Basic Lease Term." (emphasis in original)); *John Hancock Life Ins.*,  141 T.C. at 57 ("[W]e find petitioners' inevitable standard to be similar to both a compulsion and certainty standard.").

[36]  *See Consol. Edison Co. of New York*, 703 F.3d at 1376 ("In our view, and consistent with *Wells Fargo*, therefore, the 'critical inquiry' is whether ConEd 'could have reasonably expected that the tax-[indifferent] entit[y] would exercise [its] repurchase option[].'") (quoting *Wells Fargo*, 641 F.3d at 1327); *Altria Grp.*, 658 F.3d at 288 (rejecting "certain or virtually certain" standard and approving jury's consideration of "the likelihood that the tax-indifferent entity would exercise its fully-funded purchase option"); *John Hancock Life Ins. Co.*, 141 T.C. at 57 (adopting a "reasonable likelihood" standard); *see also Wells Fargo*, 641 F.3d at 1325-27; *BB&T Corp.*, 523 F.3d at  469 (rejecting plaintiff's contention that the fact that the tax-indifferent entity *could* decide not to exercise the purchase option is determinative, even though plaintiff acknowledges that the most likely scenario is that the tax-indifferent entity exercises the purchase option).

641 F.3d at 1325-26. Commenting on this passage in *Consolidated Edison*, the Federal Circuit more recently stated that "[t]his language makes clear that a 'reasonable expectation' standard, rather than a 'certainty' standard, governs the recharacterization of transactions under the substance-over-form doctrine." 703 F.3d at 1376. "In our view, and consistent with *Wells Fargo*," the court concluded, "'the critical inquiry' is whether [the taxpayer] 'could have reasonably expected that the tax-indifferent entity would exercise its repurchase option.'" *Id.* (quoting *Wells Fargo*, 641 F.3d at 1327).

## B.

This court, of course, must follow the precedential holdings of its reviewing court. *See Coltec Indus.*, 454 F.3d at 1353. And it is all the more inclined to do so here, as the holdings in question enjoy wide acceptance. So, the basic question here, at least insofar as the rent deduction is concerned, focuses on whether a prudent investor in UBC's position would have reasonably expected Anaheim to exercise the purchase option and buy out UBC's Head Lease interest? The record resoundingly answers that question – and the answer is "yes."

UBC has failed to establish that Anaheim's exercise of the Purchase Option is not the reasonably-expected outcome here. The structure of the transaction, albeit carefully wrought to disguise this result, belies such a conclusion. As UBC's internal analysis of the Pond LILO reflected, the money needed by Anaheim to exercise the purchase option was set aside, at closing, in the equity defeasance accounts. Under the Debt PUA, in the event Anaheim elects the purchase option, AIG-FP Special Finance is required to make payments that will go to AIG-FP Funding to wipe out the AIG-FP loan associated with the transaction. This is strong evidence that the Purchase Option was likely to be exercised – and something that a reasonable investor in UBC's position should have known.[37] *See Consolidated Edison*, 703 F.3d at 1378-79; *Wells Fargo*, 641 F.3d at 1328; *Altria*, 658 F.3d at 287; *BB&T*, 523 F.3d at 473 n.13.

But, what happens if Anaheim does not exercise the option? Plaintiff claims that if Anaheim decided that the Pond was not worth the option price, it could walk away with the defeasance funds to use for other purposes. But, this is untrue. If Anaheim failed to exercise the Purchase Option, UBC could require Anaheim to continue to sublease the Pond by exercising the Sublease Renewal Option. If that happens, Anaheim is required to maintain the debt and equity defeasance to continue to secure the rent and loan repayments. Or UBC could elect the Successor Sublease Option or the Return Option, thereby leaving Anaheim to bear a variety of significant costs, including defeasing the entirety of the remaining COPS Certificate obligations.

---

[37] A preponderance of the evidence suggests that UBC's advisor in the transaction, its sister company, BTM Capital, knew this. BTM conducted annual reviews of UBC's transactions and provided them to UBC. While, in those reviews, the relevant BTM officials were apparently careful never to indicate expressly that they expected the Purchase Option to be executed in the Pond LILO, they had no such qualms as to the earlier Misoxer LILO. As to the latter transaction, BTM observed that the "fully defeased" structure of that transaction "protects equity investments and compels a purchase of the facility."

In general, then, under the non-purchase options, Anaheim would lose the ability to use or control the facility, but still be on the hook for significant financial obligations – a lose-lose proposition. Accordingly, as in *Wells Fargo*, the LILO here was "designed to strongly discourage alternative outcomes" to exercising the Purchase Option. *Wells Fargo*, 641 F.3d at 1326. At the least, the risks posed by these alternatives add weight to the view that, to avoid economic uncertainty, Anaheim would be inclined to use the fully-funded Purchase Option and assume control over the Pond. *See John Hancock Life Ins.*, 141 T.C. at 59-62 (discussing similar considerations in finding that purchase option in LILO was likely to be exercised).[38]

    In concluding that a prudent investor in UBC's position would have reasonably expected Anaheim to exercise the pre-funded Purchase Option, the court also is mindful of the strong and strategic civic ties Anaheim has to the facility in question. The property subject to the Head Lease here is neither a hydroelectric plant in the wilderness, nor locomotives or rail cars on a spur somewhere, nor some other form of lesser-known corporate property hidden behind a fence, but rather a highly-visible, public arena – one acquired with public financing which currently houses a professional hockey team that bears the City's name on its sweaters (Anaheim Ducks). Like those sweaters, the Pond serves as an emblem of civic pride, a major hub of economic activity in Anaheim – and, indeed, was built upon the premise that it would be just such an economic engine. The evidence suggests that civic considerations like these could be expected to weigh heavily on the collective minds of the mayor and City council making the option decision, elected officials who, more likely than not, will not want to be viewed as walking away from a public asset – particularly, given the possibility that, if it fails to exercise the purchase option, Anaheim will be forced to rent the arena it built from the bank. *Cf. John Hancock Life Ins.*, 141 T.C. at 59 (finding that noneconomic considerations would not cause a railway to exercise purchase option for rail yard, but concluding that option was likely to be invoked based on economic considerations). Even plaintiff's stadium expert begrudgingly acknowledged the impact of these considerations.[39] Moreover, there is ample evidence that Anaheim wanted to

---

    [38] The court found the testimony of defendant's leasing expert, Paul Bent, persuasive on this point. He testified that the structure of the transaction was intended to eliminate any real risk of UBC losing its investment. He observed that the risks investors face in typical leveraged leasing – for example, a loss due to a credit downgrade for the city or to the failure of the management company to properly maintain the facility – were not present in the Pond LILO, owing to a variety of features, including the way in which the transaction was defeased. Bent opined that the fact that Anaheim would not have to use any of its own funds to exercise the Purchase Option was key in his assessment that Anaheim was likely to exercise that option. He found that the three alternatives to the Purchase Option were "more detrimental to the City long term," adding that Anaheim would have "no interest in extending [the transaction] for another 20, 23 years beyond the time of the sublease purchase option" since it had already reaped all of the benefit – the $4 million initial payment – that it was going to derive from the transaction.

    [39] That expert, James Bailey, was the executive vice president for the Cleveland Browns at the time that one Arthur Bertram Modell moved that storied franchise to Baltimore for the 1996 season. Bailey thus is well-schooled in the disastrous consequences that can befall a city

maintain some control over the Pond throughout the transaction to ensure that this "very important asset and investment would be protected and the City could help control future operations and enhance opportunities to attract tenants and events" – a desire that suggests that the City would take advantage of a fully-funded purchase option rather than cede control over the facility to UBC.[40]

Also revealing is how UBC and Anaheim internally accounted for the transaction.  For book pricing purposes, UBC reflected only the Purchase Option scenario, and did not analyze any of the alternatives – for example, its books reflected no economic benefit from the "shirttail" period that would arise if the Sublease Renewal Option were exercised.  More importantly, for book purposes, it assigned the Pond LILO a zero residual value.[41]  As persuasively described by one of defendant's experts, this entry was "highly unusual" (except perhaps for LILO deals) and signified that "this deal was engineered and structured without regard to the competitive environment."[42]  A similar view of the Purchase Option is reflected in Anaheim's recordkeeping.  To be sure, UBC's tax counsel took great pains to keep Anaheim from espousing a public position on whether it would invoke the option, going so far as to require Anaheim to sign a tax indemnity agreement that held the City responsible if UBC lost tax benefits because the City took a public position on the option.  But this agreement could not prevent Anaheim from accurately reporting the transaction in its annual financial reports prepared by the City's Department of Finance – and those reports, which were required by the City Charter,[43]

_____

that loses a professional sports team.  Based on that experience, he admitted that Anaheim would have different incentives than UBC in keeping the Ducks playing in the Pond, agreeing that "retaining sport franchises is often more important than economic considerations to a city."  He also noted that Anaheim was likely to be more concerned than UBC with the ancillary economic benefits that the Pond would have on the surrounding area, thereby confirming, in the court's mind, that synergies might be lost if the Pond were maintained, but privately controlled.

[40]  The quoted language comes from the minutes of an Anaheim City Council meeting held on November 4, 2003, which discussed the impact of the Covanta bankruptcy.  However, documents more contemporaneous with the initiation of the LILO, as well as testimony given by Anaheim's former city manager, reflect similar sentiments.

[41]  While Markowitz disputed this, other of plaintiff's witnesses, including, Dr. Ellis, did not.  Moreover, a variety of UBC documents in the record (including certain portfolio review documents completed by bank officials) confirms this fact.

[42]  Bent agreed that "a zero residual mean[s] that an equity investor, in order to achieve a return of and on its investment, need only look to the rents in the transaction and no residual."

[43]  The introduction to these reports typically stated as follows:

In accordance with the Charter of the City of Anaheim (City), we are submitting the Comprehensive Annual Financial Report (CAFR) for the fiscal year ended June 30, 2005.  Responsibility for both the accuracy of the data and the completeness and fairness of the presentation, including all disclosures, rests with

telegraphed Anaheim's true intentions, repeatedly emphasizing that the Purchase Option was fully-funded and relying on that fact in excluding various potential liabilities from the City's financial statements.[44]  Anaheim's financial advisor, Babcock & Brown was also aware that the exercise of the purchase option was likely, stating in a  message to Anaheim's Director of Finance at the time of the transactions, the "buyout option which allows the City to purchase Union Bank's position . . . is the expected case."  In short, UBC and Anaheim internally evaluated and reported the transaction based on the assumption that Anaheim would exercise the Purchase Option.

Seeking to snatch at least some substance from the void, UBC heavily relies on the Deloitte appraisal performed at the time of the transaction to demonstrate that a prudent investor would not have reasonably expected the Purchase Option to be exercised.  But, plaintiff conveniently overlooks the limited basis upon which that appraisal was admitted into evidence – not as an expert opinion, mind you, but rather only as a historical document that was part of the LILO transaction documents.[45]  This distinction is significant, as the opinions and supporting details in this report were stale, making them more difficult to rebut.  Despite this, there is strong

---

the City.  We believe the data, as presented, is accurate in all material aspects; that it is presented in a manner designed to fairly set forth the financial position and results of operations of the City, as measured by the financial activity of its various funds; and that all disclosures necessary to enable the reader to gain maximum understanding of the City's financial activities have been included.

[44]  For example, in various annual reports, the city described the Pond LILO thusly –

On January 26, 1999, the City entered into a series of lease transactions for the Arrowhead Pond of Anaheim. . . .  At the end of the sublease, the City has a purchase option to purchase the trustee's rights under the lease for a fixed amount.  The advance rent payments to the City were deposited into a trust fund and invested.  The cash scheduled to be available from this trust fund is sufficient to pay the City's rent payments for the term of the sublease and to exercise the City's purchase option at the end of the sublease. . . . The City's obligations under the lease transactions are considered to be defeased in substance, and therefore the related liabilities as well as the trust assets have been excluded from the City's financial statements.

The last sentence in this description is particularly telling as it suggests that if the City felt that any of the other options under the Sublease could be exercised, it would be required to disclose the liabilities that would be associated with that decision.  And the reports did not do that.

[45]  During the trial, the court pointedly asked plaintiff's counsel:  "But you are not relying on the appraisal report as current evidence that would indicate the appraisal was correct now, in other words."  To which he responded, "[n]o."

evidence that the Deloitte appraisal was little more than a boilerplate effort, destined to fulfill a single purpose – to validate the deductions sought under the transaction.[46]

Viewed as a predictor of Anaheim's future actions, the appraisal suffered from a variety of flaws. For one thing, the Deloitte report focused not on whether Anaheim would be likely to exercise the Purchase Option, but rather on whether it would be economically compelled to do so. The appraisal thus has limited value in resolving the question presented here. Moreover, even with its limited focus, the appraisal appeared to adopt key assumptions that were geared to devalue the residual value in the Head Lease in order to make the Purchase Option price seem unreasonably high.[47] *Inter alia*, the Deloitte appraisal failed to consider the pre-funded nature of the Purchase Option, failed to monetize the costs to Anaheim of not exercising that option,[48] and failed to consider the non-economic impact on Anaheim (*e.g.,* the impact of civic pride or voter perception) of failing to exercise that option. (Indeed, Deloitte was specifically asked to consider the non-economic factors impacting on the Purchase Option analysis, but refused to do so). In *Consolidated Edison*, these same sorts of deficiencies were cited by the Federal Circuit in holding that another Deloitte appraisal failed to validate the taxpayer's claim that a prudent investor would not have reasonably expected the purchase option there to be exercised. *Consolidated Edison*, 703 F.3d at 1378-79; *see also Altria*, 658 F.3d at 288; *BB&T*, 523 F.3d at 473 n.13 (finding that a similar Deloitte appraisal "does not reflect the economic reality of the transaction"); *John Hancock Life Ins.*, 141 T.C. at 62 (rejecting appraisal in favor of other economic considerations). Given all this, it should come as little surprise that neither UBC, BTM, nor Anaheim appear to have given much credit to the Deloitte appraisal in internally

---

[46] In *Consolidated Edison*, the Federal Circuit noted the "boilerplate" nature of the Deloitte appraisals in LILO transactions, observing that Deloitte had done "on 'the order of magnitude' of 100 appraisal reports of LILO transaction and never found that there was 'economic compulsion' to exercise a purchase option." 703 F.3d at 1379-80 (quoting trial testimony in that case). Similar testimony was produced in this case.

[47] The Deloitte appraisal concluded that the exercise of the Purchase Option would require Anaheim to pay over $176 million (the value of the Purchase Option and the forfeiture of the deferred rent) for an asset estimated to be worth less than $164 million. While there may be other problems with these numbers, *see Wells Fargo*, 641 F.3d at 1327 (discussing Deloitte's use of an improper discount rate that undervalued the leased asset), the more fundamental issue with this comparison is what it includes *vel non* on the two sides of the equation. In terms of the option price, Deloitte included the deferred Head Lease rent that Anaheim would eventually owe itself, thereby overstating the cost of exercising the option. Conversely, in deciding the economic benefits of exercising the Purchase Option, Deloitte conveniently ignored the costs that Anaheim might incur if it does not exercise that option, thereby understating the value of exercising the option. As it had done in a hundred or so similar "appraisals," Deloitte thus decidedly slanted its findings toward a predetermined result.

[48] As discussed above, these included the cost of defeasing the COPS and making the expenditures needed to ensure that the Pond met the standards specified in the return provisions.

concluding that the exercise of the purchase option was the most likely result here.  In fact, the record reveals that the participants in the Pond Transaction did not even receive a final copy of the appraisal until after the transaction had closed.

Are there some risks for UBC under the Pond LILO transaction?  Undoubtedly.  One need only look at the well-known economic history of AIG – the entity that managed the defeasance accounts here – to realize that UBC was not absolutely insulated from all forms of loss.  But, as the Federal Circuit has made quite clear in its analysis, the question here is not whether UBC was at risk if there was a once-in-a-century economic upheaval (or, for that matter, if the Pond was destroyed by a biblical flood or a superbolide meteor).  If such events were viewed as introducing enough risk to give LILOs substance, *every* transaction – including those rejected in *Consolidated Edison* and *Wells Fargo* – would pass muster.  *See Swift Dodge v. Comm'r of Internal Revenue*, 692 F.2d 651, 654 (9th Cir. 1982).  Nor does plaintiff's freewheeling speculation regarding what might happen if one of the parties filed for bankruptcy add anything of real substance to this analysis.[49]  Rather, the question is whether, given the way this LILO was carefully structured, it was more likely than not, in a reasonable economic world, that the pre-funded Purchase Option would be exercised.  And the simple fact is that if each of the parties to the transaction in question fulfilled their obligations under the transactional documents – as was reasonably-expected at the time the transaction in question closed – UBC risked nothing.  As a consequence, it should not be allowed the hundreds of millions of dollars in tax deductions that it essentially bought from Anaheim here.

---

[49]  Throughout its briefs, plaintiff makes dooms-day assumptions regarding what would happen if one or more of the parties involved in the Pond Transaction declared bankruptcy.  But, plaintiff provided no evidence to support these claims.  Perhaps that is not surprising, as it turns out to be fairly difficult to predict what would happen if AIG or one of the banks here filed for bankruptcy reorganization under chapter 11 of the Bankruptcy Code, or if Anaheim filed for protection under chapter 9 of that Code.  A cursory review of the bankruptcy laws suggests that plaintiff's concerns are overdrawn.  For example, plaintiff seems to assume that, in the event of a bankruptcy, Anaheim could stonewall its creditors and eventually walk away from the Pond Transaction.  But, while the automatic stay provisions of section 362 of the Code are applicable in chapter 9 cases, *see* 11 U.S.C. §§ 362(a), 901(a), section 922(d) of the Code limits the stay in terms of its impact on various municipal financial transactions, including the city's use of pledged funds.  *See* 11 U.S.C. § 922(d).  Likewise, section 904 of the Code severely limits the ability of bankruptcy courts to interfere with a municipal debtor's use of its property and revenues.  *See* 11 U.S.C. § 904.  While plaintiff may be willing to assume the worst in regards to the operation of these bankruptcy provisions, the court is not.  Proof is required, and that proof is lacking.

Indeed, it should not be overlooked that when Covanta, then the manager of the Pond, filed for bankruptcy in 2002, the structure of the Pond Transaction protected UBC, which suffered no loss (other than having to add to its reserves).  This was as expected – an internal UBC memo regarding the Covanta bankruptcy noted that the worst case scenario stemming from the bankruptcy was a "book loss (not economic loss)."

In sum, as the Federal Circuit found in *Wells Fargo* and *Consolidated Edison*, the economic effects of repurchasing the asset were so desirable, and the alternatives to repurchasing that asset so odious, as to make it more likely than not that Anaheim would exercise the Purchase Option. And, as described in numerous decisions, that finding makes plain that UBC did not have the requisite ownership interest in the Pond Head Lease to support its claimed rent deductions. [50]

## C.

Before leaving this issue, it should not be overlooked that the ultimate conclusion here would be the same even if it were more likely than not that Anaheim would fail to exercise the Purchase Option. That is so because, as is often true in transactions of this ilk, the LILO's other end-of-sublease options protected UBC from residual value risk during the asset's remaining useful life. *See Wells Fargo*, 641 F.3d at 1324. Rather, under the LILO, UBC will have already recouped its equity investment through the fixed and defeased Sublease Renewal rents before the end of the Sublease term – in other words, UBC's investment is assured of being recouped irrespective of the residual value of the property.

Nor, in this regard, is this case anything like *Frank Lyon*, as plaintiff contends. There, regulatory restrictions prevented the taxpayer bank (Worthen Bank & Trust) from financing the construction of a new building with a conventional mortgage. Worthen turned to a sale and leaseback arrangement with Frank Lyon Co. to finance its building. The arrangement did not give rise to tax benefits that the bank could not have enjoyed, but did result in a situation in which neither party "was the owner of the building in any simple sense." *Frank Lyon*, 435 U.S. at 581; *see also John Hancock Life Ins.*, 141 T.C. at 32. Nevertheless, the Supreme Court respected a transfer-and-leaseback arrangement because Worthen was exposed to a "real and substantial risk" of whether it could repay a recourse loan and could "recoup its investment." *Frank Lyon*, 435 U.S. at 576-79. The Court found that the bank thereby incurred a financial risk in the transaction – one to which it "exposed its very business well-being" – because there was "substantial risk" of loss, "not just the abstract possibility that something will go wrong." 435 U.S. at 576-77, 575; *see also Altria Grp.*, 658 F.3d at 287; *BB&T*, 523 F.3d at 474. In so concluding, the Court noted that the trial court had found that Worthen "was highly unlikely" to exercise its purchase option. 435 U.S. at 570; *see also Wells Fargo*, 641 F.3d at 1329-30. The Court acknowledged that "the facts of this case stand in contrast to many others in which the form of the transaction actually created tax advantages that, for one reason or another, could not

---

[50] It should not be overlooked that plaintiff's contrary arguments were heavily based on *Consolidated Edison Co. of New York, Inc. v. United States*, 90 Fed. Cl. 228 (2009), *rev'd,* 703 F.3d 1367 (Fed. Cir. 2013), which was reversed by the Federal Circuit in the opinion discussed above. That reversal caused plaintiff to make a late-course correction – while, in its opening briefs, it emphasized the similarities between *Consolidated Edison* and this case, after the reversal, in supplemental briefing, it now claims there are many factual differences between the two cases. Suffice to say that, plaintiff was right before – and wrong now.

have been enjoyed had the transaction taken another form."  435 U.S. at 583 n.18; *see also John Hancock Life Ins.*, 141 T.C. at 32.[51]

This case is fundamentally different for a host of reasons.  First, unlike the bank in *Frank Lyon*, the tax-indifferent entity here lacked control over the funds that were churned in the transaction.  As the Federal Circuit noted in *Wells Fargo*, "[t]he only flow of funds between the parties to the transaction was the initial lump sum given to the tax-exempt entity as compensation for its participation in the transaction," adding that "from the tax-exempt entity's point of view, the transaction effectively ended as soon as it began."  641 F.3d at 1330.[52] Further, unlike in *Frank Lyon*, the taxpayer here, UBC, retained neither a significant upside potential for economic gain nor a downside risk of economic loss.  *See BB&T*, 523 F.3d at 474; *Wells Fargo*, 91 Fed. Cl. at 78; *John Hancock Life Ins.*, 141 T.C. at 83 (finding that the circumstances of the LILO there "are very different from those of a traditional leveraged lease, and certainly far different from the transaction in *Frank Lyon*").  In *Frank Lyon*, Lyon's capital was committed to the building – "[i]ts financial position was affected substantially by the presence of this long-term debt."  *Frank Lyon*, 435 U.S. at 577.  Such is not the case here. Finally, UBC seeks to enjoy, via the form carefully given the transaction, deductions that would not be available to Anaheim.  And the Supreme Court emphasized that was not true of the three-party transaction in *Frank Lyon*.[53]  Accordingly, *Frank Lyon* avails plaintiff naught.

---

[51] Summarizing its ruling, the Supreme Court stated famously (well, at least for tax attorneys) that:

> In short, we hold that where, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties.  Expressed another way, so long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes.

*Frank Lyon*, 435 U.S. at 583-84.

[52] *See also Altria Grp.*, 658 F.3d at 289; *BB&T*, 523 F.3d at 473; *AWG Leasing Trust v. United States*, 592 F. Supp. 2d at 983.

[53] On this point, the Supreme Court observed:

> It is not inappropriate to note that the Government is likely to lose little revenue, if any, as a result of the shape given the transaction.  No deduction was created that . . . would not have been available to one of the parties if the transaction had been arranged differently.

*Frank Lyon*, 435 U.S. at 580.

In sum, even apart from the extreme likelihood that the Purchase Option will be exercised, the LILO transaction left UBC without the benefits and burdens of property ownership, requiring its ownership to be disregarded for tax purposes.  *See Altria Grp.*, 658 F.3d at 291; *Wells Fargo*, 641 F.3d at 1325; *BB&T*, 523 F.3d at 472-73; *AWG Leasing Trust*, 592 F. Supp. 2d at 981.[54]

## III.

Finally, the court must decide whether UBC is entitled to its interest deductions under section 163(a) of the Code.  "To achieve such deductions," the Federal Circuit recently opined, "the taxpayer must incur 'genuine indebtedness' associated with the LILO transaction." *Consolidated Edison*, 703 F.3d at 1381 (quoting *BB&T*, 523 F.3d at 475).[55]  Whether payment constitutes "interest" on genuine "debt" again depends upon the substance, not the form of the transaction.  *Knetsch v. United States*, 364 U.S. 361, 365-66 (1960); *BB&T*, 523 F.3d at 475; *Goldstein v. Comm'r of Internal Revenue*, 364 F.2d 734, 740 (2d Cir. 1966).  Here, as will be seen, the debt incurred by UBC was, in substance, decidedly not genuine, deriving from circular transactions largely with the subsidiaries of a single entity – transactions in which UBC's loan was paid with the proceeds of the same loan.

There is little of substance (or even form) to distinguish the "debt" here from that which led the courts to deny interest deductions in *Wells Fargo* and *Consolidated Edison*.  The Federal Circuit described the debt at issue in *Wells Fargo*, noting that it –

---

[54]  As this court said in comparing the SILO transaction in *Wells Fargo* to the leasing transaction in *Frank Lyon*:

> This case is very different from *Frank Lyon*, where the lessee had renewal options, but the exercise of the options was at the lessee's unconstrained choice, and the taxpayer did not have the ability to impose a renewal upon the lessee.  In *Frank Lyon*, the taxpayer's investment return was dependent upon the property's value, and its initial investment was at risk if the property declined in value.  As the Supreme Court observed, the lessee in *Frank Lyon* could choose not to exercise its renewal options and "walk away" from the property at the end of the lease-back.  *Frank Lyon*, 435 U.S. at 583, 98 S.Ct. 1291.  The taxpayer thus was "gambling" that the rents it might otherwise obtain after the lease-back would be sufficient to "recoup its investment."  *Id*. at 579, 98 S.Ct. 1291.

*Wells Fargo & Co. & Subs. v. United States*, 91 Fed. Cl. at 78.

[55]  Interest payments associated with genuine indebtedness are viewed as "compensation for the use or forbearance of money."  *Deputy v. du Pont*, 308 U.S. 488, 498 (1940); *cf. Frank Lyon Co.*, 435 U.S. at 581.

> is used to make the tax-exempt entity's sublease rental payments. Money never actually changes hands during a rental payment; the lender's affiliate simply moves funds from the tax-exempt entity's debt portion to the lender's account in an amount sufficient to service the taxpayer's nonrecourse loan debt.

641 F.3d at 1321. Relying on this characterization, the Federal Circuit disallowed the interest deductions generated by the SILO's "loop debt" because that debt stemmed from "purely circular transactions that elevate form over substance" and "existed only on a balance sheet." *Id.* at 1321, 1330; *see also Wells Fargo v. United States*, 91 Fed. Cl. 35, 40, 80-81 (2010) (discussing this issue). That same court reached the identical conclusion in *Consolidated Edison*, finding that the loop debt structure used in that LILO was indistinguishable from that found to be not genuine in *Wells Fargo. Consolidated Edison*, 703 F.3d at 1381.

The debt here was circular, as well. Here, on the day of the closing, the following carefully-scripted steps occurred: (i) AIG-FP Investment provided $93.1 million to AIG-FP Funding, which funds were used to make the AIG-FP loan to UBC and were placed in the Debt Account; (ii) AIG-FP Funding assigned the Debt Account to State Street (trustee of UBC); (iii) State Street assigned the Debt Account to Anaheim; (iv) Anaheim assigned the Debt Account (containing the loan proceeds) to AIG-FP Special Finance; and (v) AIG-FP Special Finance assigned the Debt Account (with the $93.1 million still there) back to AIF-FP Investment, placing the money back where it started. Accordingly, as was true in *Wells Fargo*, "all of the loan proceeds in the [LILO] were immediately returned to an affiliate of the lender, acting as debt payment undertaker, and then to the common parent, the original source of the funds." *Wells Fargo*, 91 Fed. Cl. at 80. To make sure this transaction worked as planned, other protections were added – for example, the transfer from Anaheim to AIF-FP Special Finance was irrevocable. Moreover, the looping nature of these offsetting transactions makes questions regarding the adequacy of the collateral (and whether, in particular, the loan amount was less than the value of UBC's interest in the Pond) quite irrelevant. Rather, as noted by the Second Circuit, "[t]he defeasance arrangements ensured that the funds remained, throughout the period of the loan, under the lender's effective control." *Altria*, 658 F.3d at 291; *see also AWG*, 592 F. Supp. 2d at 990-93. And that result, of course, was exactly what was intended. *Cf. Consolidated Edison*, 703 F.3d at 1381.

As in *BB&T*, AIG "which treated the loan as an off-balance sheet transaction, did not forbear any money during the time period in which [UBC] sought to claim interest deductions." 523 F.3d at 476; *see also Altria*, 658 F.3d at 290-91 ("The evidence . . . reasonably supported the jury's finding that the nonrecourse debt Altria incurred was not genuine. The lender never forbore use of the purportedly loaned funds and Altria never obtained use of those funds."); *Hines v. United States*, 912 F.2d 736, 741 (4th Cir. 1990). Applying the line of existing Federal Circuit precedent on this point, the court thus agrees that "[a] party simply does not incur genuine indebtedness by taking money out of a bank and then immediately returning it to the issuing bank." *Consolidated Edison*, 703 F.3d at 1381; *see also BB & T*, 523 F.3d at 477; *Wells Fargo*, 91 Fed. Cl. at 81. UBC is not entitled to its interest deductions under § 163(a).

## IV.

The court need go no further.[56]  Unlike the nobles in Hans Christian Andersen's famous fable, the court will not pretend to see something that is not there.[57]  In that story's denouement, a little child witnessing the Emperor's parade cries out to his father:  "But he has nothing on!"[58]  Viewed through the prism of *Consolidated Edison* and *Wells Fargo*, the transaction here is likewise revealed to be naked of the requisite substance.  Despite plaintiff's valiant attempt to weave cloth out of diamonds, it has not shown otherwise.

Based on the foregoing, the court concludes that plaintiff is not entitled to the refunds requested.  The Clerk is directed to enter judgment dismissing plaintiff's complaint.[59]

**IT IS SO ORDERED.**

s/Francis M. Allegra
Francis M. Allegra
Judge

---

[56]  The court has considered the remainder of plaintiff's arguments and does not find them persuasive.  Based on its findings regarding the substance-over-form doctrine, the court need not consider whether the Pond Transaction ran afoul of the economic substance doctrine.

[57]  *See* Hans Christian Andersen, The Emperor's New Clothes in Folk-Lore & Fable 237 (The Harvard Classics 1937).  (Perhaps given the name of the arena here, plaintiff hoped that its tax story would turn out more like that of the swan in another Andersen fairy tale.  *See* The Ugly Duckling (1843)).

[58]  The Emperor's New Clothes, *supra*, at 238.

[59]  This opinion shall be published, as issued, after October 22, 2013, unless the parties identify protected and/or privileged materials subject to redaction prior to that date.  Any such materials shall be identified with specificity, both in terms of the language to be redacted and the reasons for each redaction (including appropriate citations to authority).

